**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

HELEN                                    BHASKER,

                    Plaintiff,

     vs.

KEMPER     CASUALTY     INSURANCE
COMPANY,     UNITRIN     SPECIALTY
FINANCIAL     INDEMNITY     COMPANY,
FINANCIAL  INDEMNITY  COMPANY, ELITE
FINANCIAL INSURANCE and NOELLA LUNA
SUCET,

                   Defendants

.

**CASE NO. 17-CV-00260**

**NOTICE OF REMOVAL**

Defendant Financial Indemnity Company ("Defendant") hereby removes to this Court the

state court action described below.  This removal is proper under the Class Action Fairness Act

("CAFA"), 28 U.S.C. § 1332(d), 28 U.S.C. § 1441 (a) and (b), and 28 U.S.C. § 1453, because this

is a putative class action with more than 100 putative class members that seeks to recover more

than $5,000,000.

<strong>NATURE OF THE CASE</strong>

1.      Plaintiff filed this lawsuit on December 30, 2016, in the New Mexico Second

Judicial District Court, County of Bernalillo, entitled *Helen Bhasker v. Kemper Casualty Insurance

Company*, *et al.,* Case No. D-202-CV-2017-00024.  Defendant was served on January 26, 2017.

2.      Plaintiff alleges that, on July 14, 2011, Defendant provided her with a New Mexico

Auto Application ("NMAA"), and she was thereafter issued an auto insurance policy with

underinsured motorist ("UIM") coverage limits of $25,000 per person and $50,000 per accident. (Exhibit A, Compl., ¶¶ 15, 41.)

3.      According to Plaintiff, the NMAA and policy failed to fully inform her about the New Mexico statutory offset law set forth in NMSA 1978, § 66-5-301, whereby UIM coverage is offset by the amount of the tortfeasor's liability coverage.  (*Id.*, ¶¶ 17-22.)

4.      Plaintiff alleges she paid a premium for UIM coverage, but that Defendant failed to inform her of the purportedly limited scenarios in which Plaintiff would benefit from the purchase of minimum limits (*i.e.,* limits of $25,000 per person/$50,000 per accident) UIM coverage.  (*Id.*, ¶¶ 21-22.)

5.      Plaintiff alleges she was injured in a June 24, 2015 accident with an at-fault driver, Martinez, who was an underinsured motorist.  (*Id.*, ¶¶ 23-29.)  According to Plaintiff, she received the full extent of Martinez' liability coverage.  (*Id.*, ¶ 30.)  Plaintiff alleges Defendant denied her claim for UIM coverage, even though she paid a premium for that coverage, because her UIM limits were offset by the torfeasor's bodily injury liability limits.  (*Id.*, ¶¶ 43-45.)

6.      According to Plaintiff, Defendant failed to fully inform its insureds that New Mexico is a "difference state," and that "a purchase of 25/50 UIM coverage, when triggered by a crash with a tortfeasor who has 25/50 liability limits, will result in a payment of premium for which no payment of benefits will ever occur."  (*Id.*, ¶¶ 49-52.)

7.      Plaintiff seeks to represent the following putative class:

> All persons (and their heirs, executors, administrators, successors, and assigns) who, in the prior six years from the date of filing of this complaint, were a policyholder and/or insured, of a Motor Vehicle Policy issued by defendants where that policy did not and does not provide UIM coverage paid for by the policyholder, and sold and solicited by the defendants, due to the application of an offset as set forth in NMSA 66-5-301, otherwise,

known as the New Mexico statutory offset law or being a "difference state".

(*Id.,* ¶ 56.)

8.     Plaintiff asserts the following causes of action:  Count I: Violations of the New Mexico Unfair Trade Practices Act; Count II:  Violations of the Trade Practices and Frauds Act and the Insurance Code; Count III:  Breach of Contract and Claim for Underinsured Motorists Coverage; Count IV:  Breach of the Covenant of Good Faith and Fair Dealing; Count V:  Injunctive Relief; Count VI:  Declaratory Relief; and Count VII:  Punitive Damages.  (*Id.,* pp. 12-19.)

9.     Accordingly, Plaintiff seeks to recover, from Defendant, compensatory damages, punitive damages, treble damages, declaratory relief, injunctive relief, and attorneys' fees.  (*Id.,* pp. 19-20.)

## I.     ALL THE REQUIREMENTS FOR REMOVAL UNDER CAFA ARE SATISFIED.

**Class Action.**

10.     This lawsuit is a class action as defined by 28 U.S.C. § 1332(d)(1)(B).  CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  *Id.*  Plaintiff titles her Complaint a "Class Action Complaint," and expressly seeks certification of a class of New Mexico insureds.  (Exhibit A, Compl, ¶ 56.)  As such, this action is brought on behalf of a class as defined by CAFA.

**Diversity of Citizenship.**

11.     At the time this lawsuit was filed and as of the date of this Notice of Removal, a member of the proposed class of plaintiffs and a defendant are citizens of different states, satisfying the minimal diversity requirement of 28 U.S.C. § 1332(d)(2)(A).  At the time this lawsuit was filed

and as of the date of this Notice of Removal, the Defendant is alleged to be a non-New Mexico entity and in fact is a non-New Mexico citizen. (Exhibit A, Compl., ¶¶ 6-8; Declaration of James Hammel ("Hammel Dec."), attached hereto as Exhibit B, ¶ 6.) And, at the time of the commencement of this action and as of the date of this Notice of Removal, the named plaintiff, Helen Bhasker, was alleged to be and is a citizen of New Mexico. (Exhibit A, Compl., ¶ 4.)

**Amount in Controversy.**

12.     CAFA confers original jurisdiction to the district courts "of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which -- any member of the class of plaintiffs is a citizen of a State different from any defendant." *Baumann v. Chase Inv. Services Corp.*, 747 F.3d 1117, 1120 (9th Cir. 2014) (*quoting* 28 U.S.C. § 1332(d)(2)-(A)); *Arguedas v. Seawright*, No. CIV 13-00565 KG/KK, 2015 WL 11089508, *2 (D.N.M. June 3, 2015) (same principle).

13.     The amount in controversy is "not proof of the amount the plaintiff will recover. Rather, it is an estimate of the amount that will be put at issue in the course of the litigation." *McPhail v. Deere & Company*, 529 F.3d 947, 956 (10th Cir. 2008). As the Tenth Circuit recently stated, "the question at this stage in the proceedings isn't what damages the plaintiff will *likely* prove but what a factfinder *might* conceivably lawfully award. And on that question -- the only legally salient question before us -- no one has identified any legal impediment precluding a jury from finding all 312,000 persons entitled to relief. At the end of the day, [e]ven if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy, this does not meet the legally impossible standard." *Hammond v. Stamps.com, Inc.*, 844 F.3d 909, 912 (2016) (emphasis in original, citation and internal quotation omitted). *See also Valdez v. Metro.*

*Prop. & Cas. Ins. Co.,* 867 F. Supp. 2d 1143, 1163-64 (D.N.M. 2012) ("The amount-in-controversy requirement is an estimate of the amount that will be put at issue in the course of the litigation.") (citation and internal quotation omitted).

14.     A defendant seeking to remove under CAFA must show that the amount in controversy exceeds $5,000,000 by a preponderance of the evidence. *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1246 (10th Cir. 2012). A defendant may establish jurisdictional facts by either the allegations in the complaint or affidavits or other evidence submitted in federal court. *McPhail*, 529 F.3d at *Id.* at 955-56. There are several ways this can be done: "by contentions, interrogatories or admissions in state court; by calculation from the complaint's allegations[;] by reference to the plaintiff's informal estimates or settlement demands[;] or by introducing evidence, in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands." *Frederick*, 683 F.3d at 1247 (quoting *McPhail,* 529 F.3d at 954).

15.     For example, in *Barreras v. Travelers Home & Marine Ins. Co.,* No. 12-CV-0354 RB/RHS, 2012 WL 12870348, *3 (D.N.M. Oct. 17, 2012), the plaintiffs alleged they were not advised of their UM/UIM options and had not signed a waiver of UM/UIM coverage. The plaintiffs filed a lawsuit seeking to recover for what they deemed a wrongful and bad faith scheme by defendants to deny UM/UIM coverage. The court explained:

> Plaintiffs allege that the entire class lacks UM/UIM coverage. (*See* Doc. 1 Ex. A at 6, 8). Plaintiffs seek reformation of their insurance policies, presumably to include UM/UIM coverage. (*See id.* at 16). In New Mexico, the minimum limit of UM/UIM coverage is $25,000 for injury or death of one person as the result of an accident and $50,000 for injury or death of two or more persons as the result of an accident. N.M. STAT. ANN. § 66-5-215(A) (West 2012). Because the coverage increases by up to $50,000, the total value of the reformation to the plaintiffs would be $50,000 per

policy, for a total of at least $5,000,000.  Even assuming that the coverage increase is only $25,000 per policy for a total of at least $2,500,000, aggregating that amount with the potential punitive damages award and attorneys' fees would satisfy the amount in controversy requirement.

16.   In *Stanforth v. Farmers Ins. Co. of Arizona*, No. CV 09-1146 RLP/RHS, 2010 WL 11437167, *3 (D.N.M. Apr. 22, 2010), the plaintiffs alleged the Defendants wrongfully induced them to reject stacked UIM coverage.  The court explained:

> Defendants have advanced three methods of calculating damages to reach the jurisdictional requirement of $5,000.000.  One method I will term the household average calculation.  In support of this calculation, the Notice of Removal included affidavit testimony establishing that during the relevant period before the court, there were 87,020 households with Farmers' auto coverage for some period of time, of which 10,178 had no UM/UIM coverage.  For those with some UM/UIM coverage (76,842 households), Farmers paid a total of $41,055,371 on 3,407 UM/UIM claims, for an average of $524 per household.  Defendants assert that is reasonable to estimate that the accident rate for those insureds with no UM/UIM coverage would be the same as for those with coverage.  They then apply the average UM/UIM recovery to the households with no coverage, and arrive at an amount in controversy of $5,435,052.  I find this method to be reasonable, nonspeculative, and substantiated by the record.

*Id.* (footnote omitted).

17.   In *Valdez*, the plaintiffs brought a class action against six insurance companies and one insurance agency, seeking declaratory and injunctive relief based on allegations that defendants failed to provide them and other class members with full and adequate information about their legal options when buying uninsured motorist ("UM") coverage.  As part of the amount in controversy calculation in support of their removal notice, the defendants extrapolated the amounts at issue based on the complaint allegations and their own data to demonstrate the increased insurance coverage put at issue by the plaintiffs' claims.  For example, the court explained:

The Defendants assert that the aggregate increase in insurance coverage exceeds $1,500,000,000.00, because the increase in uninsured motorist coverage for Colorado Casualty alone is $1,470,000,000.00.  *See* Notice of Removal ¶ 32, at 13.  Brigitte Coulson, an Underwriting Consultant with Colorado Casualty, swore that she identified 4,799 Colorado Casualty policies that were issued or were in force after May 20, 2004, where uninsured motorist coverage was less than bodily injury coverage or rejected in its entirety.  *See* Coulson Aff. ¶ 9, at 2.  She calculated that the total coverage benefit to the putative class of an increase in uninsured motorist coverage would be "no less than $1.47 billion" and that when the increase in coverage is stacked per vehicle, the increase in coverage would be a benefit of "over $9 billion."  Coulson Aff. ¶ 11, at 2.  She asserted that these figures represent the "total difference" between uninsured motorist and bodily injury coverage limits "as set forth in approximately one-half of the policies that would be encompassed in the putative class (those policies in force before 2008) and would be significantly higher if the policies issued between 2008 and 2011 were included."  Coulson Aff. ¶ 11, at 2.

*Id.* at 1180-81.

18.      The court rejected the plaintiffs' contention that the defendants' calculations were "speculative," stating, *inter alia*, the "Plaintiffs do not challenge the number of policies that Coulson asserts would be affected and do not argue that it is unreasonable for retroactive reformation of six large insurance companies' policies to exceed $5,000,000.00. . . .  With at least 10,000 policies at issue and an estimated benefit of $2,000,000,000.00 between only two of the six insurer Defendants, the Court believes that the Defendants have proven jurisdictional facts that make it possible that [$5,000,000.00 is] in play."  *Id.* at 1181 (citation and internal quotation omitted).

19.      As the above cases show, it is entirely appropriate to base a removal amount-in-controversy calculation on a plaintiff's own complaint allegations and reasonable estimates and calculations of the sort relied upon here.  As in the above cases, and as will be further demonstrated below, there is no question the amount in controversy requirement is met in this case.

**Compensatory Damages.**

20.     Plaintiff's Complaint puts at issue the amount of premium Defendant supposedly wrongfully collected from its insureds for minimum UIM limits.  (*See, e.g.,* Exhibit A, Compl., ¶¶ 18-19 (alleging Plaintiff agreed to pay a premium for UIM insurance due to Defendant's failing to inform her of the effect of New Mexico's offset provision); *id.,* (alleging Defendant failed to inform Plaintiff she likely would not benefit from paying a premium for minimal UIM coverage equal to the amount of a tortfeasor's liability coverage); *id.*, ¶¶ 43-45 (alleging Defendant denied Plaintiff's claim for UIM coverage, even though she paid a premium for that coverage).

21.     As set forth in the Declaration of James Hammel, from December 30, 2010 to December 30, 2016 (*i.e.,* the six year period before the Complaint in this action was filed), in New Mexico Defendant collected approximately $919,601 in premium for combined UM/UIM coverage with respect to policies with minimum limits ("the relevant coverage").  (Exhibit B, Hammel Dec., ¶ 7.)  If Plaintiff prevails on one of her liability theories, which is that Defendant should be required to return this allegedly wrongfully collected premium, the amount in controversy for the premium component alone for the relevant coverage would be $919,601.

22.     Plaintiff also seeks damages based on Defendant's alleged failure to pay amounts supposedly due for UIM coverage.  (*See, e.g.,* Exhibit A, Compl., ¶¶  68, 76, 84, 93 (alleging Defendant wrongfully failed to pay claims for UIM coverage)).   In the minimum UIM limits context, these amounts could be up to $25,000 for each putative class member who, like Plaintiff, had minimum UIM limits of $25,000, sustained a loss in an accident with an at fault driver with bodily injury limits of at least $25,000, and either submitted a claim for UIM coverage which was

denied based on the offset of the tortfeasor's coverage, or did not even submit a claim based on the plain offset language of their policy.

23.     As set forth in the Hammel Declaration, from December 30, 2010 to December 30, 2016, there were approximately 795 claims in New Mexico where the insured had minimum UIM limits of $25,000 and Defendant did not pay UIM coverage.  (Exhibit B, Hammel Dec., ¶ 8.)  Under Plaintiff's theory that such coverage was wrongfully denied, each putative class member in this scenario could potentially recover up to $25,000 in UIM limits.  This increases the amount in controversy by $19,875,000 (*i.e.,* 795 claims X $25,000 = $19,875,000).

24.     But there may also be situations where an insured with minimum UIM limits was involved in an accident, but submitted no claim because he or she understood that New Mexico provides for an offset of the tortfeasor's liability limits, and therefore that UIM coverage would not be available.  Under Plaintiff's liability theory, these individuals would also be able to recover the above types of compensatory damages.  If that number is even 20% of the figure set forth in Paragraph 23 above, that would further increase the amount in controversy by $3,975,000 (*i.e.,* 159 X $25,000 = $3,975,000).  That increase would be $2,000,000 if the figure in this category were 10% of the figure in Paragraph 23 above (*i.e.,* 80 X $25,000 = $2,000,000).

25.     In short, when the above amounts for premium reimbursement for allegedly wrongfully collected UIM premium and payment of UIM coverage benefits allegedly wrongfully denied are calculated, the total amount in controversy here for compensatory damages alone is between $20,794,601 and $24,769,601 ($919,601 plus $19,875,000 = $20,794,601 plus $3,975,000 = $24,769,601).

**Punitive Damages.**

26.     "Punitive damages may be considered in determining the requisite jurisdictional amount." *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1218 (10th Cir. 2003). The defendant does not have to prove that the plaintiff is more likely than not to ultimately recover punitive damages, "but merely that: (1) state law permits a punitive damages award for the claims in question; and (2) the total award, including compensatory and punitive damages, could exceed $5,000,000. . . .  The defendant may point to facts alleged in the complaint, the nature of the claims, or evidence in the record to demonstrate that an award of punitive damages is possible." *Frederick*, 683 F.3d at 1248 (citation omitted).   Here, Plaintiff has expressly sought punitive damages. (Exhibit A, Compl., p. 20.)

27.     Defendant certainly does not concede that Plaintiff is entitled to such damages. However, viewing Plaintiff's Complaint as pled, which is the standard for removal analysis, those damages should be included for purposes of determining the amount in controversy.

28.     Courts within the Tenth Circuit have awarded punitive damages based on a six to one ratio.  *See, e.g*., *Leon v. FedEx Ground Package Sys., Inc*., 313 F.R.D. 615, 632 (D.N.M. 2016) (citations omitted).  And the Tenth Circuit has even affirmed a punitive damages award with a twenty to one ratio.  *Id.* at 633 (citing *Haberman v. The Hartford Ins. Group,* 443 F.3d 1257, 1263 (10th Cir. 2006)), and stating while the Tenth Circuit cited the Supreme Court's admonition that few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process, the Tenth Circuit nonetheless affirmed the twenty to one ratio).  *See also Applied Capital, Inc. v. Gibson*, No. CIV.05-0098JB/ACT, 2008 WL 4821336, *18 (D.N.M. May 28,

2008) (citing case law for the principle that a "normal range for punitive damages" includes ratios of 3.5 to 1 to 7.4 to 1) (citations omitted).

29.     Using a ratio of 20 times the compensatory damages in this case -- *i.e.,* as was awarded in *Haberma*n -- or 7.4 to 1 -- i.e., per the "normal range" posited by the court in Gibson -- puts the amount in controversy over $5 million even if only the "premium component" of the compensatory damages set forth above is considered, and also puts the amount in controversy even further over $5 million when both the "premium component" and the "claim component" of the amount in controversy here, as set forth above, is considered.

**Attorneys' Fees.**

30.     In addition, Plaintiffs have specifically demanded attorneys' fees. (*See* Exhibit A, Compl. p. 20.)

31.     Attorneys' fees, where specifically permitted by statute, may also be considered as part of the amount-in-controversy for purposes of federal jurisdiction. *Martinez-Wechsler v. Safeco Ins. Co. of Am.*, No. CIV 12-0738 KBM/ACT, 2012 WL 12892762, *2 (D.N.M. Sept. 13, 2012). *See also Woodmen,* 342 F.3d at 1218 ("Because the UPA requires the award of attorneys' fees to a prevailing claimant, the potential award of attorneys' fees, in addition to compensatory and treble damages, should have been considered in determining whether Woodmen satisfied the jurisdictional amount."); *Barreras*, 2012 WL 12870348, *3 ("Where a statute allows for the recovery of attorneys' fees, fees may be used in calculating the jurisdictional amount. . . . Here, UPA and other statutes under which Plaintiffs assert claims allow for the recovery of fees. *See* N.M. Stat. Ann. §§ 39-2-1, 57-12-10(C). Accordingly, that amount, too, could count toward satisfying the jurisdictional minimum.").

32.     Here, as in *Barreras,* the Unfair Trade Practices Act under which Plaintiff asserts claims allows for the recovery of attorneys' fees.  N.M. Stat. Ann. § 57-12-10(C) ("The court shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails.").   Plaintiff also alleges she is entitled to attorneys' fees pursuant to § 59A-16-30 and § 39-2-1.  (Exhibit A, Compl., ¶ 90.)  *See* N.M. Stat. Ann. § 39-2-1 ("In any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim."); N.M. Stat. Ann. § 59A-16-30 ("Any person covered by Chapter 59A, Article 16 NMSA 1978 who has suffered damages as a result of a violation of that article by an insurer or agent is granted a right to bring an action in district court to recover actual damages. Costs shall be allowed to the prevailing party unless the court otherwise directs. The court may award attorneys' fees to the prevailing party if. . . .  B. the party charged with the violation of that article has willfully engaged in the violation.").

33.     In class action cases, courts in the Tenth Circuit have applied a 20%-40% of the class recovery benchmark for attorneys' fees.  *See, e.g., In re Horizon/CMS Healthcare Corp. Sec. Litig.*, 3 F. Supp. 2d 1208, 1212 (D.N.M. 1998) ("this Court set attorneys' fees at 20% of the net recovery after expenses"); *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1249 (D.N.M. 2012) (setting attorneys' fees at "twenty-percent of the Settlement Fund -- $400,000.00 in fees," but noting "Twenty-percent in fees is below the average percentage of the class fund that courts award.  Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingency fee basis.") (citation and internal quotation omitted); *Robles v.*

*Brake Masters Sys., Inc.*, No. CIV 10-0135 JB/WPL, 2011 WL 9717448, *19 (D.N.M. Jan. 31, 2011) (setting fee at 18.77% of the class recovery, but stating the "percentage is less than half Robles' counsels' contingency fee, which would have been at least 40%," and noting courts within the Tenth Circuit have approved attorneys' fees ranging from 25% to 40%).

34.      Here, Plaintiff's claim for attorneys' fees increases the amount in controversy even further over $5 million -- *i.e.,* by at least 20% of the compensatory and punitive damages amounts discussed above, which are already well over $5 million, and even more if fees were awarded at 25%, 30%, or 33% of the potential class recovery, as they could be under the above case law. Again, Defendant certainly does not concede such fees would be justified, but they are properly considered for purposes of the amount in controversy analysis.

**Cost to Defendant of Injunctive/Declaratory Relief.**

35.      The amount in controversy is, as demonstrated above, more likely than not over $5 million here based on only compensatory and punitive damages, and certainly based on those damages plus attorneys' fees.  However, the cost of relief in this case to Defendant also should be included in the amount in controversy.  "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Valdez*, 867 F. Supp. 2d at 1178.  In measuring the value of the litigation, the Tenth Circuit follows the "either viewpoint rule," which considers the "value to the plaintiff or the cost to the defendant . . . ." *Lovell v. State Farm Mut. Auto Ins. Co.*, 466 F. 3d 893, 897 (10th Cir. 2006).  *See also Frederick*, 683 F.3d at 1247 (noting jurisdictional amount may include "how much it would cost to satisfy the plaintiff's demands.").

36.     Here, the result of any judgment for Plaintiff would be that the Defendant's practice of applying New Mexico's offset provision in connection with claims for minimum limits UIM coverage would be ruled unlawful.  And Defendant therefore would, in order to comply with the law, have to stop collecting premiums for the relevant coverage and/or to pay for these types of claims without applying the offset provision.

37.     In *Keeling v. Esurance Ins. Co.*, 660 F.3d 273 (7th Cir. 2011), the plaintiff alleged the insurer committed fraud by charging for UM/UIM coverage that was worthless in light of the automobile insurance policy's restrictions.  The insurer removed the case to federal court under CAFA.  The district court remanded the case, and the insurer appealed.  Esurance had issued more than 50,000 automobile insurance policies containing the contested clause.  During the 5-year limitations period before the suit began, it collected a net premium of $613,894 on the relevant coverages and paid no claims.  The district court treated this amount as "the principal amount in controversy (the class wants the money repaid)," and found the "prospective relief would be costless to Esurance, because that relief would require changing only a few words on a printed form." *Id.* at 274.  The district court further declared it would "be 'legally impossible' for the class to receive $4.4 million in punitive damages," which amount was required to put the stakes over $5 million.  *Id.*  The Seventh Circuit reversed the district court and determined the amount-in-controversy requirement had been met.  *Id.*  The injunctive relief required far more than reprinting forms, the Seventh Circuit found, explaining that "this suit is about money, not ink."  The value of the injunctive relief was based not on the cost of a forms change, but on the loss of premiums or increase in claims payments Esurance could incur if the plaintiff prevailed:

> If the class is right and Esurance must either stop charging a premium or change the terms so that policyholders receive indemnity more frequently,

it will suffer a financial loss. Suppose it were to comply with an injunction by eliminating this coverage and its premium. Its current profit on this coverage in Illinois is about $125,000 a year. The present value of foregoing this stream of profits is about $1.5 million. (That is the present value of $125,000 a year for 20 years, discounted at 5% per year.) The alternative means of complying with an injunction would be to change the policy's terms so that it paid more claims; that form of compliance would have an uncertain cost—presumably something less than $1.5 million (Esurance would not knowingly offer a coverage on which it loses money), but still far from trivial. The cost of prospective relief cannot be ignored in the calculation of the amount in controversy.

*Id.* Accordingly, even though the compensatory damages amounted to only approximately $600,000, the cost of the injunctive relief -- projected 20 years into the future -- plus the potential for punitive damages, brought the amount-in-controversy above CAFA's $5 million requirement.

38.    In *Valdez*, 867 F. Supp. 2d at 1165, the court quoted *Keeling* with approval for the principle that the "the cost of prospective relief cannot be ignored in the calculation of the amount in controversy," that where an insurer-defendant would either have to "stop charging a premium or change the terms so that policyholders receive indemnity more frequently, it will suffer a financial loss," and that $1,500,000.00 in future lost premiums was part of the amount in controversy. In the case before it, the *Valdez* court noted, for example, "Colorado Casualty estimates that the lost premiums it will suffer amount to over $2,900,000.00. See Coulson Aff. ¶ 12, at 3. Coulson based her calculation on the number of policies within the putative class -- 4,799 -- multiplied by the premium that Colorado Casualty would have charged for the increase in uninsured motorist coverage that the Plaintiffs seek. See Coulson Aff. ¶ 12, at 3. Schmidt estimates that 21st Century Insurance would lose in excess of $2,600,000.00 in lost premiums, if the Plaintiffs obtain the relief they seek." *Id.* at 1183. After discussing other estimates provided by defendants related to the cost of complying with a judgment in the plaintiffs' favor, the court

stated: "given that the insurance companies are in the business of providing coverage for a premium, the Court also believes that it can use lost premiums as an actual cost to the insurer Defendants.  Lost premiums are neither a phantom issue nor, with the affidavits filed, speculative." *Id* at 1184.  *See also Cox v. Allstate Ins. Co.*, No. CIV-07-1449-L, 2008 WL 2167027, *3 (W.D. Okla. May 22, 2008) (denying motion to remand; finding insurer met CAFA's amount in controversy requirement by presenting evidence that premium payments received in 2006 alone far exceeded $5,000,000 where relief sought was the equitable remedy of disgorgement of benefits insurer received for the allegedly improper conduct); *Armur v. Transamerica Life Ins. Co.*, No. 10-2136-EFM, 2010 WL 4180459, *4 (D. Kan. Oct. 20, 2010) (denying motion to remand in dispute over premium rate increases; finding insurer met CAFA's amount in controversy requirement by multiplying anticipated annual premium rate increases by total number of policies).

39.    Here, compliance with a judgment in Plaintiff's favor will not only require Defendant to reimburse the amounts of past premiums or to pay UIM claims without applying the offset, it will also require Defendant to forego such premiums and make such payments in the future.  And the Declarant here has averred that it is a reasonable assumption that the relevant sums for the future for premiums for the relevant coverage will not be materially less than in the past, and that the number of situations where the UIM coverage will now be owed will approximate those for the past.  (Exhibit B, Hammel Dec., ¶ 9.)

40.    This amount will even further increase the amount in controversy.  The $919,601 in premiums for the relevant coverage for the six-year class period approximated $153,266 per year.  (*Id.*)  If Defendant were required to forego the premiums about which Plaintiff complains for just a 5-year period, the cost to Defendant would be approximately $766,330 (5 X $153,266).

For a 10-year period (10 years less than the period used in *Keeling*), that amount would be $1,532, 266 (10 X $153,266).

41.     Similarly, the $19,875,000  in UIM payments that would potentially have to be made if Plaintiff prevails, for claims spanning the six-year class period, approximated $3,312,500 per year.  (*Id.*).  If Defendant were required to make the UIM payments in the minimum limits situation about which Plaintiff complains for just a 5-year future period, the cost to Defendant would potentially be up to $16,562,500 (5 X $3,312,500).  For a 10-year period, that potential amount would be $33,125,000 (10 X $3,312,500).

42.     So, this component of cost to Defendant even further increases the amount in controversy over $5 million, although the amount in controversy is, as demonstrated above, well over $5 million even if this cost is not considered at all.

43.     In sum, given Plaintiff's Complaint allegations and all the justifiable extrapolations and calculations set forth above, the minimum jurisdictional amount requirement of $5,000,000 is easily satisfied.

**D.     Number of Proposed Class Members.**

44.     As required by 28 U.S.C. § 1332(d)(5), the number of members of the proposed class here is at least 100 persons.  As demonstrated by the Declaration of James Hammel, the putative class as defined consists of over 100 members, as there are well over 100 individuals both who had minimum limits UIM policies issued by Defendant in New Mexico during the putative class period, and who made claims during this period.  (Exhibit B, Hammel Dec., ¶¶ 7, 8.)

### E.      CAFA Applies to this Action.

45.     CAFA applies to actions "commenced" on or after its effective date, February 18,

2005.  This action was filed in December, 2016, so CAFA clearly applies.

### II.      THE EXCEPTIONS UNDER CAFA DO NOT APPLY.

46.     **The "Local Controversy" Exception Does Not Apply.**  The requirements of

Section 1332(d)(4)(A)(i)(II), CAFA's "local controversy" exception, are not met.  This exception

applies only if, among other factors, at least one defendant is a "defendant:  (aa) from whom

*significant relief* is sought by members of the plaintiff class; (bb) whose *alleged conduct forms a*

*significant basis for the claims asserted by the proposed plaintiff class*; and (cc) who is a citizen

of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(A)(i)(II) (emphasis

added).  Here, the New Mexico defendants are Elite and Sucet, but the only significant relief sought

-- reimbursement of premiums supposedly wrongfully collected and the provision of UIM

coverage supposedly wrongfully denied -- would obviously come from the insurer, not from Elite

and Sucet.  *See, e.g., Stanforth*, 2010 WL 11437167, *5 ("the most significant relief sought by

Plaintiffs is against Farmers, not against the named non-diverse defendants, Tobin and Aragon,

and the conduct of Tobin and Aragon is not a significant basis for the claims asserted by the class.")

(footnote omitted).   Moreover, since there is no such entity as Unitrin Specialty Financial

Indemnity Company (*see* Exhibit B, Hammel Dec., ¶ 4), and Plaintiff does not allege she had any

dealings with that Defendant, and since Kemper Casualty Insurance Company had no affiliation

with Financial Indemnity Company, nor with any other member of the Kemper Insurance Group

during any time period relevant to this case (*see* Exhibit B, Hammel Dec., ¶ 5), and Plaintiff does

not allege she had any dealings with that Defendant, neither of these entities is one from which

"significant relief" is sought.  In any event, Plaintiff expressly alleges these two defendants are not

New Mexico citizens.  (Exhibit A, Compl., ¶¶ 6-8.)

47.     For example, in *Waters v. Advent Prod. Dev. Inc.*, No. 07CV2089BTMLSP, 2008

WL 7683231,  *5 (S.D. Cal. June 26, 2008), the court denied a motion to remand and concluded

CAFA's local controversy exception did not apply, stating:

> [I]n a consumer fraud case alleging that an insurance company
> incorporated and based in another state misrepresented its policies, a local
> agent of the company named as a defendant presumably would not fit this
> criteria. He or she probably would have had contact with only some of the
> purported class members and thus would not be a person from whom
> significant relief would be sought by the plaintiff class viewed as a whole.
> Obviously, from a relief standpoint, *the real demand of the full class in
> terms of seeking significant relief would be on the insurance company
> itself.*

*Id.,* *14-15 (quoting S. Rep. No. 109-14 at 40) (emphasis added).  *See also Clay v. Chobani LLC,*

No. 14CV2258 BEN DBH, 2015 WL 4743891, *6 (S.D. Cal. Aug. 10, 2015) ("the allegations of

the Complaint indicate that the relief sought from Vons and Safeway is 'small change' compared

to what is sought from the real defendant, Chobani. . . .  The [local controversy] exception does

not fit because the real Defendant, Chobani, is not a citizen of California."); *Roppo v. Travelers

Insurance Company*, No. 13 C 05569, 2014 WL 3810580, *5 (N.D. Ill. Aug. 1, 2014) (where

plaintiff sued tortfeasor's insurer, a foreign defendant, and two local defendants -- the tortfeasor's

attorney and his law firm -- the court rejected the plaintiff's contention that the two local

defendants were defendants "from whom significant relief is sought by members of the plaintiff

class [and] whose alleged conduct forms a significant basis for the claims asserted," thus finding

CAFA's local controversy exception did not apply); *Martin v. State Farm Mut. Auto. Ins. Co.*, No.

10-0144, 2010 WL 3259418, *8 (S.D. W.Va. Aug. 18, 2010) (where plaintiff asserted claims

against a foreign defendant insurer and two of the insurer's agents, both local defendants, holding local controversy exception did not apply because plaintiff "cannot show that any West Virginia adjuster's conduct formed a significant basis for all the claims asserted.").  Here, the real demand for significant relief is from the insurer, not the insurance agency and agent, so the local controversy exception does not apply.

48.    **The "Home State Controversy" Exception Does Not Apply.**  Similarly, the exception in 28 U.S.C. § 1332(d)(4)(B) does not apply.  CAFA's "home state controversy" exception requires a court to decline CAFA jurisdiction if "two-thirds or more of all proposed plaintiff classes, and the *primary* defendants, are citizens of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(B) (emphasis added).  Here, as noted, Defendant, not Elite and Sucet, or either of the other two named defendants (who are not New Mexico citizens in any event) is the primary Defendant, so this exception does not apply.  *See, e.g., Dutcher v. Matheson,* 840 F.3d 1183, 1194 (10th Cir. 2016) ("the phrase 'the primary defendants [ ] are' requires that all primary defendants be citizens of Utah in order for the case to qualify for remand.  Because the plaintiffs do not contest that some primary defendants are not Utah citizens, we conclude that the case cannot be remanded under the home state exception."); *Fulgenzi v. Smith,* No. CIV 12-1261 RB/RHS, 2013 WL 11336867, *3 (D.N.M. July 2, 2013) ("the Court concludes that a defendant may be considered a primary defendant for purpose of CAFA if, based on the allegations in the complaint, it has substantial exposure to the proposed class in the action, or is allegedly liable to the majority of the members of the proposed classes.  Plaintiff's claims relate to the UM Selection/Rejection Forms allegedly promulgated by Farmers. Therefore, Farmers qualifies as a primary defendant for purposes of CAFA.  Because Farmers is not a citizen of New

Mexico, Plaintiff has not established a prerequisite of the home-state exception."); *Martin*, 2010 WL 3259418, *9 (where plaintiff asserted claims against a foreign defendant insurer and two of the insurer's agents, both local defendants, holding "home state" exception did not apply since, as here, the insurer was the only primary defendant); *Marino v. Countrywide Fin. Corp.*, 26 F. Supp. 3d 949, 954 (C.D. Cal. 2014) (finding "home state" exception did not apply; stating "Plaintiff brings both of his claims against all Defendants and seeks relief collectively from all Defendants. Thus, even if the allegations of misconduct are directed to Countrywide Defendants, Bank of America Defendants are the subject of a significant portion of the claims asserted by Plaintiff. Likewise, although no claim is brought solely against Bank of America Defendants, no claim is brought solely against Countrywide Defendants either, further demonstrating that Bank of America Defendants are primary defendants.").

49.    **The Discretionary Exception Does Not Apply.**   The discretionary exception to CAFA also does not apply in this case.  28 U.S.C. § 1332(d)(3).  Under CAFA, a court may decline to exercise CAFA jurisdiction in its discretion if "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the *primary* defendants are citizens of the State in which the action was originally filed[.]" *Id.* (emphasis added).  Again, since none of the "primary" defendants here is a New Mexico citizen, this exception cannot apply.  *See, e.g., Dutcher*, 840 F.3d at 1194–95 (10th Cir. 2016) ("the primary defendants are citizens of the State" in the CAFA setting requires a showing that *all* primary defendants are citizens of the relevant state, and the plaintiffs cannot make that showing.  Therefore, we may not remand the case under the discretionary exception.") (emphasis Court's); *Copper Sands Homeowners Ass'n, Inc. v. Copper Sands Realty, LLC,* No. 2:10-CV-00510-GMN, 2011 WL 941079, *6 (D. Nev. Mar.

16, 2011) ("The Court finds that Countrywide is a primary defendant.  Countrywide is not a citizen of Nevada and consequently the court cannot remand this case pursuant to 1332(d)(3)[.]").

### III.   THE OTHER PROCEDURAL REQUISITES FOR REMOVAL ARE SATISFIED.

50.    Removal is timely under 28 U.S.C. §§ 1446(b) and 1453, because the Complaint in this case is the first pleading, motion, order, or other paper from which it could first be ascertained that this action is one which is or has become removable.  The Complaint was first served on January 26, 2017, and this Notice of Removal is filed on February 24, 2017 -- within thirty days after that initial service.  In addition, venue is appropriate here because Plaintiff resides in this judicial district, and the alleged acts and omissions giving rise to this action occurred here.  28 U.S.C. § 1391.  Pursuant to 28 U.S.C. § 1446(a), attached as Exhibit B is a copy of all the state court pleadings and process in this matter.  Attached as Exhibit C is a copy of the notice of filing of notice of removal in the state court.  The Defendant has, therefore, satisfied all the requirements for removal under 28 U.S.C. § 1446 and all other applicable rules.

### CONCLUSION

For all the foregoing reasons, Defendant Financial Indemnity Company respectfully requests this Court assume full jurisdiction over the cause herein as provided by law.  The Defendant intends no admission of liability by this Notice and expressly reserves all defenses, motions, and pleas, including without limitation objections to the sufficiency of Plaintiff's pleadings and the propriety of class certification.

Respectfully submitted,

O'BRIEN & PADILLA, P.C.

*/s/ Alicia M. Santos*_____
Alicia M. Santos
Kerri L. Allensworth
*Attorneys for Defendant*
6000 Indian School Road NE
Suite 200
Albuquerque, NM 87110
Phone: (505) 883-8181
Facsimile: (505) 883-3232
asantos@obrienlawoffice.com
KAllensworth@obrienlawoffice.com


**I FURTHER CERTIFY** that on such date I served the foregoing on the in the manner indicated:

Via certified mail, return receipt requested, addressed as follows:

William Ferguson
*Counsel for Plaintiff*
WILL FERGUSON AND ASSOCIATES
1720 Louisiana Blvd. Suite 100
Albuquerque, NM 87106

*/s/ Alicia M. Santos*_____
Alicia M. Santos
Kerri L. Allensworth