**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**HELEN BHASKER,**
**on behalf of herself and all others similarly
situated,**

      **Plaintiff,**

**vs.**

**FINANCIAL INDEMNITY COMPANY,**

      **Defendant.**

**NO. 17-cv-00260-JB-WPL**

## DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Defendant, Financial Indemnity Company ("Defendant"), respectfully moves, pursuant to Fed. R. Civ. P. 12(b)(6), for the entry of an Order dismissing this action. All Plaintiff's claims are premised on the theory that the minimum limits underinsured motorists coverage at issue in this case is "illusory." As the case law discussed below demonstrates, however, all Plaintiff's claims are barred by the filed rate and voluntary payments doctrines. Additionally, as a matter of law, Plaintiff's "illusory coverage" argument is simply wrong, because minimum limits underinsured motorists coverage does provide tangible benefits to those who choose it. And none of Plaintiff's new allegations cures the legal deficiencies in her claims. Accordingly, all Plaintiff's claims should be dismissed with prejudice.

## BACKGROUND

In her First Amended Complaint ("Compl."), Plaintiff alleges she was injured in a June 24, 2015 accident with an at-fault driver, Stephanie Martinez, who was an underinsured motorist. (*Id.*,

¶¶ 11-17.)  According to Plaintiff, she received the full extent of Ms. Martinez' $25,000 bodily injury liability coverage.  (*Id.*, ¶ 18.)  Plaintiff alleges that, prior to the collision, she "paid a premium for automobile coverage under the Financial Indemnity Company auto insurance policy," and had a "reasonable expectation" that she had underinsured motorist ("UIM") coverage of $25,000 each person and $50,000 each accident under that policy.  (*Id.*, ¶ 19.)

According to Plaintiff, the insurance application and policy issued by Defendant failed to advise her that UIM coverage is "illusory" in the event of an accident involving a minimally insured driver, and also failed to advise her what the monthly premiums would be for corresponding levels of coverage.  (*Id.*, ¶¶ 32-33, 47.)  Plaintiff alleges the application did not fully inform her of the effects of New Mexico's UIM offset laws, which she alleges result in no possible UIM minimum limits claim.  (*Id.*, ¶¶ 39, 43.)  According to Plaintiff, Defendant failed to fully inform its insureds that "a purchase of 25/50 underinsured coverage, when triggered by a crash with a tortfeasor who has 25/50 bodily injury liability limits, will result in a payment of premium for which no payment of benefits will ever occur and therefore violated plaintiff and other insureds reasonable expectations of benefiting from underinsured coverage."  (*Id.*, ¶ 48.)

Plaintiff seeks to represent the following putative class:

> All persons (and their heirs, executors, administrators, successors, and assigns) who, in the prior six years from the date of filing of this complaint, were a policyholder and/or insured, of a Motor Vehicle Policy issued by defendant where that policy did not and does not provide UIM coverage paid for by the policyholder, and sold and solicited by the defendant, due to the application of an offset as set forth in NMSA 66-5-301, otherwise, known as the New Mexico statutory offset law or being a "difference state".

(*Id.,* ¶ 54.)

Plaintiff asserts the following causes of action:  Count I: Negligence; Count II: Violation of the New Mexico Unfair Trade Practices Act; Count III: Violation of the New Mexico Unfair

Insurance Practices Act; Count IV: Breach of Contract and Claim for Underinsured Motorists Coverage; Count V: Breach of the Covenant of Good Faith and Fair Dealing; Count VI: Injunctive Relief; Count VII: Declaratory Relief; and Count VIII: Punitive Damages. (*Id.,* pp. 13-22.)

## ARGUMENT

### I. THE FILED RATE DOCTRINE BARS PLAINTIFF'S CLAIMS.

Plaintiff's allegations in her current Complaint, as in her prior one, leave no doubt she is challenging Defendant's rates for UIM coverage. For example, Plaintiff alleges that, based on the information provided by Defendant, she agreed to pay a premium for UIM coverage, and that when she agreed to pay that premium Defendant did not fully inform her of the consequences of New Mexico's UIM set off. (Compl. ¶¶ 19, 34-35.) She further alleges Defendant failed to inform her she would likely not benefit from paying a premium for minimum limits UIM coverage, and that she demanded that Defendant provide her with UIM benefits for which she had paid a premium. (*Id.,* ¶¶ 43, 44.) Plaintiff further alleges Defendant has "written direct premium automobile insurance to thousands of New Mexico residents and, from 2010-2014, wrote direct premiums in the amount of $1.09 billion across the United States." (*Id.*, ¶ 22.) Plaintiff's theory is, simply stated, that Defendant charged her a premium for UIM coverage that was "illusory." Because Plaintiff's Complaint is premised on her "unlawful premium" theory, all her claims run afoul of the filed rate doctrine.

New Mexico's filed rate doctrine provides that "any filed rate -- that is, one approved by the governing regulatory agency -- [is] per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Coll v. First Am. Title Ins. Co.,* 642 F.3d 876, 886–87 (10th Cir. 2011) (quoting *Valdez v. State,* 2002-NMSC-028, 132 N.M. 667, 671, 54 P.3d 71, 74–75 (internal quotation marks and alterations omitted)). Among other things, the policy behind the filed rate

doctrine is to preserve the role of agencies in approving rates and to keep courts out of the rate-making process. *Id.* at 887. *See also Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650 (E.D. Tex. 1999) ("the filed rate doctrine assumes that all rates that have been filed and approved are 'reasonable and non-discriminatory'") (citations omitted).

The filed rate doctrine applies regardless of the label plaintiffs may attach to the underlying allegedly wrongful conduct. For example, courts apply the filed rate doctrine even where plaintiffs allege fraud or other illegal activity in connection with the rates charged. *See, e.g., Montana-Dakota Utilities Co. v. Northwestern Public Serv. Co.,* 341 U.S. 246, 248-52 (1951) (filed rate doctrine applied even where one party allegedly defrauded the other in reaching an agreement on rates they would charge); *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 159-62 (1922) (filed rate doctrine applied even where plaintiff claimed that a conspiracy illegally inflated the rates).

Where, as here, the relevant rates are filed with the Insurance Department, the filed rate doctrine necessarily applies. In fact, courts have repeatedly applied the filed rate doctrine in the insurance context. *See, e.g., Peacock v. AARP, Inc.,* 181 F. Supp. 3d 430, 441 (S.D. Tex. 2016) (filed rate doctrine barred plaintiffs' claims challenging rates charged for group insurance); *Sher v. Allstate Ins. Co.,* 947 F. Supp. 2d 370, 387-88 (S.D.N.Y. 2013) (where plaintiff alleged defendant insurer "sold illusory coverage at a price far above the value of the coverage actually provided"; court held the filed rate doctrine barred plaintiff's claims); *Sapuppo v. Allstate Floridian Ins. Co.,* No. 4:12CV382-RH/CAS, 2013 WL 6925674, *2 (N.D. Fla. Mar. 12, 2013), *aff'd on other grounds*, 739 F.3d 678 (11th Cir. 2014) (applying filed rate doctrine to property rates filed with the Florida Insurance Commissioner); *Korte*, 48 F. Supp. 2d at 652-53 (filed rate doctrine barred insureds' claim that auto insurer overcharged high-risk insureds); *Uniforce*

*Temporary Personnel v. Nat'l Council on Compensation Ins., Inc.,* 892 F. Supp. 1503, 1512-13 (S.D. Fla. 1995), *aff'd*, 87 F.3d 1296 (11th Cir. 1996) (applying filed rate doctrine to claims for workers' compensation coverage); *Morales v. Attorneys' Title Ins. Fund, Inc.,* 983 F. Supp. 1418, 1426-27 (S.D. Fla. 1997) (applying filed rate doctrine to title insurance rates); *Minihane v. Weissman*, 226 A.D.2d 152, 152, 640 N.Y.S.2d 102, 102 (1996) (the "filed rate doctrine prevents challenges to rates established by regulatory agencies, here the New York State Insurance Department."); *Edge v. State Farm Mut. Auto. Ins. Co.*, 366 S.C. 511, 519-21, 623 S.E.2d 387, 392-93 (2005) (adopting the filed rate doctrine and finding it applicable to the insurance industry: "The filed rate doctrine preserves the stability, uniformity, and finality inherent in rates filed with the regulatory agency and what has been determined to be a reasonable rate by that agency.").

Significantly, in *Alabama Mut. Ins. Corp. v. City of Fairfield*, 178 So. 3d 350, 363–64 (Ala. 2013), *on return to remand* (Dec. 19, 2014), *reh'g denied* (Feb. 20, 2015), the court found an "illusory" UIM coverage claim similar to Plaintiff's here was barred by the filed rate doctrine. The court explained "by alleging that AMIC charged for UM/UIM coverage but then deviated from the agreed-to coverage by amending the insurance policy to exclude from coverage virtually every person who could properly collect benefits under the policy, Vernon, the original class representative, claimed that AMIC's rates under the policy were excessive, *i.e.*, that premiums were collected but that only illusory (effectively nonexistent) coverage was provided -- that matter is squarely within the exclusive jurisdiction of the commissioner. . . . Because the class plaintiffs take issue with AMIC's forms and rating plans, both of which involved the commissioner's approval, the filed-rate doctrine precludes judicial review." *Id.* (citation and internal quotation omitted). *See also Davis v. State Farm Mut. Auto. Ins. Co.,* No. CIV. A. S09C-09-012, 2011 WL 1379562, *4 (Del. Super. Feb. 15, 2011), *aff'd*, 29 A.3d 245 (Del. 2011) ("Although plaintiffs'

claims do not explicitly challenge the rates imposed by defendant insurers, plaintiffs' underlying assertion is that the rates charged are unreasonable, given the benefits received"; thus the filed rate doctrine applied).

In *Korte*, the plaintiffs sought money damages as a result of the defendant's alleged failure to file automobile insurance rates that met the requirements of the insurance code. 48 F. Supp. 2d at 649. The plaintiffs claimed that they were overcharged premiums by the defendant for a period of years, because the rates filed during that time were unlawful. *Id*. The court first determined that it was appropriate to apply the filed rate doctrine to the insurance industry. *Id*. at 651. The court then concluded that the filed rate doctrine applied to the case pending before it because the plaintiffs' claims implicated the reasonableness of the filed rates. *Id*. at 652. The court held that all plaintiffs' claims were barred by the filed rate doctrine, because "[a]ny calculation of damages would involve this Court in retroactive alteration of the filed rate, a function which this Court should not perform." *Id*. at 652-53.

In New Mexico, the legislature has adopted a comprehensive system of regulations for insurance. Pursuant to the New Mexico Insurance Code, § 59A-17-9:

> A. In regard to filings in competitive markets:
>     * * * *
> (2) for filings by insurers:
> (a) an insurer shall file with the superintendent rates and supplementary rate information prior to their use in New Mexico[.]

N.M. Stat. Ann. § 59A-17-9.

One of the stated purposes of the rate statute is: "1) to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to protect policyholders and the public against the adverse effects of excessive, inadequate or unfairly discriminatory rates[.]" N.M. Stat. Ann. § 59A-17-3. The statute provides

that insurers must adhere to the filed rates: "No insurer shall make or issue a contract or policy of insurance except in accordance with filings or rates that are lawfully in effect for the insurer as provided in the Insurance Rate Regulation Law." N.M. Stat. Ann. § 59A-17-12.

The Insurance Code makes it clear that the Superintendent of Insurance has exclusive authority over challenges to filed rates. For example, the Code provides that "[a]ny person aggrieved by any action, threatened action or failure to act of the superintendent or otherwise under Chapter 59A, Article 17 NMSA 1978 shall have the same right to a hearing before the superintendent with respect thereto as provided for in general under Section 59A-4-15 NMSA 1978." N.M. Stat. Ann. § 59A-17-34. The Code further provides that "no other person shall impose a penalty or other adverse consequence for failure of an insurer to adhere to certain rates or rules except as to action by the superintendent in enforcement of Section 59A-17-12 NMSA 1978." N.M. Stat. Ann. § 59A-17-26.

The comprehensive regulatory scheme of the New Mexico Insurance Code leaves no doubt that the New Mexico Legislature did not intend that the premiums charged by insurers could be collaterally attacked. Yet, that is precisely what Plaintiff is attempting to do here with her "illusory coverage" theory. Indeed, Plaintiff alleges that at the "time of the crash, the Plaintiff paid a premium of $80 for bodily injury coverage and $54 for un-and-underinsured coverage for a total of $134 for minimal combined coverage. A purchase of higher limits, for example, at a premium of $201 would yield a disproportionate underinsured indemnification to premium ratio of 308/1, when compared to the purchase of minimal combined coverage for virtually no underinsured indemnification." (Compl., ¶ 34.) In footnote 5 of her Complaint, Plaintiff calculates her "disproportionate underinsured indemnification to premium ratio" as follows: "$25,000.00/$81=308," and in footnote 6 she states "the Plaintiff would be indemnified up to

$25,000.00 in underinsured coverage with a purchase of the next tier of available coverage of $50,000.00 per person/$100.000.00 per accident after the offset." (*Id*, n. 5 & n. 6.) These allegations emphatically underscore that Plaintiff is indeed directly challenging the premiums Defendant charged, which is precisely the type of claim prohibited by the filed rate doctrine.

Plaintiff's claims, if permitted to stand, would require this Court to make an independent determination of the propriety of rate filings with the Insurance Department, and would undermine the exclusive authority vested in the Superintendent of Insurance to determine the propriety of insurance rates. *See Valdez*, 132 N.M. 667, 671, 54 P.3d 71, 75 (plaintiffs' challenge to telephone services rates in correctional facilities was properly dismissed under filed rate doctrine, because rates at issue were "legal" after authorization by relevant New Mexico agency). Accordingly, dismissal of the Amended Complaint is warranted under the filed rate doctrine alone.

## II.    ALL PLAINTIFF'S CLAIMS FAIL BASED ON THE VOLUNTARY PAYMENTS DOCTRINE.

Plaintiff's claims also fail pursuant to the voluntary payments doctrine. It is a "well established rule that payments voluntarily made with full knowledge of all material facts cannot be recovered back in absence of fraud or duress." *Rabbit Ear Cattle Co. v. Frieze,* 80 N.M. 203, 204, 453 P.2d 373, 374 (1969) (citations omitted). "A person paying money on a controverted or disputed claim while conscious of his want of knowledge of material facts and where . . . the disputed facts are specifically brought to his attention . . . is not payment under 'mistake of fact' as to allow recovery of the payments so made." *Id.* at 204-05, 453 P. 2d at 374-75. *See also Prenalta Corp. v. Colorado Interstate Gas Co*., 944 F.2d 677, 685 (10th Cir. 1991) (applying Wyoming law) (citing the "universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot

be recovered back on the ground that . . . there was no liability to pay in the first instance.") (citation and internal quotation omitted).

For example, in *Rabbit Ear,* the plaintiff brought an action to recover $832.00 from the defendant for pasturage of cattle on the ground that the amount was mistakenly overpaid. The court rejected that theory because the payments were voluntary. In so ruling, the court noted that both parties "knew the position of the other, nevertheless, the plaintiff paid the additional amount claimed by the defendant . . . so as to avoid an argument in a public cafe." *Id.* at 204, 453 P.2d at 374. The court concluded the "finding that the payment was made under a mistake of fact is not factually supported. The evidence is all the other way; the payment was made voluntarily in settlement of a disputed claim." *Id.* at 204, 453 P. 2d at 375. *See also Cheesecake Factory, Inc. v. Baines,* 1998-NMCA-120, 125 N.M. 622, 624–25, 964 P.2d 183, 185–86 (citing "general rule that one who makes a voluntary payment to another has no right to restitution."); *State ex rel. Callaway v. Axtell,* 1964-NMSC-046, 74 N.M. 339, 343, 393 P.2d 451, 454 (citing general rule that a "voluntary payment, made under mistake or ignorance of the law but with full knowledge of all the facts, cannot be recovered back and . . . this applies to a corporation as well as to a natural person.").

In *Robbins v. Scana Energy Mktg., Inc.,* No. 1:08-CV-640-BBM, 2008 WL 7724171 (N.D. Ga. June 13, 2008), the plaintiffs sought to represent a class of Georgia natural gas customers of SCANA, who plaintiffs alleged were overcharged for their natural gas usage. The court stated:

> Perhaps in anticipation of SCANA's defense of the voluntary payment doctrine, Plaintiffs choose their words carefully in describing their damages. Nevertheless, it is clear that Plaintiffs seek damages in the amount paid by purported class members based upon the improperly charged higher fees. SCANA never notified or informed Plaintiffs that they were being charged per therm rates and customer service charges that exceeded the published per therm rates and customer service charges. Neither did Plaintiffs consent to being charged those higher prices.

Plaintiffs claim that "SCANA concealed material facts from [them] thereby preventing them from being able to learn the truth about SCANA's deceptive conduct" and that they "put misplaced confidence in SCANA" because "SCANA provides a basic necessity for hundreds of thousands of households across the State of Georgia."

*Id.,* *2 (footnote omitted).

The court held "Plaintiffs' claims must be dismissed in accordance with Georgia's voluntary payment statute," which provides that "[p]ayments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary." *Id.,* *4 (citations omitted). In so ruling, the court explained the plaintiffs could have learned of their rights based on the relevant statute, and that their ignorance of the law did not excuse their voluntary payment of the challenged charges: "A cursory review of O.C.G.A. § 46-4-160 would inform Plaintiffs that SCANA is required to publish rates with the PSC monthly. In light of the fact that Plaintiffs acknowledge and allege that the SCANA Variable rates were published monthly, those rates were clearly within the public domain and readily accessible to Plaintiffs." *Id.*, *5. The court concluded the plaintiffs "[a]t most . . . made the payments through an unexcused ignorance of law." *Id.* (citation omitted).

In *Randazzo v. Harris Bank Palatine, N.A.,* 262 F.3d 663 (7th Cir. 2001), Randazzo alleged that Harris Bank wrongfully forced him to sell stock which secured a loan agreement between Randazzo and Harris, arguing Harris had no right to do so because he was not in default under his agreement. Randazzo never questioned Harris' purported right to sell the stock to pay off the loan, but indicated he would have done so had he read the agreement beforehand. *Id.* at 666. Shortly after the stock was sold, Randazzo learned it had increased in value, and he claimed that, as a result of Harris' wrongful sale of the stock, he lost over $400,000. *Id.* The court explained that under

the voluntary payments doctrine, a plaintiff who "voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact." *Id.* at 666. The district court refused to permit Randazzo to escape the voluntary payment doctrine by a bald allegation of fraud or mistake of fact, however, explaining: "Although these factors can provide protection from the application of the doctrine, neither is available when a party to a contract relies on the interpretation of another party as to the meaning of the terms of the contract." *Id.* at 667.

The Seventh Circuit affirmed, noting that the voluntary payments doctrine is rooted in the principle that "ignorance of the law is no excuse," and is a corollary to the mistake of law doctrine which, "in its general formulation, holds that a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution." *Id.* Emphasizing that the voluntary payments doctrine "retains its affinity for the mistake of law doctrine," the court explained the reason for the mistake of law doctrine: "if litigation is intended by the one of whom the money is demanded, it should precede payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence or under a reservation of right to litigate the claim, and afterward sue to recover the amount paid." *Id.* at 668 (citation and internal quotation omitted). In holding that the voluntary payments doctrine precluded Randazzo's claim, the court agreed with the district court's conclusion that "Randazzo could not make out a case for fraud or mistake of fact. To the extent that Mr. Randazzo was ignorant of his rights under the loan agreement, it was because he refused to apprise himself of those rights by reading the appropriate documents." *Id.* (further stating Randazzo "found himself in that position simply because he had elected not to

become knowledgeable about the nature of his legal rights and, correspondingly, had failed to assert them.").

In *Chris Albritton Const. Co. v. Pitney Bowes Inc*., 304 F.3d 527, 531 (5th Cir. 2002), the plaintiffs alleged Pitney Bowes and other defendants engaged in a scheme to defraud plaintiffs, their customers, by misrepresenting that Pitney Bowes would not charge plaintiffs for insurance covering leased equipment without first requesting proof of the customer's own insurance. The plaintiffs claimed the defendants failed to make such a request and charged their customers a small but highly profitable insurance premium utilizing the misleading label of "ValueMAX." *Id.* at 529. The court, based on the voluntary payments doctrine, rejected the plaintiffs' claims, explaining:

> Plaintiffs have imputed knowledge of Pitney Bowes' risk management program, because they are charged with the duty to read the lease they sign, even the fine print. The purpose of the voluntary payment doctrine is to preclude courts from being occupied in undoing the arrangements of parties, which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and liabilities. . . . The exceptions for fraud, accident, or excusable ignorance do not negate the doctrine.

*Id.* at 531 (citation and internal quotation omitted). The court further explained plaintiffs "could have easily found out about ValueMAX before paying the fee." *Id.* at 532.

As the above cases show, the voluntary payments doctrine bars all claims by a plaintiff who complains he or she has been misled by a defendant into paying for something where, as here, the plaintiff could have easily learned of the law underlying the basis for the disputed charge. Here, the crux of Plaintiff's liability theory is that she paid premiums for "illusory" UIM coverage because Defendants "failed to fully inform Plaintiff of illusory underinsured coverage with a disproportionate premium/indemnification ratio when compared to the next tier of available coverage[.]" (Compl., ¶ 35.) But Plaintiff paid these premiums voluntarily, and, as the above

cases show, Defendant's alleged failure to advise Plaintiff about New Mexico's offset law, or any argument that Plaintiff was ignorant of the law, does not preclude application of the voluntary payments doctrine. Plaintiff is attempting to do precisely what the *Randazzo* court described as contrary to the voluntary payments doctrine -- *i.e.,* postponing litigation by paying the disputed charge in silence, then afterward suing to recover the amount paid.

Indeed, Plaintiff's contention that Defendant was required to disclose the existence and effect of the New Mexico offset law is contrary to the well-established rule, which is wholly consistent with the above voluntary payments case law, that all persons are charged with knowledge of the law. *See, e.g., City of Aztec v. Groh,* No. 29,951, 2010 WL 4162051, *1 (N.M. Ct. App. May 25, 2010) ("Everyone is presumed to know the law."); *New Jersey v. Delaware,* 552 U.S. 597, 621 n. 20 (2008) ("All citizens . . . are presumptively charged with knowledge of the law.") (quoting *Atkins v. Parker*, 472 U.S. 115, 130 (1985)); *Utah Power & Light Co. v. Fed. Ins. Co.*, 983 F.2d 1549, 1556 (10th Cir. 1993) ("no one can be deceived by a misrepresentation of law because everyone has access to the law and may be presumed to know it.").

This principle further underscores why the voluntary payments doctrine applies here to bar Plaintiff's claims. As a matter of law, Plaintiff was presumed to know the law, clearly in the public domain, regarding New Mexico's UIM offset provision. She cannot now be heard to complain that she was misled into paying premiums based on Defendant's supposedly failing to tell her about New Mexico's offset law or its effect on her UIM coverage.

The applicability of the voluntary payments doctrine here is further emphasized by Plaintiff's new "reasonable expectation" allegations -- that she had a "reasonable expectation" that she had UIM coverage of $25,000 each person and $50,000 each accident under her policy. (*See, e.g.,* Compl., ¶ 18.) The reasonable expectations doctrine simply does *not* come into play in the

face of clear and unambiguous policy language. *See, e.g., Sheldon v. Hartford Ins. Co.,* 2008-NMCA-098, 144 N.M. 562, 567, 189 P.3d 695, 700 ("Because we find that there is no ambiguity as a matter of law, Appellants' reasonable expectations argument necessarily fails); *Truck Ins. Exch. v. Gagnon,* 2001-NMCA-092, 131 N.M. 151, 153, 33 P.3d 901, 903 ("When a court interprets the terms of an insurance policy that is unclear and ambiguous, the reasonable expectations of the insured guide the analysis. . . . However, when the policy language is clear and unambiguous, we must give effect to the contract and enforce it as written.").

Here, the insurance policy documents attached to the Complaint not only list the level of UIM coverage Plaintiff selected, they also explicitly state when UIM coverage applies, describing the very "offset" of bodily injury liability coverage against UIM coverage which Plaintiff complains results in "illusory" UIM coverage here. *See* Policy Application, Exhibit A to Complaint (setting forth selected UIM coverage); UIM Endorsement, Exhibit B to Complaint (expressly stating when UIM coverage applies; defining "underinsured motor vehicle" to mean a motor vehicle "for which the sum of the limits of all bodily injury liability bonds or insurance policies applicable at the time of the accident is less than the sum of the limits of liability applicable to the injured person for [UIM] Coverage under this policy and any other policy(ies).").[1] Plaintiff need only have looked at the very policy documents attached to her Complaint to see exactly what coverage she had. The reasonable expectations doctrine does not apply in these circumstances, nor can any conclusory allegation of some type of fraud or artifice by Defendant stand in the face of the unambiguous policy documents telling Plaintiff exactly what her coverage would be.

---

[1] It is appropriate to consider the Complaint exhibits on a motion to dismiss. *See, e.g., Alexander v. Adelberg*, 497 F. App'x 816, 818 (10th Cir. 2012) (on a "motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, and documents incorporated into the complaint by reference."); *Aragon v. De Baca Cty. Sheriff's Dep't,* 93 F. Supp. 3d 1283, 1287 (D.N.M. 2015) ("In addition to the facts alleged in the complaint, a court reviewing a motion to dismiss may consider documents in the public record or incorporated by reference into the complaint.").

Plaintiff's new allegation (Compl., ¶¶ 32-33), that Defendant's insurance application was deficient because it did not advise her what the monthly premiums would be for the next available tier of coverage or list corresponding levels of coverage, does not change the above analysis. New Mexico Courts have imposed the requirement that corresponding premium levels be disclosed *only* where the policyholder rejects UM/UIM coverage equal to the bodily injury liability limits or altogether. *See, e.g., Jordan v. Allstate Ins. Co.,* 2010-NMSC-051, 149 N.M. 162, 170, 245 P.3d 1214, 1222 ("we detail for the first time the technical *requirements for a valid rejection of UM/UIM coverage in an amount equal to liability limits.* By requiring insurance carriers to list premium costs corresponding to each available UM/UIM coverage level, we are providing specific guidance concerning the form and manner that valid offers and rejections of UM/UIM insurance must take to comply with controlling statutory and regulatory provisions.") (emphasis added); *Farm Bureau Prop. & Cas. Ins. Co. v. Hale,* No. 1:14-CV-00527-WJ/WPL, 2014 WL 11512598, *8 (D.N.M. Nov. 14, 2014) ("*Jaramillo* also discussed the requirements under New Mexico law for a *valid rejection* of UM/UIM coverage, as set forth under *Jordan* . . . which are: (1) an offer to the insured to purchase UM/UIM coverage in an amount equal to the policy's liability limits; (2) information regarding corresponding premium charges for each available UM/UIM coverage choice; (3) the insured's *written rejection of UM/UIM coverage equal to the liability limits*" and (4) incorporation of that rejection into the policy such that the insured may fairly reconsider his decision.") (citing *Jaramillo v. Gov't Employees Ins. Co.,* 573 F. App'x 733, 743–44 (10th Cir. 2014)) (emphasis added, internal quotations omitted). *See also Gov't Employees Ins. Co. v. Shroyer,* No. 115CV00306PJKSCY, 2015 WL 12669885, *2 (D.N.M. Dec. 1, 2015) (citing *Jordan;* stating "New Mexico law *requires insurers to offer UM/UIM coverage up to the liability limits of the policy.* N.M. Stat. § 66-5-301(A) & (B). Insureds have the right to reject such coverage, N.M.

Stat. § 66-5-301(C), but before such coverage is excluded, an insurer must obtain a valid rejection.")
(emphasis added).

Indeed, the remedy in cases alleging improper failure to list coverage premiums is to reform the UIM limits to equal the bodily injury liability limits. *See, e.g., Jordan*, 149 N.M. at 173, 245 P.3d at 1225 ("we affirm the Court of Appeals' holdings that the insurers in these consolidated cases failed to obtain valid rejections of UM/UIM coverage and that the proper remedy in each of these cases is reformation of Plaintiffs' automobile liability policies to provide UM/UIM coverage equal to the liability limits."); *Sinclair v. Zurich Am. Ins. Co.,* 141 F. Supp. 3d 1162, 1168 (D.N.M. 2015) ("I find that Zurich failed to properly inform SAIA about the costs of the premiums for UM/UIM coverages available under New Mexico law. Thus, SAIA's rejection of UM/UIM coverage is not valid under New Mexico law, and SAIA's policy will be reformed to provide UM/UIM coverage equal to the policy's liability limits.").

The above cases are wholly inapposite here because Plaintiff admittedly did not reject UIM coverage and selected UM/UIM coverage limits equal to, not lower than, her bodily injury liability limits. (Compl., ¶ 26.) So, Plaintiff already has equalized UIM and bodily injury liability limits, and the need to list premiums, alleged by Plaintiff, simply not does not apply. In short, the voluntary payments doctrine applies with full force here.

III.    PLAINTIFF'S CLAIMS ALSO FAIL BECAUSE, AS A MATTER OF LAW, THE COVERAGE AT ISSUE IS NOT "ILLUSORY."

All Plaintiff's claims are premised on her theory that minimum limits UIM coverage is inherently worthless or "illusory." Plaintiff's theory is legally incorrect, however, as numerous courts have recognized. Indeed, there are several situations in which minimum limits UIM coverage has value for New Mexico policyholders.

For example, in *Vincent v. Safeco Ins. Co. of Am.,* 136 Idaho 107, 112, 29 P.3d 943, 948 (2001), the court held UIM coverage equal to minimum bodily injury liability limits was not illusory, even if no vehicle covered by a policy issued in the state could satisfy the definition of an underinsured motor vehicle. This was so because if the tortfeasor was a driver with an out-of-state policy with lower bodily injury liability minimum limits than in the policy state, the policyholder could recover the difference as to those limits. In *Vincent*, the insured purchased an automobile insurance policy from Safeco which provided $25,000/$50,000 uninsured and underinsured motorists coverage. The court explained "an underinsured motor vehicle, as the term is applied to the Vincents coverage, is one with some liability insurance but less than $25,000/ $50,000. By law, insurance companies cannot issue liability policies with coverage less than $25,000/$50,000 in Idaho. . . . As a result, no Idaho vehicle can meet the definition provided in the Safeco policy." *Id.* Nonetheless, the policy "would provide coverage if the Vincents leave Idaho and travel to states with lower minimum requirements such as Arizona, California, Nevada, or Oklahoma. *See* Ariz. Rev. Stat. §§ 28-4009 and 28-4135 ($15,000 per person); Cal. Veh. Code § 16056 ($15,000/$30,000); Nev. Rev. Stat. § 485.185 ($15,000 per person); Okla. Stat. tit. 47, §§ 7-203 and 7-204(a) ($10,000 per person)." *Id.* Accordingly, the court held "there is an identifiable group of people who are covered-insureds who travel to states with lower minimum liability amounts. . . . Since there is an identifiable group that may collect on the policy, the insurance is not illusory." *Id.* In this regard it should be noted that, as of today, the minimum required limits in Arizona (Ariz. Rev. Stat. §§ 28-4009 - $15,000/$30,000), California (Cal. Veh. Code § 16056 - $15,000/$30,000) and Nevada (Nev. Rev. Stat. § 485.185 - $15,000/$30,000), as well as those in Louisiana (La. Stat. Ann. § 32:900 - $15,000/$30,000), are still lower than those in New Mexico.

Similarly, in *Meridian Mut. Ins. Co. v. Richie*, 544 N.E.2d 488, 489-90 (Ind. 1989), the court stated "it has become evident that we erred in finding the underinsured motorist coverage to be illusory," because underinsured automobiles could include "vehicles from other states which require lesser amounts than does Indiana of liability insurance, so that conceivably Richie could have benefitted from his underinsured motorist coverage. . . . Consequently, the policy issued by Meridian to Richie does not violate the public policy against illusory coverage." *See also Johnson v. AAA Chicago Motor Club Ins. Co.,* 699 N.E.2d 1182, 1186 (Ind. Ct. App. 1998) (the "trial court properly noted that the policy was not illusory because recovery could be had against an out-of-state tortfeasor whose bodily injury coverage requirements were less than that required in Indiana. The trial court was correct in following *Meridian Mutual.*"); *Colonial Ins. Co. of California v. Batson*, 85 Md. App. 467, 476, 584 A.2d 137, 141 (1991) ("While it's true that if the tort-feasor's policy is issued in Maryland then of necessity it will include the statutory minimum of $20,000 and appellee will never recover from his underinsurance coverage of $20,000, it is still not an illusory benefit."; reasoning that had primary insured been from out of state and purchased coverage for less than the Maryland statutory minimums, the insured could have recovered).

In addition, policyholders will be paid, even if they have minimum limits UIM coverage, where there are multiple injured parties in an accident, such that no single policyholder will recover the entirety of the tortfeasor's liability limit. For example, in *Showman v. Busser*, No. 311141, 2013 WL 6037161, *4 (Mich. Ct. App. Nov. 14, 2013), the court held the UIM policy at issue was "not illusory," because, "[a]lthough the policy limits equal the statutory minimum in Michigan, the insurance policy in question still provides underinsured motorist benefits when the tortfeasor's liability insurance is less than $20,000 or when the tortfeasor's liability insurance is reduced to less than $20,000 by payments to other injured persons other than resident relatives. By the plain

language of the policy, there are circumstances where the insured's coverage is triggered, and thus, the policy is not illusory."); *Hallihan v. Progressive Direct Ins. Co.,* No. 315CV01068NJRSCW, 2016 WL 4617243, *6 (S.D. Ill. Sept. 6, 2016), *app filed* ("Reviewing the policy language at hand in light of the language of 215 ILCS 5/143a-2(4), the Court concludes that Progressive's minimum UIM coverage is not illusory. While there may be situations where a claimant is unable to recover under his or her minimum UIM policy, that does not mean he or she is *never* able to recover under it. There are certainly circumstances where a claimant may recover less than the minimum liability limits from the at-fault driver; the insured is then entitled to seek the difference, up to the UIM policy limits, from Progressive. That an insured chooses to purchase the minimum UIM coverage does not make it illusory; the 'freedom of contract includes the freedom to make a bad bargain.'") (emphasis court's).

Moreover, under New Mexico law, if the insured receives less than the tortfeasor's policy limits due to a contractual exclusion for punitive damages, the insurer may not offset the full amount of the tortfeasor's liability limits. *See Farmers Ins. Co. of Arizona v. Sandoval*, 2011-NMCA-051, 149 N.M. 654, 656, 253 P.3d 944, 946 (stating "we must determine whether an insurer is entitled to offset an injured insured's award of [UIM] benefits by a tortfeasor's liability policy limits when the insured receives an amount less than policy limits due to a contractual exclusion for punitive damages. In light of the remedial purpose of NMSA 1978, Section 66–5–301 (1983), we conclude that the insurer's offset is limited to the amount of money actually received by the insured from the tortfeasor."). So, this is yet another situation where an insured with minimum limits UIM coverage can receive payment.

As the above cases show, there is no question that minimum limits UIM coverage has value for New Mexico policyholders, so the coverage is not, as a matter of law, "illusory." It should be

noted that some courts have reached the opposite conclusion.[2]  However, Defendant respectfully submits the above cases, which represent a clear majority of the authority existing on this issue, and which reject the notion that the coverage is "illusory" in these circumstances, are better reasoned.  It makes no sense to deem coverage "illusory" when it clearly provides valuable benefits to insureds, as the above cases demonstrate minimum limits UIM coverage does in multiple situations.

In her First Amended Complaint (¶ 23), Plaintiff cites *Progressive Nw. Ins. Co. v. Weed Warrior Servs.,* 2010-NMSC-050, 149 N.M. 157, 245 P.3d 1209, for the proposition that the New Mexico Supreme Court established UIM coverage is "superfluous" when the insured and tortfeasor both have the statutory minimum level of coverage.   *Weed Warrior*, however, does not help Plaintiff.

In *Weed Warrior,* Mrs. Etcheverry argued that the applicable Progressive policy should be reformed to provide UM/UIM coverage equal to the liability limits of $1,000,000, rather than $100,000, because the purchase of UM/UIM coverage at an amount lower than the liability limits was not evidenced with a written rejection.  The Court addressed *only* this question "Does the election to take UM/UIM coverage for less than the general policy liability limits constitute a rejection under the New Mexico uninsured motorist statute?"  *Id.* at 158, 245 P.3d at 1210.  In answering that question in the affirmative, the Court explained:  "Recalling that Section 66-5-301 is a remedial statute that must be construed liberally, we hold that the offer of UM/UIM coverage must include the maximum amount statutorily available in order to effectuate the policy of the Legislature.  As Section 66-5-301 *requires insurers to offer UM/UIM coverage up to the liability*

[2] *See, e.g., Hardy v. Progressive Specialty Ins. Co.,* 2003 MT 85, ¶¶ 27-29, 315 Mont. 107, 115, 67 P.3d 892, 897; *Schemberg v. Progressive Cas. Ins. Co.*, 709 F. Supp. 620, 621-22 (E.D. Pa. 1989).

*limits of the policy*, it follows that the choice by the insured to purchase any lower amount is a rejection." *Id.* at 161, 245 P. 3d at 1213 (emphasis added). This was the context in which the Court made the statements about "superfluous" coverage cited by Plaintiff. Despite that verbiage, however, the *Weed Warrior* Court held only that New Mexico insurers had to offer UM/UIM coverage up to the bodily injury liability limits of the subject policy. Here, of course, there is no dispute that this was done, since Plaintiff chose UM/UIM limits equal to her bodily injury liability limits. Nothing in *Weed Warrior*, though, in any way prohibited an insured from purchasing minimum limits UM/UIM coverage, or deemed such coverage illegal.

Indeed, because it was only addressing the issue of what coverage had to be offered, the *Weed Warrior* Court had no occasion to consider or address all the situations, discussed above, in which minimum limits UM/UIM coverage does in fact have value, hence is not "illusory," because that simply was not the question before the Court. To the contrary, the Court expressly contemplated that insureds could in fact select lower levels of coverage. *Id.* at 161, 245 P.3d at 1213 ("we draw the conclusion that the Legislature intended for drivers to have the option of carrying UM/UIM coverage equal to their policy limits, but that *lower levels of UM/UIM coverage are preferred to none at all* for those who affirmatively choose not to carry equal levels of coverage.").

In this regard, it is significant that courts have held that where, as here, the insurer offers minimum limits UIM coverage consistent with the applicable law, there can be no argument that the coverage is "illusory." For example, in *Fagundes v. Am. Internat. Adjustment Co.,* 2 Cal. App. 4th 1310, 1317, 3 Cal. Rptr. 2d 763, 767 (1992), the court stated:

> The fact that at the minimum level underinsurance coverage will generally not come into play is irrelevant, in light of the statutory direction that uninsured motorist and underinsured motorist coverage 'shall be offered as a single coverage.' The New Hampshire policy does neither more nor

> less than required by statute. The words employed in the policy are as
> clear and direct as the complex subject matter admits. The fact that in
> many cases purchase of minimum coverage will not provide reason to
> invoke underinsured coverage, as distinct from uninsured coverage, is an
> arithmetical consequence of no weight or significance to purchasers of
> insurance. When an insurance company offers coverage mandated by law,
> in words which parallel the language of the statute, it is logically
> impossible to charge the insurance company with offering an illusory
> contract, when the contract offered is mandated.

*Id.*

Here, Plaintiff does not allege, because she cannot, that the minimum limits UIM coverage about which she complains is inconsistent with New Mexico's UIM statute. Accordingly, as in *Fagundes,* it is logically impossible to charge Defendant with offering "illusory" coverage. *See also Davidson v. U.S. Fid. & Guar. Co.,* 78 N.C. App. 140, 143, 336 S.E.2d 709, 711 (1985), *aff'd*, 316 N.C. 551, 342 S.E.2d 523 (1986) ("The plaintiff argues that under the terms of the policy without the endorsement for underinsured motorist coverage he could collect on his uninsured motorist coverage for any loss from any tortfeasor who has no coverage or less coverage than the minimum required. He contends that there are no circumstances under which he can collect on his underinsured coverage and he has paid his premium for this coverage in exchange for nothing. It appears that the plaintiff is correct in this argument but it does not justify our rewriting the policy.").

Finally, Plaintiff's contention that Defendant is charging excessive premiums for UIM coverage she claims will not be provided is negated by her own Complaint allegations and exhibits. The declarations page attached as Exhibit A to Plaintiff's Complaint shows that Plaintiff has *combined* UM and UIM coverage, and that a single premium is charged therefor. Under New Mexico law, rates must be charged based on the insurers' loss history. *See, e.g.,* N.M. Stat. Ann. § 59A-17-7 ("In determining whether rates comply with the rate standards, the following criteria shall be applied: A. due consideration shall be given to past and prospective loss and expense experience within and without this state[.]"); N.M. Stat. Ann. § 59A-17-6 ("Rates are inadequate

if they are clearly insufficient, together with the investment income attributable to them, to sustain projected losses and expenses in the line, kind or class of business to which they apply.").  Taking Plaintiff's Complaint allegations that Defendant rarely, if ever, pays under minimum limits UIM coverage as true, then by definition the portion of the rate for the combined UM/UIM coverage that is attributable to UIM, as opposed to UM, coverage would be minimal based on a minimal loss payment history.  So, again taking Plaintiff's Complaint allegations as true, Defendant cannot, as a matter of law, be collecting excessive premiums for UIM coverage that has an allegedly small or "illusory" value.  And that analysis only further underscores why, as fully discussed above, the filed rate doctrine also bars Plaintiff's claims.

## CONCLUSION

For all the foregoing reasons, Defendant, Financial Indemnity Company, respectfully requests this Court to enter an order dismissing Plaintiff's Complaint with prejudice.

Respectfully submitted,

O'BRIEN & PADILLA, P.C.

*/s/ Alicia M. Santos*
ALICIA M. SANTOS
KERRI L. ALLENSWORTH
*Attorneys for Defendant Financial Indemnity Company*
6000 Indian School Road NE, Ste. 200
Albuquerque, NM 87110
Phone: (505) 883-8181
Facsimile: (505) 883-3232
asantos@obrienlawoffice.com
kallensworth@obrienlawoffice.com

I HEREBY CERTIFY that on the 31st day of March, 2017, I filed the foregoing using CM/ECF, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

William Ferguson
Kedar Bhasker
*Counsel for Plaintiff*
WILL FERGUSON AND ASSOCIATES
1720 Louisiana Blvd. Suite 100
Albuquerque, NM 87106
will@fergusonlaw.com
kedar@fergusonlaw.com


*/s/ Alicia M. Santos*_____
ALICIA M. SANTOS
KERRI L. ALLENSWORTH