# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HELEN BHASKER,

       Plaintiff,

vs.                                      No. CIV 17-0260 JB/JHR

KEMPER CASUALTY INSURANCE
COMPANY; UNITRIN SPECIALTY
FINANCIAL INDEMNITY COMPANY;
FINANCIAL INDEMNITY COMPANY;
ELITE FINANCIAL INSURANCE and
NOELIA LUNA SUCET,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support, filed April 28, 2017 (Doc. 15) ("MTD"). The Court held a hearing on July 24, 2017. The primary issues are: (i) whether New Mexico's filed rate doctrine bars Plaintiff Helen Bhasker's negligence claims, claims under New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 ("UPA") violations, claims under New Mexico's Unfair Insurance Practices Act, N.M. Stat. Ann. § 59A-16-1 ("UIPA"), and claims of breach of contract alleging that Financial Indemnity Company ("Financial Indemnity") sold her illusory underinsured motorist insurance ("UIM"); (ii) whether, if New Mexico applies the filed rate doctrine to consumer-protection claims against insurers, Bhasker can seek premium-based damages, which depends on whether Bhasker's UIM coverage was illusory; (iii) whether, if the UIM coverage is not illusory, Bhasker's claims fail as a matter of law, because the UIM coverage offers benefits in some situations; and (iv) whether the voluntary payment doctrine bars Bhasker's claims. The Court concludes that: (i) the filed rate doctrine

does not bar Bhasker's claims, because the Supreme Court of New Mexico would not apply the filed rate doctrine to claims against insurers alleging unfair or deceptive business practices; (ii) even if New Mexico applied the filed rate doctrine to those claims, Bhasker and the proposed class could still seek premium-based damages, because the Supreme Court of New Mexico would determine that the UIM coverage was illusory in light of little coverage it provides; (iii) even if the UIM coverage is not illusory, Bhasker's claims may proceed, because they do not require that the UIM coverage be illusory; and (iv) the voluntary payment doctrine does not bar Bhasker's claims, because she alleges that she did not know all the material facts. Accordingly, the Court denies the MTD.

## FACTUAL BACKGROUND

Bhasker contends that, "[b]ased on the information provided by the Defendant," she agreed to "pay a six-month premium for the State of New Mexico mandated minimum automobile bodily injury and uninsured/underinsured motorist coverage." First Amended Class Action Complaint for Breach of Statutory, Common law, and Contractual Duties ¶ 30, at 5, filed March 23, 2017 (Doc. 12)("Complaint"). According to Bhasker, her insurance policy features: (i) liability coverage on one vehicle for $25,000.00 per person and $50,000.00 per accident, per vehicle; and (ii) underinsured coverage on one vehicle for $25,000.00 per person and $50,000 per occurrence, per vehicle. See Complaint ¶¶ 42-43, at 7 (citing Coverage for 1995 Lexus LS 500 4D at 1 (Doc. 12-2)). Bhasker asserts that Financial Indemnity did not "fully inform" her that "a purchase of 25/50 underinsured coverage, when triggered by a crash with a tortfeasor who has 25/50 bodily injury liability limits, will result in a payment of premium for which no payment of benefits will occur . . . ." Complaint ¶ 48, at 8.

Bhasker avers that, on June 24, 2015, she was driving eastbound on I-40 in Albuquerque,

New Mexico, when another driver, Stephanie Martinez, "failed to stop for the traffic in front of her vehicle" and struck Bhasker's car in the rear, causing "serious bodily injuries and other damages." Complaint ¶¶ 12-14, at 2-3. Bhasker asserts that Martinez "was an underinsured motorist at the time of the collision" as Bhasker's insurance policy and New Mexico law define the term. Complaint ¶ 17, at 3. Bhasker contends that she "received the full extent of liability coverage carried by Ms. Martinez," which was $25,000.00. Complaint ¶ 18, at 3. Bhasker asserts that after the accident, Financial Indemnity provided a certified copy of a document summarizing her policy. <u>See</u> Complaint ¶ 38, at 6 (citing New Mexico Personal Auto Application at 1-4 (Doc. 12-1)("Policy Application")). Bhasker contends that the "certified copy of the [Policy Application] materially misrepresented the terms of [its] underinsured [motorist] coverage and did not contain clear, unambiguous language regarding the effects of New Mexico's underinsured coverage offset laws." Complaint ¶ 39, at 6. Furthermore, Bhasker contends that the Policy Application's language is "deceptive and clearly ambiguous in that it states that the applicant may purchase underinsured coverage in excess of the bodily injury coverage limits, which is the opposite of the legislative intent" of N.M. Stat. Ann. § 66-5-301 and New Mexico case law. Complaint ¶ 40, at 6. Bhasker contends that Financial Indemnity's Policy Application

> did not alert [her], nor make clear to the ordinary and similarly situated insured, the fact that the New Mexico offset law drastically and materially diminished payment of benefits arising from a covered occurrence under the policy. . . . Specifically, there is virtually no possible underinsured minimum limits claim available to the Plaintiff and other similarly situated members of the class.

Complaint ¶ 43, at 7. Bhasker avers that, when she, "through counsel, demanded Defendant provide [her] with underinsured benefits that Defendant solicited and for which the Plaintiff paid

a premium," Financial Indemnity denied her claim for underinsured benefits. Complaint ¶ 44, at 7.

Bhasker further contends that Financial Indemnity has "written direct premium automobile insurance to thousands of New Mexico residents and, from 2010-12-14, wrote direct premiums" around the United States totaling $1.09 billion. Complaint ¶ 22, at 4.

## PROCEDURAL BACKGROUND

Bhasker originally brought this case in the Second Judicial District Court, County of Bernalillo, State of New Mexico. See Class Action Complaint for Breach of Statutory, Common Law, and Contractual Duties, filed in the Second Judicial District Court, County of Bernalillo, State of New Mexico (filed in state court on December 30, 2016), filed in federal court February 24, 2016 (Doc. 1-1)("State Complaint"). Financial Indemnity removed the action to federal court on February 24, 2017. See Notice of Removal, filed February 24, 2017 (Doc. 1). Financial Indemnity removed the case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because "this is a putative class action with more than 100 putative class members that seeks to recover more than $5,000,000.00." Notice of Removal at 1. One week later, Financial Indemnity filed a Motion to Dismiss. See Defendant Financial Indemnity Company's Motion to Dismiss and Memorandum of Law in Support, filed March 2, 2017 (Doc. 4).[1]

---

[1] Financial Indemnity withdrew this Motion to Dismiss after Bhasker filed her Complaint. See Notice of Withdrawal of Defendant's Motion to Dismiss Plaintiff's Original Complaint at 1, filed March 31, 2017 (Doc. 13).

1.      **The Complaint.**

A few weeks later, Bhasker filed her Complaint on March 23, 2017.  In her Complaint, Bhasker argues that Financial Indemnity[2] "failed to act honestly and in good faith when it solicited and sold superfluous and illusory minimal limits underinsured motorist coverage to their insureds (in whole or in part)" in violation of New Mexico law, "and/or they denied claims for the benefits of that coverage."  Complaint ¶ 1, at 1.  Bhasker contends that, "[b]asically, there is no such thing as 'minimum limits underinsured motorist coverage.'"  Complaint ¶ 1, at 1.  Bhasker asserts that she "brings this action on her own behalf, and on behalf of the many insured around the state who have been deceived by [Financial Indemnity's] practices."  Complaint ¶ 4, at 2.  Bhasker contends that, before the accident, she had "properly paid a premium for automobile coverage under the Financial Indemnity Company auto insurance policy," and, therefore, "had a reasonable expectation" that she carried underinsured motorist coverage for "$25,000.00 each person and $50,000.00 each accident."  Complaint ¶ 19, at 3.

Next, Bhasker asserts that the Supreme Court of New Mexico "established that underinsured coverage is superfluous when the tortfeasor and the injured driver both carry the statutory minimum of liability and underinsured coverage."  Complaint ¶ 23, at 4 (citing

---

[2]Although Bhasker's original state court lawsuit named several Defendants, see State Action at 1 (naming Kemper Casualty Insurance Company, Unitrin Specialty Financial Indemnity Company, Financial Indemnity Company, Elite Financial Insurance, and Noelia Luna Sucet as Defendants), Bhasker's Complaint names Financial Indemnity as the sole defendant, see Complaint at 1 (listing Financial Indemnity as the sole defendant); Notice of Consent to Removal by Defendant Unitrin Specialty Financial Indemnity Company at 1-2, filed March 13, 2017 (Doc. 9)(explaining that "Defendants Elite Financial Insurance and Noelia Luna Sucet hereby provide Notice of Consent to Removal and joins the Notice of Removal by Defendant Unitrin Specialty Financial Indemnity Company"); Notice of Removal ¶ 46, at 18 (explaining that "there is no such entity as Unitrin Specialty Financial Indemnity Company" and that Kemper Casualty Insurance Company "had no affiliation with Financial Indemnity Company . . . during any time period relevant to this case").

Progressive v. Weed Warrior, 2010-NMSC-050, ¶ 10, 245 P.3d 1209, 1213 ("Weed Warrior").

Bhasker then asserts that Financial Indemnity's insurance agents told her that she "must be insured for the state mandated minimum automobile bodily injury insurance coverage of $25,000.00 per person and $50,000.00 per accident." Complaint ¶ 26, at 4. Bhasker also avers that Financial Indemnity used an "incorrect and inappropriate form from another state," which "included ambiguous language that Plaintiff could purchase underinsured coverage in excess of her selected liability coverage limits." Complaint ¶ 27, at 4 (citing Policy Application at 1-4).

Bhasker alleges that Financial Indemnity "misrepresented to [her] that she would benefit from underinsured coverage when they knew, or should have known, that the coverage was meaningless," and that Financial Indemnity made these misrepresentations "knowingly and willfully, with the intent to deceive and induce the Plaintiff in purchasing underinsured coverage." Complaint ¶ 29, at 5.

Bhasker contends that Financial Indemnity breached its duty to "fully inform Plaintiff what the monthly premiums would be for the next available tier of coverage." Complaint ¶ 33, at 5. Bhasker states that she paid a $80.00 premium for bodily injury coverage and $54.00 for uninsured/underinsured ("UM/UIM") coverage for a total of $134.00 "for minimal combined coverage," and that a "purchase of higher limits, for example, at a premium of $201 would yield a disproportionate underinsured indemnification to premium ratio of 308/1, when compared to the purchase of minimal combined coverage for virtually no underinsured indemnification." Complaint ¶ 34, at 5-6.

Bhasker argues that the Policy Application violated New Mexico law, because it "failed to state that underinsured coverage is illusory in the event of a covered occurrence . . . involving a minimally insured driver." Complaint ¶ 32, at 5. Bhasker also asserts that Financial Indemnity

breached its duty to "act fairly, honestly, and in good faith" when it (i) "failed to fully inform Plaintiff of illusory underinsured coverage with a disproportionate premium/indemnification ratio when compared to the next tier of available coverage"; and (ii) "materially misrepresent[ed] the terms of underinsured coverage." Complaint ¶ 35, at 6.

Bhasker alleges that, by "fail[ing] to offer their insured sufficient information and knowledge regarding the superfluous, illusory, and deceptive coverage," Financial Indemnity violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 ("UPA"), the New Mexico Unfair Insurance Practices Act, N.M. Stat. Ann. § 59A-16-1 ("UIPA"), and "New Mexico common law." Complaint ¶ 46, at 7. Relatedly, Bhasker asserts that, under New Mexico law, the "underinsured application, coverage, and the corresponding policy language must not be so complex such that a reasonable person would be unable to understand its full impact . . . ." Complaint ¶ 49, at 8 (citing King v. Travelers Ins. Co., 1973-NMSC-013, 505 P.2d 1226, 1232; Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 17, 803 P.2d 243, 248). Bhasker concludes that, because Financial Indemnity did not "fully inform [her] of the New Mexico offset law or that New Mexico is a 'different state' during the application and policy underwriting stages, in a matter consistent with the requirements imposed by[] the UPA, the UIPA, and New Mexico common law," Financial Indemnity should compensate Bhasker for her injuries and/or actual damages sustained in the June 24, 2015 accident "via the underinsured benefits ($25,000.00) for which she paid a premium." Complaint ¶ 50, at 8.

Bhasker then asserts that, because Financial Indemnity has deceived many other New Mexicans in the same way as it deceived her, the action is "properly maintainable as a class action pursuant to Rule 1-023 NMRA." Complaint ¶¶ 53-54, at 9. Bhasker proffers a class definition:

> All persons (and their heirs, executors, administrators, successors, and assigns) who, in the prior six years from the date of filing of this complaint, were a policyholder and/or insured, of a Motor Vehicle Policy issued by defendant where that policy did not and does not provide underinsured coverage paid for by the policyholder, and sold and solicited by the defendant, due to the application of an offset as set forth in NMSA 66-5-301, otherwise known as the New Mexico offset law or being a "difference state". . . . Excluded from the Class are all present or former officers and/or directors of Defendant, the "Referees" for purposes of the Evaluation Appeal process set forth below, Class Counsel and their resident relatives, and Defendant's counsel of record and their resident relatives.

Complaint ¶¶ 54-55, at 9.

Bhasker then enumerates specific claims. See Complaint ¶¶ 65-109, at 13-21. First, Bhasker argues that Financial Indemnity was negligent, because Financial Indemnity breached its duty to ensure that she and other class members "would be offered and obtain the maximum benefit of underinsured coverage and would not be sold underinsured coverage." Complaint ¶ 66, at 13. See Complaint ¶¶ 65-70, at 13-14. Moreover, Bhasker asserts that it was "reasonably foreseeable" that the underinsured coverage was, "in large part," illusory and that a "reasonably prudent insurance company exercising ordinary care" would not sell illusory coverage. Complaint ¶ 68, at 14. Bhasker contends that Financial Indemnity's negligence means that it is liable for actual damages as well as punitive damages for its actions that were "willful, reckless and wanton, and in bad faith." Complaint ¶¶ 67-70, at 14.

Second, Bhasker argues that Financial Indemnity violated the UPA.[3] See Complaint ¶¶ 71-75, at 14-16. She argues that Financial Indemnity "failed to deliver the quality or quantity of services," because (i) Financial Indemnity did not provide sufficient information to "fully inform a reasonably prudent person charged with the task of purchasing underinsured insurance,

---

[3] Specifically, Bhasker alleges that Financial Indemnity violated N.M. Stat. Ann. § 57-12-2(D)(7), (D)(14)-(15), (D)(17), (E).

which Plaintiff was under the reasonable belief that such coverage existed"; and (ii) did not pay benefit claims. Complaint ¶ 73, at 15.

Third, Bhasker alleges that Financial Indemnity violated the UIPA. See Complaint ¶¶ 76-96, at 16-17. Bhasker contends that Financial Indemnity violated its "duties of good faith, fair dealing, and the accompanying fiduciary obligations." Complaint ¶ 80, at 16. Specifically, Bhasker asserts that Financial Indemnity: (i) misrepresented its policy's terms; (ii) did not disclose material facts; (iii) took advantage of Bhasker's lack of knowledge and experience; (iv) committed negligence per se by violating its statutory duties under the UIPA; (v) did not "acknowledge and act reasonably and promptly to Bhasker's communications regarding her claims, in violation of N.M. Stat. Ann. § 59A-16-20(B)"; (vi) did not "adopt and implement reasonable standards for the prompt investigation and processing" of Bhasker's claims, in violation of N.M. Stat. Ann. § 59A-16-20(C); (vii) did not "properly affirm and pay the coverage for claims" within a reasonable period of time, in violation of N.M. Stat. Ann. § 59A-16-20(D); (viii) did not act in good faith to promptly and fairly settle Bhasker's claims, in violation of N.M. Stat. Ann. § 59A-16-20(E); (ix) compelled Bhasker to sue Financial Indemnity because Financial Indemnity offered "substantially less (i.e. nothing)" than the amount owed to Bhasker, in violation N.M. Stat. Ann. § 59A-16-20(G); and (x) did not promptly explain why it denied her claims, in violation of N.M. Stat. Ann. § 59A-16-20(N). Complaint ¶¶ 83-94, at 17-18. Bhasker contends that she and other class members are entitled to attorneys' fees and costs pursuant to N.M. Stat. Ann. § 59A-16-30, plus actual damages. See Complaint ¶ 96, at 18.

Fourth, Bhasker asserts that Financial Indemnity breached their contract by not providing underinsured coverage or, alternatively, by improperly denying underinsured benefit claims. See Complaint ¶¶ 91-95, at 18-19. Bhasker contends that she and other class members are entitled to

"actual damages, including but not limited to, underinsured coverage in an amount equal to liability limits and may be entitled to payment of underinsured benefits, or payment of additional underinsured benefits accordingly and to damage to Plaintiff and the Class in an amount to be proven at trial." Complaint ¶ 95, at 19.

Fifth, Bhasker asserts that Financial Indemnity breached their contract, and the covenant of good faith and fair dealing. <u>See</u> Complaint ¶¶ 96-102, at 19-20. Bhasker contends that Financial Indemnity breached the implied covenant of good faith and fair dealing by, <u>e.g.</u>, denying coverage, not investigating her claim promptly, and refusing to resolve her claim. <u>See</u> Complaint ¶ 100(a)-(f), at 20.

Sixth, Bhasker seeks injunctive relief preventing Financial Indemnity from continuing practices that violate the duties, contractual, and legal obligations" owed to her and the class, Complaint ¶ 104, at 21, and a declaratory judgment that "establish[es] the respective rights and obligations of the parties with respect to the claims set forth herein," Complaint ¶ 108, at 21.

Seventh, Bhasker argues that the Court should award punitive damages, because Financial Indemnity acted in "willful, wanton, and in reckless disregard" of Bhasker's and the proposed class' rights. Complaint ¶ 109, at 21.

Bhasker concludes by summarizing her requests:

A.    Certifying this action as a class action pursuant to Rule l-023(A) & (B) NMRA;

B.    Awarding compensatory damages to the Plaintiff and the Class for the damages done to them by Defendant in an amount to be proven at trial;

C.    Awarding punitive damages to the Plaintiff and the Class in an amount sufficient to punish Defendant for their willful and wanton conduct, and to deter them, and others similarly situated, from such conduct in the future in an amount to be proven at trial;

D. Awarding the Plaintiff and the Class damages from Defendant as a result of its violations of UIPA, in an amount to be determined at trial and for attorneys' fees and costs;

E. Awarding treble damages in accordance with the UPA which will deter Defendant and others from such unfair trade practices and wrongful conduct in the future and will punish them or the conduct set forth in this Complaint;

F. Granting a declaratory judgment that establishes the rights and obligations of the parties with respect to the claims set forth herein;

G. Granting injunctive relief as may be deemed proper by the Court to require Defendant to desist in the wrongful actions described herein;

H. Awarding the Plaintiff and the Class their costs and expenses incurred in this actions, including reasonable attorneys' fees, experts' fees, and costs; and

I. Granting such other and further relief as the Court deems just and proper.

Complaint at 22.

## 2. The Motion to Dismiss.

In the MTD, Financial Indemnity moves to dismiss the Complaint. See MTD at 1. Financial Indemnity argues that the filed rate and voluntary payments doctrines bar Bhasker's claims. See MTD at 1. Financial Indemnity also asserts that Bhasker's illusory coverage argument is "simply wrong" as a matter of law, "because minimum limits underinsured motorists coverage does provide tangible benefits to those who choose it." MTD at 1.

Financial Indemnity asserts that the filed rate doctrine bars Bhasker's claims. See MTD at 3. Financial Indemnity characterizes Bhasker's claims as challenging rates Financial Indemnity charged for UIM coverage such that her "theory is, simply stated that Defendant charged her a premium for UIM coverage that was 'illusory.'" MTD at 3. Financial Indemnity argues that, because her Complaint is "premised on her 'unlawful premium' theory, all her

claims run afoul of the filed rate doctrine." MTD at 3.

According to Financial Indemnity, New Mexico's filed rate doctrine "provides that 'any filed rate -- that is, one approved by the governing regulatory agency -- [is] per se reasonable and unassailable in judicial proceedings brought by ratepayers.'" MTD at 3 (quoting Coll v. First Am. Title Ins. Co., 642 F.3d 876, 886-87 (10th Cir. 2011)). Financial Indemnity contends that the filed rate doctrine's policy "is to preserve the role of agencies in approving rates and to keep courts out of the rate-making process." MTD at 3-4 (citing Coll v. First Am. Title Ins. Co., 642 F.3d at 887; Korte v. Allstate Ins. Co., 48 F. Supp. 2d 647, 650 (E.D. Tex. 1999)(Folsom, J.)).

Financial Indemnity contends that the filed rate doctrine applies "regardless of the label plaintiffs may attach to the underlying allegedly wrongful conduct," which means that courts will apply the doctrine "even where plaintiffs allege fraud or other illegal activity." MTD at 4 (citing Montana-Dakota Utilities Co. v. Northwestern Public Serv. Co., 341 U.S. 246, 248-52 (1951)); Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 159-62 (1922)). Financial Indemnity asserts that the filed rate doctrine applies when, as in this case, the "relevant rates are filed with the Insurance Department." MTD at 4. Financial Indemnity contends that courts have "repeatedly applied the filed rate doctrine in the insurance context." MTD at 4 (citing Peacock v. AARP, Inc., 181 F. Supp. 3d 430, 441 (S.D. Tex. 2016)(Hanks Jr., J.); Sher v. Allstate Ins. Co., 947 F. Supp.2d 370, 387-88 (S.D.N.Y. 2013)(Koeltl, J.)).

Financial Indemnity asserts that an Alabama state court "faced an 'illusory' UIM coverage claim similar to Plaintiff's claim here" and determined that the filed rate doctrine barred the claim. MTD at 5 (citing Alabama Mut. Ins. Corp. v. City of Fairfield, 178 So. 3d 350, 363-64 (Ala. 2013), on return to remand (Dec. 19, 2014), reh'g denied (Feb. 20, 2015)). Financial Indemnity also asserts that a the United States District Court to the Eastern District of

Texas determined that the filed rate doctrine barred the plaintiffs' claims that the insurers overcharged them in premiums, because: (i) the filed rate doctrine applies to the insurance industry; and (ii) the plaintiffs' claims "implicated the reasonableness of the filed rates." MTD at 6 (citing Korte v. Allstate Ins. Co., 48 F. Supp. 2d at 650).

Financial Indemnity asserts that, in New Mexico, an insurer must "'file with the superintendent rates and supplementary rate information prior to their use in New Mexico.'" MTD at 6 (quoting N.M. Stat. Ann. § 59A-17-9(A)(2)(a)). Financial Indemnity contends that the statute's purpose is to "'promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to protect policy holders and the public against the adverse effects of excessive, inadequate or unfairly discriminatory rates.'" MTD at 6 (quoting N.M. Stat. Ann. § 59A-17-3).

Financial Indemnity contends that "[t]he Insurance Code makes it clear that the Superintendent of Insurance has exclusive authority over challenges to filed rates." MTD at 7 (citing N.M. Stat. Ann. § 59A-17-26, -34). Financial Indemnity asserts that the New Mexico Insurance Code "leaves no doubt that the New Mexico Legislature did not intend that the premiums charged by insurers could be collaterally attacked," yet "that is precisely what Plaintiff is attempting to do here." MTD at 7. Financial Indemnity contends that, if Bhasker's claims are "permitted to stand," the Court would have to "make an independent determination of the propriety of rate filings with the Insurance Department, and would undermine the exclusive authority vested in the Superintendent of Insurance to determine the propriety of insurance rates." MTD at 8.

Financial Indemnity also contends that Bhasker's claims "fail pursuant to the voluntary payments doctrine." MTD at 8. Financial Indemnity asserts that it is a "'well established rule

that payments voluntarily made with full knowledge of all material facts cannot be recovered back in absence of fraud or duress.'"  MTD at 8 (quoting <u>Rabbit Ear Cattle Co. v. Frieze</u>, 1969-NMSC-043, ¶ 5, 453 P.2d 373, 374).  Financial Indemnity then summarizes cases from various jurisdictions that show, Financial Indemnity contends, that "[t]he voluntary payments doctrine bars all claims by a plaintiff who complains he or she has been misled by a defendant into paying for something where, as here, the plaintiff could have easily learned of the law underlying the basis for the disputed charge."  MTD at 9-12 (citing <u>Randazzo v. Harris Bank Palatine, N.A.</u>, 262 F.3d 663, 667-68 (7th Cir. 2001)(Ripple, J.); <u>Chris Albritton Const. Co. v. Pitney Bowes Inc.</u>, 304 F.3d 527, 531 (5th Cir. 2002)(Duhe, J.); <u>Robbins v. Scana Energy Mktg. Inc.</u>, No. 08-CV-640, 2008 WL 7724171, at *5 (N.D. Ga. June 13, 2008)(Martin, J.); <u>Cheesecake Factory, Inc. v. Baines</u>, 1998-NMCA-120, ¶ 6, 964 P.2d 183, 185-86).  Financial Indemnity contends that those cases show that Financial Indemnity's "alleged failure to advise Plaintiff about New Mexico's offset law, or any argument that Plaintiff was ignorant of the law, does not preclude application of the voluntary payments doctrine."  MTD at 12-13.  Financial Indemnity adds that Bhasker "is attempting to do precisely what the *Randazzo* court described as contrary to the voluntary payments doctrine -- *i.e.*, postponing litigation by paying the disputed charge in silence, then afterward suing to recover the amount paid."  MTD at 13 (citing <u>Randazzo v. Harris Bank Palatine, N.A.</u>, 262 F.3d 663).  Moreover, Financial Indemnity asserts that Bhasker's contention that Financial Indemnity "was required to disclose the existence and effect of the New Mexico offset law" contravenes the "well-established rule" that "all persons are charged with knowledge of the law."  MTD at 13 (citing <u>New Jersey v. Delaware</u>, 552 U.S. 597, 621 n.20; <u>City of Aztec v. Groh</u>, No. 29,951, 2010 WL 4162051, *1 (N.M. Ct. App. May 25, 2010)(unpublished)).  Financial Indemnity concludes that,

[a]s a matter of law, Plaintiff was presumed to know the law, clearly in the public domain, regarding New Mexico's UIM offset provision [and] she cannot now be heard to complain that she was misled into paying premiums based on Defendant's supposedly failing to tell her about New Mexico's offset law or its effect on her UIM coverage.

MTD at 13.

Financial Indemnity then addresses Bhasker's contention that she had a "reasonable expectation" that she had UIM coverage of $25,000.00 for each person and $50,000 for each accident. MTD at 13. Financial Indemnity asserts that the "reasonable expectations doctrine simply does *not* come into play in the face of clear and unambiguous policy language." MTD at 13-14 (citing Sheldon v. Hartford Ins. Co., 2008-NMCA-098, ¶ 17, 189 P.3d 695, 700; Truck Ins. Exch. V. Gagnon, 2001-NMCA-092, ¶ 7, 33 P.3d 901, 903). Financial Indemnity contends that the insurance policy documents that Bhasker attached to the Complaint[4] "not only list the level of UIM coverage Plaintiff selected, they also explicitly state when UIM coverage applies, describing the very 'offset' of bodily injury liability coverage against UIM coverage which Plaintiff complaints results in 'illusory' UIM coverage here." MTD at 14. Financial Indemnity asserts that Bhasker "need only have looked at the very policy documents attached to her Complaint to see exactly what coverage she had." MTD at 14. Consequently, Financial Indemnity concludes, the reasonable expectations doctrine "does not apply in these circumstances, nor can any conclusory allegation of some type of fraud or artifice by Defendant stand in the face of the unambiguous policy documents telling Plaintiff exactly what her coverage would be." MTD at 14.

---

[4]Financial Indemnity asserts that the Court may soundly consider the Complaint's exhibits on a Motion to Dismiss. See MTD at 14 n.10 (citing Alexander v. Adelberg, 479 F. App'x 816, 818 (10th Cir. 2012); Aragon v. De Baca Cty. Sheriff's Dep't, 93 F. Supp. 3d 1283, 1287 (D.N.M. 2015)(Vazquez, J.)).

Next, Financial Indemnity contends -- contrary to Bhasker's allegation that Financial Indemnity's insurance-policy application should have "advise[d] her what the monthly premiums would be for the next available tier of coverage or list[ed] corresponding levels of coverage," MTD at 15 -- that New Mexico requires that "corresponding premium levels be disclosed *only* where the policy holder rejects UM/UIM coverage equal to the bodily injury liability limits or altogether." MTD at 15 (citing Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 25, 245 P.3d 1214, 1222); Farm Bureau Prop. & Cas. Ins. Co. v. Hale, No. CIV 14-0527, 2014 WL 11512598, at *8 (D.N.M. Nov. 14, 2014)(Johnson, J.); Gov't Employees Ins. Co. v. Shroyer, No. CIV 15-0306, 2015 WL 12669885, *2 (D.N.M. Dec. 1, 2015)(Kelly, J.). Financial Indemnity asserts that, in cases alleging improper failure to list coverage premiums, "the remedy is to reform the UIM limits to equal the bodily injury liability limits." MTD at 16 (citing Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 36, 245 P.3d at 1225; Sinclair v. Zurich Am. Ins. Co.,141 F. Supp. 3d 1162, 1168 (D.N.M. 2015)(Lynch, J.). Financial Indemnity asserts that it did not have to list corresponding premiums, because Bhasker "selected UM/UIM coverage limits equal to, not lower than, her bodily injury liability limits." MTD at 16 (citing Complaint ¶ 26, at 4). Financial Indemnity further asserts that Bhasker "already has equalized UIM and bodily injury liability limits, and the need to list premiums . . . simply . . . does not apply." MTD at 16.

Financial Indemnity contends that, as a matter of law, Bhasker's insurance coverage was not illusory, because there are "several situations in which minimum limits UIM coverage has value for New Mexico policyholders." MTD at 16. First, Financial Indemnity asserts that an Idaho state court held that "UIM coverage equal to minimum bodily injury liability limits was not illusory, even if no vehicle covered by a policy issued in the state could satisfy the definition of an underinsured motor vehicle," because, "if the tortfeasor was a driver with an out-of-state

policy with lower bodily injury minimum limits than in the policy state, the policyholder could recover the difference as to those limits." MTD at 17 (citing Vincent v. Safeco Ins. Co. of Am., 29 P.3d 943, 948 (Idaho 2001)). Financial Indemnity contends that an Indiana state court arrived at a similar conclusion, determining that underinsured motorist coverage is not illusory, because underinsured automobiles could include vehicles from states that require less liability insurance than Indiana requires. See MTD at 18 (citing Meridian Mut. Ins. Co. v. Richie, 544 N.E.2d 488, 489-90 (Ind. 1989)).

Second, Financial Indemnity argues that policyholders with minimum limits UIM coverage "policyholders will be paid, even if they have minimum limits UIM coverage, where there are multiple injured parties in an accident, such that no single policyholder will recover the entirety of the tortfeasor's liability limit." MTD at 18 (citing Showman v. Busser, No. 311141, 2013 WL 6037161, *4 (Mich. Ct. App. Nov. 14, 2013)). Third, Financial Indemnity contends that, under New Mexico law, "if the insured receives less than the tortfeasor's policy limits due to a contractual exclusion for punitive damages, the insurer may not offset the full amount of the tortfeasor's liability limits." MTD at 19 (citing Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶ 1, 253 P.3d 944, 946).

Financial Indemnity asserts that the coverage is not, as a matter of law, illusory, because the "above cases show there is no question that minimum limits UIM coverage has value for New Mexico policyholders." MTD at 19. Financial Indemnity notes, however, that "some courts have reached the opposite conclusion." MTD at 19-20 (citing Hardy v. Progressive Specialty Ins. Co., 67 P.3d 892, 897; Schemberg v. Progressive Cas. Ins. Co., 709 F. Supp. 620, 621-22 (E.D. Pa. 1989)(Cahn, J.)). Financial Indemnity asserts, nonetheless, that the cases holding that minimum limits UIM coverage has value for policy holders "represent a clear

majority of the authority existing on this issue, and [those] which reject the notion that the coverage 'illusory' in these circumstances [are] better reasoned."  MTD at 20.  According to Financial Indemnity, "[i]t makes no sense to deem coverage 'illusory' when it clearly provides valuable benefits to insureds, as the above cases demonstrate minimum limits UIM coverage does in multiple situations."  MTD at 20.

Next, Financial Indemnity addresses Bhasker's argument that the Supreme Court of New Mexico "established that UIM coverage is 'superfluous' when the insured and tortfeasor both have the statutory minimum level of coverage."  MTD at 20 (quoting Complaint ¶ 23, at 4). Financial Indemnity contends the case which Bhasker cites for this proposition -- Weed Warrior -- does not support Bhasker.  See MTD at 20.  Financial Indemnity asserts that the Supreme Court of New Mexico considered only whether "elect[ing] to take UM/UIM coverage for less than the general policy liability limits constitute[s] a rejection under the New Mexico uninsured motorist statute."  MTD at 20 (quoting Weed Warrior, 2010-NMSC-050, ¶ 3, 245 P.3d at 1210).  Financial Indemnity contends that the Supreme Court of New Mexico

> held only that New Mexico insurers had to offer UM/UIM coverage up to the bodily injury liability limits of the subject policy.  Here, of course, there is no dispute that this was done, since Plaintiff chose UM/UIM limits equal to her bodily injury liability limits.  Nothing in *Weed Warrior*, though, in any way prohibited an insured from purchasing minimum limits UM/UIM coverage, or deemed such coverage illegal.

MTD at 21.  Financial Indemnity asserts that the Supreme Court of New Mexico "had no occasion to consider or address all the situations in which minimum limits UM/UIM coverage does in fact have value."  MTD at 21.

Financial Indemnity then asserts that a California state court ruled that, when an insurer offers minimum limits underinsured coverage that is consistent with applicable law, "there can

be no argument that the coverage is 'illusory.'" MTD at 21 (citing <u>Fagundes v. Am. Internat. Adjustment Co.</u>, 3 Cal. Rptr. 2d 763, 767 (Cal. Ct. App. 1992)).

Next, Financial Indemnity addresses Bhasker's contention that Financial Indemnity allegedly charged excessive premiums for underinsured motorist coverage that Financial Indemnity did not, in the end, provide. <u>See</u> MTD at 22. Financial Indemnity asserts that this argument "is negated by her own Complaint allegation and exhibits." MTD at 22. Financial Indemnity contends that Bhasker's policy documents shows that Financial Indemnity charged her a single premium for combined uninsured motorist ("UM") and underinsured coverage. <u>See</u> MTD at 22. Financial Indemnity then argues:

> Under New Mexico law, rates must be charged based on the insurers' loss history. See, e.g., N.M. Stat. Ann. § 59A-17-7 ("In determining whether rates comply with the rate standards, the following criteria shall be applied: A. due consideration shall be given to past and prospective loss and expense experience within and without this state[.]"); N.M. Stat. Ann. § 59A-17-6 ("Rates are inadequate if they are clearly insufficient, together with the investment income attributable to them, to sustain projected losses and expenses in the line, kind or class of business to which they apply."). Taking Plaintiff's Complaint allegations that Defendant rarely, if ever, pays under minimum limits UIM coverage as true, then by definition the portion of the rate for the combined UM/UIM coverage that is attributable to UIM, as opposed to UM, coverage would be minimal based on a minimal loss payment history. So, again taking Plaintiff's Complaint allegations as true, Defendant cannot, as a matter of law, be collecting excessive premiums for UIM coverage that has an allegedly small or "illusory" value. And that analysis only further underscores why, as fully discussed above, the filed rate doctrine also bars Plaintiff's claims.

MTD at 22-23.

### 3. The Response.

Bhasker responds to Financial Indemnity's MTD. <u>See</u> Plaintiff's Response and Memorandum of Law in Opposition to Defendant's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support, filed May 23, 2017 (Doc. 18)("Response").

Bhasker argues that the filed rate doctrine does not apply to her claims. <u>See</u> Response at 3. Bhasker acknowledges that she paid a premium "for illusory coverage," but her Complaint concerns "disputed contractual coverage, misrepresentations to sell coverage, and failure to properly advise Plaintiff as to the impact of her choice." Response at 3. Bhasker contends that "[s]uch conduct is separate from any regulatory framework or the setting of rates." Response at 3. Bhasker asserts that the United States District Court for the Southern District of Illinois determined that the filed rate doctrine "was wholly inapplicable to claim of illusory UIM coverage" where the plaintiff alleges deception and fraud. Response at 4 (citing <u>Keeling v. Esurance Ins. Co.</u>, No. 10-0835-DRH, 2012 WL 699580, at *4-5 (S.D. Ill. Mar. 1, 2012)(Herndon, C.J.)). In other words, Bhasker asserts that the filed rates doctrine does not apply where a plaintiff alleges claims that "'challenge defendant's alleged deception, not the amount charged for the underinsured coverage and do not seek to change the rates.'" Response at 4 (quoting <u>Keeling v. Esurance Ins. Co.</u>, 2012 WL 699580, at *5).

Bhasker asserts that the same analysis should apply in this case, because she alleges that, "based on fraudulent and deceptive behavior by the insurer, the coverage provided was a sham," and New Mexico law "precludes an insurer from retaining premiums on an insurance contract where the policy is illegal." Response at 4 (citing <u>Forrest Currell Lumber Co. v. Thomas</u>, 1970-NMSC-018, ¶¶ 15-16, 464 P.2d 891, 895 (1970)). Bhasker also contends that New Mexico law "provides that approval of a policy form by a regulatory body does not conclusively establish the validity of the policy or shield it from review by the courts." Response at 4 (citing <u>Azar v. Prudential Ins. Co. of Am.</u>, 2003-NMCA-062, ¶ 69, 68 P.3d 909, 929 (Ct. App. 2003)). Bhasker asserts that "[a]pplying the filed rate doctrine to every insurance dispute in which an insured alleges that the contract was illusory is clearly contrary to New Mexico law and cannot stand."

Response at 4. Bhasker concludes, accordingly, that, because she alleges that Financial Indemnity made fraudulent misrepresentations, the filed rate doctrine does not apply. See Response at 4-5.

Next, Bhasker contends that the voluntary payment doctrine does not apply to her claims. See Response at 5. Bhasker asserts that the voluntary payment doctrine is "not a legally adequate affirmative defense to claims of unfair and deceptive business practices." Response at 5 (citing Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC, 198 F. Supp. 3d 1332, 1342 (S.D. Fla. 2016); Soule v. Hilton Worldwide, Inc., 1 F. Supp. 3d 1084, 1104 (D. Haw. 2014); Huch v. Charter Commc'ns, Inc., 290 S.W.3d 721 (Mo. 2009); State ex rel. Miller v. Vertrue, Inc., 834 N.W.2d 12 (Iowa 2013); Samuel v. Time Warner, Inc., 10 Misc. 3d 537, 549, 809 N.Y.S.2d 408, 418 (Sup. Ct. 2005)). Bhasker asserts that one of Financial Indemnity's voluntary payment cases "identifie[s] the exception to the rule's application which is pertinent to the instant dispute: 'payments voluntarily made with full knowledge of all material facts cannot be recovered back *in absence of fraud or duress*.'" Response at 5 (quoting Rabbit Ear Cattle Co. v. Frieze, 1969-NMSC-043, ¶ 5, 453 P.2d at 374)(emphasis added by Bhasker). Bhasker also discusses a Washington state court case, in which, she asserts, the state court recognized the voluntary payment doctrine's "generally recognized exception" that it is "inapplicable where the payment was induced by fraud." Response at 6-7 (quoting Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 170 P.3d 10, 23 (Wash. 2007)). Bhasker asserts that the Washington state court rejected the voluntary payment doctrine's application in an action brought under the state's consumer protection laws. Response at 7 (citing Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 170 P.3d at 24). Moreover, Bhasker contends, federal district courts have "uniformly recognized" that the voluntary payment

doctrine does not apply when the payment is made under duress or as a result of fraud.  Response at 7 (citing <u>Shaw v. Marriott Int'l, Inc.</u>, 474 F. Supp. 2d 141, 151 (D.D.C. 2007)(Kessler, J.); <u>Fink v. Time Warner Cable</u>, 810 F. Supp. 2d 633, 649 (S.D.N.Y. 2011)(Swain, J.), <u>on reconsideration</u>, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011)).

Bhasker then asserts that, on the few occasions on which New Mexico courts have considered the voluntary payment doctrine, they have "simply not recognized or applied the voluntary payment doctrine outside the context of restitution claims and clearly never in the context of a bar to a statutory cause of action."  Response at 7-8 (citing <u>Aetna Life Ins. Co. v. Nix</u>, 1973-NMSC-069, ¶ 9, 512 P.2d 1251, 1253;  <u>Cheesecake Factory, Inc. v. Baines</u>, 1998-NMCA-120, ¶ 6, 964 P.2d 183, 185-86).  Bhasker concludes that, "whether based on an improper extension of state law, or the well-recognized exceptions to the common law doctrine, the voluntary payment doctrine is equally inapplicable to the instant action and must fail."  Response at 8.

Next, Bhasker asserts that her illusory-coverage claims is viable.  <u>See</u> Response at 8.  Bhasker contends that she "believed that she was purchasing valuable coverage," but "was led to purchase . . . worthless and illusory [coverage] since the insurer would never incur liability under the policy."  Response at 8-9 (citing <u>Pompa v. Am. Family Mut. Ins. Co.</u> 520 F.3d 1139, 1145 (10th Cir. 2008)).  Bhasker contends that the Supreme Court of New Mexico has determined that an "'insured carries UIM coverage *only* if the UM/UIM limits on her or his policy are greater than the statutory minimum of $25,000.'"  Response at 9 (quoting <u>Weed Warrior</u>, 2010-NMSC-050, ¶ 10, 245 P.3d 1209, 1212-13).  Bhasker argues that, because New Mexico courts have not "squarely addressed" whether the UIM coverage which she purchased was illusory, the Court should consider authority in jurisdictions with "a similar statutory framework

to that in New Mexico." Response at 9. Bhasker contends:

> In other jurisdictions where the limits of the tortfeasor's liability coverage and the claimants' underinsured motorist coverage limits are the same, and where the state law determines a claimant's status as underinsured solely by considering the contractual limits of liability rather than the damages sustained, courts have recognized that under the principle of illusory coverage, or under the reasonable expectations of the claimant, UIM coverage may be activated.

Response at 9.

Bhasker contends that "different jurisdictions define and apply UIM coverage differently," with some jurisdictions "compar[ing] the damages sustained by the insured to the limits of coverage under the tortfeasor's policy," Response at 9-10 (citing Brainard v. Trinity Universal Ins. Co., 216 S.W.3d 809 (Tex. 2006)), while other jurisdictions "require a comparison of the limits of the tortfeasor's policy to the limits of the insured's UIM policy to satisfy the definition of an underinsured motorist," Response at 10 (citing S'Dao v. National Grange Mut. Ins. Co., 661 N.E. 2d 1378 (N.Y. 1995)). Bhasker concludes that "those jurisdictions that have considered the issue which is most pertinent to Plaintiff's dispute are those where the definition of underinsured motorist requires an examination of the limits of coverage, as is required under the policy at issue in this case." Response at 10 (citing Smith v. Auto-Owners Ins. Co., 500 So. 2d 1042, 1044 (Ala. 1986); Glazewski v. Allstate Ins. Co., 466 N.E.2d 1151, 1156 (Ill. App. Ct. 1984), aff'd in part, rev'd in part sub nom., Glazewski v. Coronet Ins. Co., 483 N.E.2d 1263 (Ill. 1985); Hardy v. Progressive Specialty Ins. Co., 67 P.3d 892 (Mont. 2003); Pristavec v. Westfield Ins. Co., 400 S.E.2d 575, 577 (W. Va. 1990); Hoglund v. Secura Ins., 500 N.W.2d 354, 355 (Wis. Ct. App. 1993), superseded by statute). Regarding Pristavec v. Westfield Ins. Co., Bhasker asserts that the court concluded that West Virginia's underinsured motorist statute public policy provides full compensation for damages not paid by a negligent tortfeasor to

support its conclusion that "UIM coverage was activated" under the state's underinsured statute. Response at 14 (citing <u>Pristavec v. Westfield Ins. Co.</u>, S.E.2d at 582). Bhasker contends that New Mexico's underinsured statute "also furthers a public policy of compensating injured persons not compensated by a negligent tortfeasor." Response at 14 n.3 (citing <u>Salas v. Mountain States Mut. Cas. Co.</u>, 2009-NMSC-005, ¶ 20, 202 P.3d 901, 808; <u>Richards v. Mountain States Mut. Cas. Co.</u>, 1986-NMSC-021, ¶ 9, 716 P.2d at 240). Bhasker contends that, "[w]here an insured's underinsured coverage was equal to a tortfeasor's liability coverage," Indiana courts "held that such coverage was illusory under a policy that defined an underinsured motorist as one whose limits of liability coverage were less than the limits of UIM coverage." Response at 14-15 (citing <u>W. Reserve Mut. Cas. Co. v. Holland</u>, 666 N.E.2d 966, 968 (Ind. Ct. App. 1996); <u>Landis v. Am. Interinsurance Exch.</u>, 542 N.E.2d 1351, 1354 (Ind. Ct. App. 1989)).

Next, Bhasker considers Financial Indemnity's argument that the contract is not illusory, because, in New Mexico, it is possible that an out-of-state driver may have liability insurance with lower limits than those New Mexico mandates. <u>See</u> Response at 15. Bhasker argues that this argument is unreasonable as a matter of law, because New Mexico courts "have already decided that a New Mexico insured with only $25,000 in UM/UIM coverage *does not*, in fact, carry underinsured coverage." Response at 15 (citing <u>Weed Warrior Services</u>, 2010-NMSC-050, ¶ 10, 245 P.3d at 1213). Bhasker also argues that,

> even if a tortfeasor has an out-of-state liability policy with lower bodily injury liability minimum limits than those required in New Mexico, there is always the possibility that the tortfeasor's policy will contain an out-of-state coverage clause which will provide liability limits in an amount equal to the liability limits imposed by New Mexico's Mandatory Financial Responsibilities Act[, N.M. Stat. Ann. § 66-5-201]. *See, for example, Bristol West Ins. Co. v. Wawanesa Mut. Ins. Co.*, 570 F.3d 461, 463-64 (1st Cir. 2009)). The effect of such a clause would be to increase the out-of-state tortfeasor's liability limits to the minimum amount required in New Mexico, namely, $25,000. In such an instance, a New Mexico

resident with minimum UIM limits *would not* be able to recover the benefits of his or her UIM coverage in an auto accident with an out-of-state driver.

Response at 15 (emphasis in original).

Bhasker then considers Financial Indemnity's argument that the coverage is not illusory, because there are some instances in which the policy holder may recover benefits. <u>See</u> Response at 16-17. Bhasker argues that Financial Indemnity's "hypothetical and remote" examples do not negate the coverage's "illusory nature." Response at 16 (citing <u>Hardy v. Progressive Specialty Ins. Co.</u>, 67 P.3d at 894).

Next, Bhasker argues that her reasonable expectations "are of paramount importance when considering what benefits an insured is entitled to under the terms of an insurance policy." Response at 18 (citing <u>Rummel v. Lexington Ins. Co.</u>, 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977( 1997); <u>Sanchez v. Herrera</u>, 1989-NMSC-073, ¶ 24, 783 P.2d 465, 469). Bhasker also contends that the reasonable expectations doctrine applies, because, in New Mexico, the reasonable expectations doctrine "'is not restricted to those cases in which the policy language is at issue.'" Response at 18 (quoting <u>Barth v. Coleman</u>, 1994-NMSC-067, ¶ 15, 878 P.2d 319, 323)(citing <u>Berlangieri v. Running Elk Corp.</u>, 2002-NMCA-046, ¶ 13, 44 P.3d 538, 541-42). Bhasker contends that, in any case, the policy's language at issue "is not clear and unambiguous." Response at 19. Bhasker asserts that, in applying the reasonable expectations doctrine, "courts will look to how a reasonable non-attorney would view the terms of coverage." Response at 19 (citing <u>Battishill v. Farmers Alliance Ins. Co.</u>, 2006-NMSC-004, ¶ 13, 127 P.3d 1111, 1114; <u>Computer Corner, Inc. v. Fireman's Funds Ins. Co.</u>, 2002-NMCA-054, ¶ 13, 46 P.3d 1264, 1268). Bhasker asserts that courts will also consider the kind of insurance at issue. <u>See</u>

Response at 20 (citing <u>Hinkle v. State Farm Fire & Cas. Co.</u>, 2013-NMCA-084, ¶ 18, 308 P.3d 1009, 1014).

Bhasker concludes that she has

> pled facts which, if taken as true and viewed in the light most favorable to the Plaintiff, suffice to evidence her entitlement to relief for her claims against Defendant for negligence, violation of the New Mexico Unfair Trade Practices Act, violation of the New Mexico Unfair Insurance Practices Act, breach of contract, breach of the covenant of good faith and fair dealing, and for punitive damages. Both of Defendant's affirmative defenses must fail as a matter of law and Bhasker has shown that the underinsured coverage she purchased must be considered illusory. Accordingly, Defendant's Motion to Dismiss must be denied in its entirety and the matter permitted to proceed.

Response at 20-21.

### 4.      **The Reply.**

Financial Indemnity replies to Bhasker's response. <u>See</u> Reply in Support of Defendant's Motion to Dismiss First Amended Complaint, filed June 6, 2017 (Doc. 20)("Reply"). Financial Indemnity first argues that the filed rate doctrine bars Bhasker's claims. <u>See</u> Reply at 1. Financial Indemnity disputes Bhasker's contention that her claims are "'separate from any regulatory framework or the setting of rates.'" <u>See</u> Reply at 1 (quoting Response at 3). Financial Indemnity argues that "clear authority" in the United States Court of Appeals for the Tenth Circuit and in other United States Courts of Appeals hold that the filed rate doctrine "applies regardless of the label used to describe the claims, including where fraud or other illegal activity is alleged." Reply at 1. Financial Indemnity contends that the Tenth Circuit, applying New Mexico law, "rejected the same type of 'fraudulent activity' argument Plaintiff asserts here, upholding dismissal, based on the filed rate doctrine, of plaintiffs' claims against the insurer defendants of conspiracy and bribery." Reply at 1-2 (citing <u>Coll v. First Am. Title Ins. Co.</u>, 642 F.3d 876 (10th Cir. 2011)). In <u>Coll v. First American Title Insurance Co.</u>, Financial Indemnity

asserts, the Tenth Circuit held that the "'focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations,'" and that the "'underlying conduct does not control whether the filed rate doctrine applies.'"  Reply at 2 (quoting 642 F.3d at 890).  Financial Indemnity asserts that the Tenth Circuit concludes that the "'dispositive question'" is whether a win for the plaintiff would impact the regulatory agency's rate determinations; "'if so, the 'filed rate' doctrine will bar the claim.'"  Reply at 2 (quoting 642 F.3d at 890).  Financial Indemnity argues that the Tenth Circuit, in Coll v. First American Title Insurance Co., looked to New Mexico precedent in Valdez v. State, 2002-NMSC-028, 54 P.3d 71, and "concluded that, under New Mexico law, there is no fraud exception to the 'filed rate' doctrine."  Reply at 2 (citing 642 F.3d at 890).  Financial Indemnity contends that other courts have reached similar conclusions.  See Reply at 2-3 (citing Crumley v. Time Warner Cable, Inc., 556 F.3d 879, 881 (8th Cir. 2009); Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 20 (2d Cir. 1994); Sun City Taxpayers' Ass'n v. Citizens Utilities Co., 847 F. Supp. 281, 291 (D. Conn. 1994), aff'd, 45 F.3d 58 (2d Cir. 1995); Korte v. Allstate Ins. Co., 48 F. Supp. 2d 647, 650 (E.D. Tex. 1999); Porr v. NYNEX Corp., 230 A.D.2d 564, 574 (N.Y. App. Div. 1997);).  Financial Indemnity contends that, "no matter how Plaintiff tries to characterize her claims, it is clear she is challenging Defendant's rates for UIM coverage, which brings this case squarely within the filed rate doctrine."  Reply at 3.  Financial Indemnity writes:

> Plaintiff claims she "paid a premium of $80 for bodily injury coverage and $54 for un-and-underinsured coverage for a total of $134 for minimal combined coverage.  A purchase of higher limits, for example, at a premium of $201 would yield a disproportionate underinsured indemnification to premium ratio of 308/1, when compared to the purchase of minimal combined coverage for virtually no underinsured indemnification."  (Compl., ¶ 34.)  Plaintiff calculates her "disproportionate underinsured indemnification to premium ratio" as

follows: "$25,000.00/$81=308," and states "the Plaintiff would be indemnified up to $25,000.00 in underinsured coverage with a purchase of the next tier of available coverage of $50,000.00 per person/$100,000.00 per accident after the offset." (Id, n. 5 & n. 6.) If, as Plaintiff maintains, she is not challenging insurance rates, her Complaint would not allege, as it plainly does, that Defendant has charged a disproportionate premium for minimum limits UIM coverage, or set forth calculations regarding that alleged wrongful premium, and it certainly would not seek a class-wide refund of supposedly improperly collected minimum limits UIM premiums. Put simply, on the face of the Complaint Plaintiff herself has injected "unlawful premiums" as a damages element in this case, alleging she and the class overpaid for worthless coverage. She is thus necessarily challenging the rate she was charged, which is precisely what the filed rate doctrine prevents.

Reply at 3-4.

Financial Indemnity also argues that Bhasker's reliance on <u>Keeling v. Esurance Ins. Co.</u>, No. 10-0835, 2012 WL 699580 (S.D. Ill. March 1, 2012), is misplaced. <u>See</u> Reply at 4. According to Financial Indemnity, the plaintiff in <u>Keeling v. Esurance Ins. Co.</u>, challenged the defendant's alleged deceptive and fraudulent conduct in selling sham coverage, not whether the rates were reasonable, which meant that the filed rate doctrine did not bar the plaintiff's claims. <u>See</u> Reply at 4 (citing <u>Keeling v. Esurance Ins. Co.</u>, 2012 WL 699580 at *5). By contrast, Financial Indemnity argues, Bhasker is "attacking a purportedly 'disproportionate' insurance premium, thereby clearly challenging the amount charged for the coverage." Reply at 4. Moreover, Financial Indemnity contends, <u>Keeling v. Esurance Ins. Co.</u> is "directly contrary" to the Tenth Circuit's decision in <u>Coll v. First American Title Insurance Co.</u>, where, according to Financial Indemnity, the Tenth Circuit held that "there is no fraud exception to the filed rate doctrine." Reply at 4. Financial Indemnity contends that Bhasker does not dispute that its insurance premiums "are part of New Mexico's comprehensive regulatory scheme, and thus are heavily regulated and cannot be collaterally attacked." Reply at 4. Financial Indemnity warns that, "if this Court were to follow the approach Plaintiff advocates based on *Keeling*, however, it

would allow Plaintiff, under the guise of asserting 'fraudulent' conduct, to obtain a different UIM premium rate than established under New Mexico's regulatory framework." Reply at 4-5. Financial Indemnity further warns that ruling for Bhasker would require determining whether the premium Financial Indemnity charged was proper, "which would require the Court to interfere in matters reserved for the Superintendent of Insurance, who is vested with authority to determine the propriety of insurance rates." Reply at 5. Financial Indemnity also contends that Bhasker does not attempt to distinguish this case from an Alabama state case that is directly on point. See Reply at 5 (citing Alabama Mut. Ins. Corp. v. City of Fairfield, 178 So. 3d at 363-64).

Financial Indemnity asserts that all of Bhasker's claims "fail based on the voluntary payments doctrine." Reply at 5. Financial Indemnity contends that Bhasker cites no cases, and makes no arguments, contradicting Financial Indemnity's assertions "that the voluntary payments doctrine applies -- *including where fraud is alleged* -- where, as here, the plaintiff knew or could have easily learned of the law underlying the basis for the disputed charge." Reply at 6 (citing Chris Albritton Const. Co. v. Pitney Bowes Inc., 304 F.3d 527, 531 (5th Cir. 2002); Randazzo v. Harris Bank Palatine, N.A., 262 F.3d 663, 666-68 (7th Cir. 2001); Robbins v. SCANA Energy Mktg., Inc., No. 1:08-CV-640-BBM, 2008 WL 7724171, *5 (N.D. Ga. June 13, 2008)). Financial Indemnity also asserts that Bhasker "fails to address the fact that the face of her Complaint shows that she received exactly what she was unambiguously told she would get." Reply at 7 (citing Complaint ¶¶ 67-74, at 14-15).

Financial Indemnity argues that Bhasker's claims fail because the policy coverage is not illusory as a matter of law. See Reply at 8. Financial Indemnity contends that, although Bhasker cites to cases holding that the coverage is illusory, Bhasker "cannot avoid the clear majority of cases [that Financial Indemnity] cited . . . which have rejected Plaintiff's 'illusory' coverage

argument." Reply at 8 (citing <u>Hallihan v. Progressive Direct Ins. Co.</u>, No. 315CV01068NJRSCW, 2016 WL 4617243, at *6 (S.D. Ill. Sept. 6, 2016)(Rosenstengel, J.); <u>Fagundes v. Am. Internat. Adjustment Co.</u>, 3 Cal. Rptr. 2d at 767, <u>Vincent v. Safeco Ins. Co. of Am.</u>, 29 P.3d at 948; <u>Meridian Mut. Ins. Co. v. Richie</u>, 544 N.E.2d at 489-90; <u>Johnson v. AAA Chicago Motor Club Ins. Co.</u>, 699 N.E.2d 1182, 1186 (Ind. Ct. App. 1998); <u>Colonial Ins. Co. of California v. Batson</u>, 584 A.2d 137, 141 (Md. Ct. Spec. App. 1991); <u>Showman v. Busser</u>, 2013 WL 6037161, at *4). Financial Indemnity asserts:

> As these cases show, there are in fact situations in which minimum limits UIM coverage provides tangible benefits for New Mexico policyholders, including where: (a) the tortfeasor had an out-of-state policy with lower bodily injury liability minimum limits than in the policy state; (b) there are multiple injured parties in an accident, such that no single policyholder will recover the entirety of the tortfeasor's liability limit; and (c) the insured receives less than the tortfeasor's policy limits due to a contractual exclusion for punitive damages, and the insurer offsets the full amount of the tortfeasor's liability limits.

Reply at 8. Financial Indemnity argues that "the cases holding minimum limits UIM coverage is not 'illusory' are better reasoned" and "most of the cases Plaintiff cites . . . are either factually distinguishable or failed to consider all the scenarios where the coverage does indeed provide valuable benefits to insured (most notably the punitive damage scenario based on New Mexico's unique law in that regard)." Reply at 8 (citing <u>Smith v. Auto-Owners Ins. Co.</u>, 500 So. 2d 1042, 1045 (Ala. 1986); <u>Glazewski v. Allstate Ins. Co.</u>, 466 N.E.2d at 1156; <u>Hoglund v. Secura Ins.</u>, 500 N.W.2d at 356). Financial Indemnity asserts that two cases that Bhasker cites -- <u>Hardy v. Progressive Specialty Ins. Co.</u> and <u>Pristavec v. Westfield Ins. Co.</u> -- are "internally inconsistent," because it "makes no sense, on the one hand, to acknowledge that minimum limits UIM coverage *does* provide benefits in certain situations, but on the other hand to hold that the coverage is 'illusory' or worthless." Reply at 9-10. Financial Indemnity also contends that the

Indiana state court cases to which Bhasker cites -- <u>Western Reserve Mutual Casualty Company</u> <u>v. Holland</u>, 666 N.E.2d 966 (Ind. Ct. App. 1996); <u>Landis v. Am. Interinsurance Exch.</u>, 542 N.E.2d 1351 (Ind. Ct. App. 1989) -- are "fatally inconsistent" with the Supreme Court of Indiana's decision in <u>Meridian Mutual Insurance Co. v. Richie</u>, 544 N.E.2d at 489-90, and Indiana courts "have declined to follow them on that very ground." Reply at 10 n.7.

Next, Financial Indemnity argues that Bhasker's contention that she "has paid excessive premiums and received nothing in return" ignores that, as a matter of law, Financial Indemnity can "charge rates based on its loss history." Reply at 10 (citing MTD at 24). Financial Indemnity asserts that Bhasker's policy documents show that she has combined UM and UIM coverage for which she paid a single premium, and "[t]aking Plaintiff's Complaint allegations that Defendant rarely, if ever, pays under minimum limits UIM coverage as true, the portion of the combined UM/UIM coverage premium attributable to UIM coverage would, of necessity, be miniscule." Reply at 10. Financial Indemnity contends that this fact "wholly negates Plaintiff's theory that Defendant has collected excessive premiums for UIM coverage with an allegedly 'illusory' value." Reply at 10.

Financial Indemnity also disputes Bhasker's contention that the Supreme Court of New Mexico, in <u>Weed Warrior</u>, has already determined that a New Mexico insured with only $25,000.00 in UM/UIM coverage does not carry underinsured coverage. <u>See</u> Reply at 10-11. Financial Indemnity asserts that, in that case, the Supreme Court of New Mexico "simply did not hold that minimum limits UIM coverage is impermissibly illusory"; instead, the Supreme Court "held only that New Mexico insurers had to offer UM/UIM coverage up to the bodily injury liability limits of the subject policy." Reply at 10-11. Financial Indemnity asserts that Bhasker "chose UM/UIM limits equal to her bodily injury liability limits." Reply at 11. Financial

Indemnity contends that nothing in <u>Weed Warrior</u> "prohibits an insured from purchasing minimum limits UM/UIM coverage, or deems such coverage illegal." Reply at 11.

Next, Financial Indemnity considers Bhasker's "reasonable expectations" arguments, and contends that Bhasker "cannot escape the cases holding that this doctrine simply does not come into play in the face of clear and unambiguous policy language." Reply at 11 (citing <u>Sheldon v. Hartford Ins. Co.</u>, 2008-NMCA-098, ¶ 17, 189 P.3d at 700; <u>Truck Ins. Exch. v. Gagnon</u>, 2001-NMCA-092, 33 P.3d at 903). Financial Indemnity considers Bhasker's contention that the reasonable-expectations doctrine may apply when policy language is ambiguous and when additional factors contributed to the plaintiff's expectations, and Financial Indemnity argues that Bhasker has asserted no such factors. <u>See</u> Reply at 11. Financial Indemnity also contends that Bhasker does not identify any policy language or provision in particular that Bhasker contends is ambiguous. <u>See</u> Reply at 11-12.

5.     **The Hearing.**

The Court held a hearing on July 24, 2017. <u>See</u> Hearing Transcript (taken July 24, 2017) (Doc. 34)("Tr."). Financial Indemnity began by arguing that there are three reasons why the Court should grant its MTD. <u>See</u> Tr. at 3:6-7 (Hanover). First, Financial Indemnity argued that Bhasker "is challenging the amount of the premium that she was charged for her minimum limits UIM coverage, and this challenge is barred by the Filed Rate Doctrine." Tr. at 3:8-12 (Hanover). The Court asked whether New Mexico courts have ever "squarely adopted" the filed rate doctrine, Tr. at 3:13-14 (Court), and Financial Indemnity answered that it "can't cite to a New Mexico state court case that's adopted it [but] I will say that I'm not aware of any state that has ever rejected the filed rate doctrine," Tr. at 3:21-24 (Hanover). Financial Indemnity stated that Montana "is the only state I can think of that hasn't formally adopted [the filed rate doctrine] but

they have not rejected it either."  See Tr. at 4:2-7 (Hanover).

The Court asked Financial Indemnity: "[I]f you had an illusory contract in which you did not have anything being sold, do you think the Supreme Court of New Mexico would say . . . the filed rate doctrine -- that it's never adopted -- is going to bar a claim for that?"  Tr. at 4:8-13 (Court).  Financial Indemnity stated that it did not know, but conceded that it would be unlikely that the Supreme Court of New Mexico would bar such a claim based on the filed rate doctrine. See Tr. at 5:7-9 (Hanover).  Financial Indemnity asserted, nonetheless, that the UM/UIM coverage in this case is not illusory.  See Tr. at 4:14-16 (Hanover).

The Court then asked Financial Indemnity about Coll v. First American Title Insurance Co.  See Tr. at 5:10-14 (Court).  Financial Indemnity explained that the Tenth Circuit held that "any filed rate that is one approved by the governing regulatory agency is, per se, reasonable and unassailable in judicial proceedings brought by ratepayers."  Tr. at 6:24-7:4 (Hanover). Financial Indemnity asserted that the filed rate doctrine's purpose is "to preserve the role of regulatory bodies in approving rates and maintaining markets and keeping courts out of the ratemaking process."  Tr. at 7:4-8 (Hanover).  Financial Indemnity asserted that, in New Mexico, there is a "comprehensive rating scheme" for insurance rates: "Section 17.9 of the Insurance Code requires insurers to file the rates with the Superintendent of Insurance . . . prior to using them."  Tr. at 7:9-13 (Hanover).  Financial Indemnity asserted that Section 17.12 "requires insurers to charge only the rates that are lawfully in effect as provided in the insurance rate regulation laws, and the Superintendent of Insurance has exclusive authority over any challenges to fixed rates."  Tr. at 7:13-17 (Hanover).  Financial Indemnity asserted that, under New Mexico's Insurance Code, any "aggrieved person" has the right to a hearing before the Superintendent of Insurance.  Tr. at 7:23-25 (Hanover).  Financial Indemnity concluded that "this

comprehensive scheme leaves no doubt that the New Mexico Legislature did not intend for the premiums charged by insurers to be collaterally estopped, and that's exactly what the plaintiffs are alleging here with their illusory coverage theory." Tr. at 8:1-6 (Hanover). Financial Indemnity stated:

> The plaintiff specifically alleged that the premium that she paid for her UM/UIM coverage was too high. She calculates the ratios for minimum limits and for higher limits, with the contention that the premium actually charged to the plaintiff was excessive. The plaintiff uses the phrase that there was "a disproportionate premium/indemnification ratio." These are exactly the kinds of matters that have been entrusted to the Superintendent of Insurance to regulate.
>
> . . . .
>
> Once a rate has been submitted to the regulator and it's appropriate to be used, that is the only rate that the carrier is permitted to charge, and any allegations about representations about the rate are estopped by virtue of the doctrine.

Tr. at 8:7-9:6 (Hanover)(quoting Complaint ¶¶ 34-35, at 5-6).

The Court asked how there are claims in New Mexico and in other states for illusory insurance contracts, given that the filed rate insurance doctrine would seem to preclude those claims. See Tr. at 9:7-12 (Court). Financial Indemnity answered that a "majority [of jurisdictions] have found that coverage was not illusory, and a minority have found that coverage is illusory." Tr. at 9:13-16 (Court). Financial Indemnity argued that the cases that have found coverage to be illusory can be separated into two categories:

> Some of them, such as the <u>Hoglund[ v. Secura Insurance</u>, 176 Wis. 2d at 500 N.W.2d 354 (Ct. App. 1993),] case from the Wisconsin Court of Appeals, and the Smith versus Auto-Owners case from the Alabama Supreme Court, simply found that minimum limits UM/UIM coverage is completely worthless. And so they found where it's valueless, therefore, that the coverage was illusory. They didn't consider any of the circumstances where it could be worthwhile. The other category are cases like <u>Glazewski[ v. Allstate Ins. Co.</u>, 126 Ill. App. 3d 401, 466 N.E.2d 1151,] from Illinois, as well as <u>Hardy[ v. Progressive Specialty Ins. Co.</u>, 315 Mont. 107, 67 P.3d 892 (2003),] from Montana, and <u>Pristavec[ v. Westfield Ins. Co.</u>, 184 W.Va. 331, 400 S.E.2d 575 (1990)]. In these circumstances the

courts did consider at least one circumstance where the coverage could have some value. In some of the cases they did not consider all the circumstances. But they just came to a conclusion that, notwithstanding these circumstances, the coverage was too remote or had no value in any event.

Tr. at 9:19-10:11 (Hanover). The Court asked how courts "[got] around the filed rate doctrine in concluding there was claim for an illusory contract," and Financial Indemnity responded that, in "pure coverage" cases -- i.e., when the question is exclusively whether there is coverage in a certain circumstance -- the filed rate doctrine does not necessarily apply. Tr. at 10:12-22 (Court, Hanover). Financial Indemnity added that this case is not a "pure coverage" case. Tr. at 10:23-24 (Hanover). The Court asked whether the cases reflecting the "minority position" were distinguishable from this case. Tr. at 10:25-11:2 (Court). Financial Indemnity responded that, among the minority cases, some were unclear whether the issue was "purely coverage." Tr. at 11:3-7 (Hanover). Financial Indemnity argued that, in this case, certain clues indicate that this is not a "purely coverage" question, e.g., because the "putative class definition includes everyone that has the coverage, without regard to whether or not they've had any claim," and because Bhasker "is challenging the proportionality and amount of the premium that was charged for coverage that they believe to have been either completely or nearly worthless." Tr. at 11:8-17 (Hanover).

The Court then asked Bhasker whether she thought that the Tenth Circuit "has correctly read New Mexico as adopting the filed rate doctrine." Tr. at 13:5-7 (Court). Bhasker replied that she believed that New Mexico has already adopted the filed rate doctrine. See Tr. at 13:8-12 (Bhasker)[5]. The Court asked Bhasker how she can "get around the Tenth Circuit application of that particular case," and Bhasker responded that "the way you get around it is to focus on the

[5]Kedar Bhasker, of Will Ferguson & Associates, argued before the Court on behalf of the Plaintiff, Helen Bhasker. See Tr. at 2:9-10 (Bhasker).

relief Plaintiff seeks," and, in the Tenth Circuit case, "the relief they were seeking was to adjust the rates." Tr. at 13:16-19 (Bhasker). The Court asked: "[I]f you're asking for a refund of premiums, you are asking for some premiums back." Tr. at 13:22-24 (Court). Bhasker answered that she "has not specifically requested that we receive a refund of the rates." Tr. at 14:2-6 (Bhasker). Bhasker asserted that she seeks "remedies that are available for the misleading and unconscionable trade practice . . . [which] include actual damages, punitive damages, attorney fees." Tr. at 14:10-13 (Bhasker). The Court wondered whether, to award damages to Bhasker, it would have to determine that the premiums were unlawful, and therefore "run into the filed rate doctrine." Tr. at 14:14-20 (Court). Bhasker answered that "the term 'unlawful premium' was first published by the defendant" and that "[n]owhere in our complaint have to we alleged that there was an unlawful premium." Tr. at 14:21-24 (Bhasker). The Court asked whether Bhasker's reference to "'illusory uninsured coverage with a disproportionate premium identification ratio, when compared to the next tier of available coverage'" in her Complaint alleged an unlawful premium. Tr. at 14:25-15:5 (Court)(quoting Complaint ¶ 35, at 6). Bhasker responded that

> this description of the ratio and the next tier is to provide an example of the illusory nature of this coverage, and if the Court believes that this example is alleging that the rates are not fair, we would request that . . . there would be a chance to amend the complaint to clear up this type of language.

Tr. at 15:6-13 (Bhasker).

Bhasker then argued that this case is distinct from the Tenth Circuit's <u>Coll v. First American Title Insurance Co.</u>, because, in that case, "the filed rate was applicable to preclude damages for restitution, unjust enrichment, and disgorgement of the excessive amounts charged for title insurance," but, in this case, Bhasker seeks "the underinsured motorist benefits and any

other damages the Court deems fair," but not restitution or unjust enrichment.  Tr. at 15:18-24 (Bhasker).

Next, Bhasker argued that the Supreme Court of Alabama determined in <u>Peachtree Casualty Insurance v. Sharpton</u>, 768 So.2d 368 (Ala. 2000) that the filed rate doctrine did not apply in a case where "they were trying to determine the proper amount of insurance coverage." Tr. at 16:2-7 (Bhasker).  Bhasker asserted that the Supreme Court of Alabama applied the filed rate doctrine in <u>Alabama Mut. Ins. Corp. v. City of Fairfield</u>, 178 So. 3d at 363-64, "where the plaintiff was asking the court to adjust insurance rates."  Tr. at 16:7-13 (Bhasker).  Bhasker concluded that, "as far as the filed rate doctrine is concerned, we just don't think that it fits for this case, because of the relief plaintiff seeks."  Tr. at 16:14-16 (Bhasker).  Bhasker asserted that, in <u>Azar v. Prudential Insurance Co. of America</u>, 2003-NMCA-062, 68 P.3d 909, the Court of Appeals of New Mexico did not apply the filed rate doctrine in a class action for life insurance policies where the "defendant failed to adequately disclose the additional cost of paying their premiums . . . [a]nd the allegations were [for] violations of the UIPA."  Tr. at 16:17-25 (Bhasker).

Bhasker asserted that the Court has previously determined that the UIPA "is founded in a tort cause of action."  Tr. at 17:1-8 (Bhasker, Court)(citing <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, 749 F. Supp. 2d 1235 (D.N.M. 2010)(Browning, J.)).  Bhasker asserted that she has also brought causes of action under the UPA, the UIPA, negligence, breach of contract, and the breach of covenant of good faith and fair dealing, "which all allow plaintiff to seek relief from this Court."  Tr. at 17:9-18 (Bhasker).  Bhasker also contended that she "understands that the Court does not have the power to adjust the rates, which plaintiffs are not seeking."  Tr. at 17:16-18 (Bhasker).

The Court asked whether Bhasker would agree that the "vast majority of cases that . . . are similar to yours have held that the filed rate doctrine blocks these types of claims."  Tr. at 17:19-22 (Bhasker).  Bhasker answered that she would not agree with that statement, but added that "I would agree that the vast majority of cases Defendant has cited [holds that the filed rate doctrine] blocks claims wherein the plaintiff are seeking rate adjustments."  Tr. at 17:23-1 (Bhasker).  The Court asked whether Bhasker could identify a case in which a plaintiff brought an illusory insurance claim, and the court discussed the filed rate doctrine and explained how they were allowing the claim to go forward despite the doctrine.  See Tr. at 18:2-6 (Bhasker).  Bhasker stated that the Alabama Supreme Court case, Peachtree Casualty Insurance v. Sharpton, 768 So.2d 368 (Ala. 2000), is a "perfect reference" because, in that holding, "they said 'the department of insurance's approval of the policy language does not by itself suggest that the defendant may issue a policy that violates the restrictions of the underinsured motorist statute.'"  Tr. at 18:7-16 (Bhasker)(quoting  Peachtree Casualty Insurance v. Sharpton, 768 So. 2d at 373).

The Court gave Financial Indemnity another opportunity to address the filed rate doctrine issue.  See Tr. at 18:22-23 (Court).  Financial Indemnity stated that

> I believe it's disingenuous for Plaintiff to argue that they're not seeking any return of premium, when they broadly define the class to include people who have no claims whatsoever.  It's difficult to figure out what possible damages would be there if there is no allegation to get premium back.  Although the plaintiff has styled causes of action for . . . violation of the Unfair Trade Practices Act or Unfair Insurance Practices Act, there is no factual conduct that's alleged that could possibly constitute any violations of those acts, because there is no dispute that the terms of the policy disclosed the minimum UIM coverage limits; disclosed the terms of those coverages; that the plaintiff was on notice about New Mexico law with respect to the offset provision.  And nothing in the complaint suggests anything improper or fraudulent about that.

Tr. at 18:24-19:17 (Hanover).

The Court then switched to the voluntary payment doctrine.  See Tr. at 19:21 (Court).

- 38 -

Financial Indemnity began by arguing that, in New Mexico, "payments which are voluntarily made, with full knowledge of facts, cannot be recovered, in absence of fraud or duress." Tr. at 19:22-25 (Hanover). Financial Indemnity argued that Bhasker knew the policy's terms, "was constructively on notice of New Mexico, and may have been actually on notice." Tr. at 20:8-12 (Hanover). Moreover, Financial Indemnity argued, Bhasker "paid her premium voluntarily," and there are "no well-pleaded facts about any fraud or any duress." Tr. at 20:11-13 (Hanover). Financial Indemnity asserts that Bhasker's argument that Financial Indemnity was "somehow required to affirmatively advise about the effect of New Mexico's offset law is not supported by any case law or other authority, nor does it preclude the application of the Voluntary Payments Doctrine." Tr. at 20:13-18 (Hanover). Financial Indemnity contends that Bhasker has not proffered any facts indicating circumstances under which the reasonable expectations doctrine should apply even in the face of clear policy language, nor is there anything in the pleadings indicating Bhasker got anything other than what she sought to purchase. See 20:25-21-14 (Hanover).

Financial Indemnity next argues that the "only context in which New Mexico courts have required additional disclosure requirements have been where a policyholder rejects UM/UIM coverage limits in the same amount as the liability limit, which is not the situation here [because Bhasker] actually purchased the coverage limits." Tr. at 21:20-25 (Hanover).

Financial Indemnity also asserts that, although Bhasker correctly states that New Mexico courts have applied the voluntary payment doctrine only to cases relating to restitution, "there is no case that suggests that they wouldn't apply it more broadly than restitution." Tr. at 22:3-9 (Hanover).

The Court let Bhasker respond on the voluntary payment doctrine issue. See Tr. at

22:12-13 (Court). Bhasker began by returning to the filed rate doctrine question, stating that the case <u>Sewell v. Safeco Ins. Co. of America</u>, No. CIV 06-0150, 2007 WL 2071617 (D. Colo. July 19, 2007) held that applying the filed rate doctrine "in situations similar to this" is "'disingenuous'" Tr. at 22:15-23:3 (Bhasker)(quoting 2007 WL 2071617, at *3). As for the voluntary payment doctrine, Bhasker stated that she asks the Court "to focus on the remedy plaintiffs seek." Tr. at 23:6-7 (Bhasker). Bhasker asserted that in creating the class definition, "we made it broad so we can encompass -- not leave out -- potential members, but if Your Honor requests, we can change the class definition." Tr. at 23:9-12 (Bhasker). Bhasker asserted that, if the Court "believes that our complaint seeks restitution, unjust enrichment, and disgorgement, we would be happy to amend the complaint and make it clear that we seek the underinsured motorist coverage." Tr. at 24:3-7 (Bhasker). The Court asked for clarification, and Bhasker replied that she wants the "benefit of the premium she paid" -- <u>i.e.</u>, that she benefits from the underinsured motorist coverage for $25,000.00. Tr. at 24:8-15 (Court, Bhasker). Bhasker added that there may be "other situations for the putative class where those amounts may differ." Tr. at 24:16-17 (Bhasker). The Court asked how it could give Bhasker that coverage. <u>See</u> Tr. at 24:18-19 (Court). Bhasker answered:

> One way is to follow the Supreme Court's decision in <u>Progressive v. Weed Warrior</u>, wherein they list steps in how to fully inform the insured onto what they're buying. The other way is to reform the contract, and that's through statutory interpretation. But, nonetheless, if you apply <u>Progressive v. Weed Warrior</u> steps, defendant will not be required to change their rates.

Tr. at 24:20-25:4 (Bhasker).

The Court gave Financial Indemnity another chance discuss the voluntary payment doctrine. <u>See</u> Tr. at 25:9-10 (Court). Financial Indemnity argued that <u>Progressive v. Weed Warrior</u> does not apply to this case:

In [Weed Warrior] the plaintiff had affirmatively selected UM/UIM limits that were lower than the liability limits. And . . . the plaintiff contended that this constituted a rejection of coverage. And as a rejection of UM coverage, it was subject to the New Mexico requirements for affirmative statements about rejecting UM coverage. These statements were allegedly not provided, and therefore, they claimed that the rejection was improper. So that they had never actually rejected coverage, and they should have the full limits up to the liability limits. The Supreme Court agreed with them. So the way that they reformed those policies was that they gave the plaintiffs coverage up to the full level of liability.

Here, there is no issue about any rejection, and the plaintiffs in the putative class already have the same UM/UIM limits as the liability limits. So if you're not trying to refund some sort of premium for allegedly illusory coverage, I'm hard-pressed to think about what you could possibly give them in terms of additional coverage. There is no allegation about any limits. We would just be engaging in sheer speculation as to what the plaintiff or the putative class may or may not have done if they had read their policy or thought about New Mexico law, or decided that the coverage was not worth a sufficient amount for them.

Tr. at 25:11-26:18 (Hanover).

Financial Indemnity then identified "three circumstances where the minimum limits UIM coverage does have value here": (i) "where the tortfeasor is an out-of-state driver who may have statutory limits lower than [is required in] New Mexico"; (ii) "where there are multiple injured parties, such that no one of them can recover the full amount of the tortfeasor's liability limits"; and (iii) "where the tortfeasor's policy limits contractually limits any payments for punitive damages judgments." Tr. at 26:19-27:6 (Hanover). Financial Indemnity contended that, "if we accept . . . that [the minimum limits UIM coverage is] worth something," the question becomes how much is that coverage worth, and who should decide. Tr. at 27:7-18 (Hanover). Financial Indemnity asserted that it is the Superintendent of Insurance's job to determine insurance policies' worth. See Tr. at 27:14-18 (Hanover). Financial Indemnity then argued that, because Bhasker paid one premium for combined underinsured and uninsured coverage, and insurers are allowed to set rates based on their loss history, it "may be that only a miniscule portion" of the

combined premium "related to the UIM portion versus the UM portion."  Tr. at 27:19-28:20

(Hanover).  Financial Indemnity explained that

> those are all facts that we don't have here, but the point is that it doesn't really matter where those facts come out, because it's not the Court's job to figure out whether or not [the premium] was too much, too little, or just right.  That's the job of the Superintendent of Insurance under the filed rate doctrine.

Tr. at 28:21-29:2 (Hanover).

The Court then switched to the illusory coverage issue.  See Tr. at 29:16-19 (Court).

Bhasker listed several major New Mexico cases discussing the doctrine: Weed Warrior, 2010-NMSC-050, 245 P.3d 1209; Jordan v. Allstate Ins. Co., 2010-NMSC-051, 245 P.3d 1214; Computer Corner, Inc. v. Fireman's Funds Ins. Co., 2002-NMCA-054, 46 P.3d 1264.  See Tr. at 30:4-16 (Bhasker).  Bhasker asserted that, under her breach-of-contract claim, the Court will need to consider whether the policy's coverage is illusory.  See Tr. at 30:22-25 (Bhasker).  For the tort causes of action, Bhasker asserted that "it would be necessary for this Court to find if defendant misled the insured and the putative class into a good that they were not going to receive."  Tr. at 31:1-4 (Bhasker).

Bhasker then began discussing the Supreme Court of New Mexico case Schmick v. State Farm Mutual Auto Insurance Company, 1985-NMSC-073, 704 P.2d 1092.  See Tr. at 31:5-22 (Bhasker).  Bhasker stated that the case is "archaic and needs to be reassessed," because it determined that "the offset is not expressly authorized by the statute" when neither New Mexico consumers nor lawmakers were familiar with underinsured motorist coverage.  See Tr. at 31:11-22 (Bhasker).  The Court asked how it could not follow the Supreme Court of New Mexico precedent in Schmick v. State Farm Mutual Auto Insurance Company, and Bhasker replied that "we have guidance [from] Progressive v. Weed Warrior, wherein the Supreme Court

of New Mexico has stated the underinsured motorist coverage we're talking about is different than uninsured motorist coverage. They're not synonymous or one and the same. . . . [T]hey've established it as superfluous or unnecessary." Tr. at 32:8-15 (Bhasker). Bhasker added that "if this Court finds it necessary for us to certify a question of law to the Supreme Court, we can certainly proceed down that route." Tr. at 32:15-17 (Bhasker).

Financial Indemnity returned to the podium and began discussing Bhasker's misleading sales practices allegations. See Tr. at 33:1-3 (Hanover). Financial Indemnity asserted that Bhasker's Complaint "is devoid of any allegations about the process or method of representations that were made to Plaintiff by Financial Indemnity Company in the sales process." Tr. at 33:3-7 (Hanover). Financial Indemnity asserted that the reason why the Complaint does not make allegations of misleading sales process is because she purchased the policy from an independent agent, who is no longer a party to the case. See Tr. at 33:9-17 (Hanover). Financial Indemnity contended that Bhasker asserts that "there should have been additional disclosures" by Financial Indemnity, but Bhasker "provides no legal justification for why any such disclosures were mandated in the sales process." Tr. at 33:18-34:3 (Hanover).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-

moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.) ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Iqbal")(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Twombly")). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for

these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Robbins v. Oklahoma, 519 F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)). Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The limitations defense is the affirmative defense that the complaint's uncontroverted facts are most likely to establish. See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner

v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense). It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates. See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.). Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice. See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

**LAW REGARDING DIVERSITY JURISDICTION AND ERIE**

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district

court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance

Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M.

2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin

with the statute's text, a court formulating an Erie prediction should look first to the words of the

state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[6] If the Court finds only an opinion from the Court of Appeals of New

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in

making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same

way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d

1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from

---

[6]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1247 n.30. Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[7]  The Court may also rely on decisions by the

_____

[7]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears

Tenth Circuit interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy Prod.,

LLC, 27 F. Supp. 3d at 1243 & n.30.[8]  Ultimately, "the Court's task is to predict what the state

<hr>

to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[8]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-

law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both

reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption),

expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at

665-66).

## LAW REGARDING THE UIPA

The New Mexico Legislature passed the UIPA, N.M. Stat. Ann. § 59A-16-20, "to

regulate trade practices in the insurance business and related businesses," including "practices in

this state which constitute unfair methods of competition or unfair or deceptive acts or

practices." N.M. Stat. Ann. § 59A-16-2. N.M. Stat. Ann. § 59A-16-4 proscribes certain

misrepresentations that relate to insurance transactions, including "misrepresent[ing] the

benefits, advantages, conditions or terms of any policy." N.M. Stat. Ann. § 59A-16-4. N.M.

Stat. Ann. § 59A-16-5 forbids "untrue, deceptive or misleading" advertisements that relate to

insurance. N.M. Stat. Ann. § 59A-16-5. N.M. Stat. Ann. § 59A-16-8 makes actionable certain

falsifications of insurance records and the circulation of "any false statement of the financial

---

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
    Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's
highest court.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at
866).
    The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be
at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing
State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).
Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

condition of an insurer." Various provisions in the UIPA proscribe discrimination in relation to insurance transactions. See, e.g., N.M. Stat. Ann. §§ 59A-16-11 to - 13.2. N.M. Stat. Ann. § 59A-16-19 prohibits anti-competitive insurance practices "resulting or tending to result in unreasonable restraint of, or monopoly in, the business of insurance." N.M. Stat. Ann. § 59A-16-19.

The UIPA imposes liability for a laundry list of unfair insurance claims practices, including the following:

A.    misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

B.    failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

C.    failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

D.    failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

E.    not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;

F.    failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

G.    compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered;

H.    attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

I.      attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

J.      failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made;

K.      making known to insureds or claimants a practice of insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

L.      delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

M.      failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage;

N.      failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

O.      violating a provision of the Domestic Abuse Insurance Protection Act.

N.M. Stat. Ann. § 59A-16-20.  N.M. Stat. Ann. § 59A-16-30 provides a right of action for violations of the UIPA.  See N.M. Stat. Ann. § 59A-16-30.  The UIPA allows for attorney's fees to prevailing parties.  See N.M. Stat. Ann. § 59A-16-30.  The Honorable Bruce D. Black, United States District Judge for the District of New Mexico, has concluded that a plaintiff failed to plausibly plead a UIPA claim:

Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act that prohibits unfair claims practices. Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged. At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of

Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, it is not clear either what Dr. Yumukoglu is claiming or to what relief he is entitled under § 56A-16-20. Dr. Yumukoglu's claim appears, like his claim for breach of the duty of good faith and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits. As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's benefits did not amount to bad faith. Provident's motion for summary judgment on Plaintiff's claim for statutory violation is granted.

Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d 1215, 1227 (D.N.M. 2001)(Black, J.)(footnote omitted)(citations omitted). The Court has previously found that a plaintiff failed to state a claim under rule 12(b)(6) when the complaint did not contain even "a formulaic recitation of the elements of a cause of action" under the UIPA. Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11-0486 JB/WDS, 2012 WL 1132332, at *7 (D.N.M. Mar. 28, 2012)(Browning, J.)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

## ANALYSIS

The Court concludes that: (i) the filed rate doctrine does not bar Bhasker's claims, because the Supreme Court of New Mexico would not apply the filed rate doctrine to bar claims against insurers for unfair or deceptive business practices; (ii) Bhasker's claims are well-pleaded even if the underinsured motorists insurance is not illusory; and (iii) the voluntary payment doctrine does not bar Bhasker's claims because she alleges that she did not know all the material facts. Accordingly, the Court denies the MTD.

## I. THE FILED RATE DOCTRINE DOES NOT BAR EITHER BHASKER'S OR THE PROPOSED CLASS' CLAIMS.

The Court concludes that the Supreme Court of New Mexico would not expand its filed rate doctrine to cases where, as here, a consumer alleges that an insurer misrepresents material facts about a policy when making the sale. Although some courts in other jurisdictions apply the

filed rate doctrine to bar claims against insurers and claims brought under consumer protection statutes, the Court determines that the Supreme Court of New Mexico would allow such suits to proceed. In making this decision, the Court fully recognizes how dutifully and broadly other states have applied the doctrine to bar claims implicating approved fees of all types. The Court concludes, nonetheless, that its ruling is the correct one in New Mexico's case, given that (i) the New Mexico Legislature expressly permits such suits; (ii) New Mexico case law gives no indication that the Supreme Court of New Mexico would expand its filed rate doctrine beyond the public utilities context to bar consumer protection claims against insurers; (iii) the Tenth Circuit's decision in <u>Coll v. First Am. Title Ins. Co.</u> does not require the Court to bar such claims; and (iv) other jurisdiction's rulings do not persuade the Court that the Supreme Court of New Mexico would bar such claims.

A. **NEW MEXICO'S CASE LAW DOES NOT SUGGEST THAT THE SUPREME COURT OF NEW MEXICO WOULD EXPAND ITS FILED RATE DOCTRINE TO LIMIT CONSUMERS' SUITS AGAINST INSURERS FOR MISREPRESENTING THEIR POLICIES.**

New Mexico courts have considered the filed rate doctrine only a handful of times and have never barred a plaintiff's misrepresentation claims against an insurer. In <u>In re Comm'n Investigation Into 1997 Earnings of U S W. Commc'ns, Inc.</u>, a telephone company challenged the New Mexico State Corporation Commission's order effecting an interim reduction in the company's rates. <u>See</u> 1999-NMSC-016, ¶ 1, 980 P.2d 37, 40. The telephone company argued that the filed rate doctrine precluded the Supreme Court of New Mexico from "enforc[ing] the interim rate reduction as of the effective date stated in the Commission's order . . . because . . . [the company] had not filed new tariffs in response to that order." 1999-NMSC-016, ¶ 57, 980 P.2d at 54. The Supreme Court concluded that the filed rate

doctrine did not apply, because the New Mexico State Corporation Commission found the original rate to be unreasonable, and because the case did "not involve an issue of discriminatory ratepaying." 1999-NMSC-016, ¶ 57, 980 P.2d at 54. The Supreme Court of New Mexico noted two purposes for the filed rate doctrine: (i) "to preserve the agency's primary jurisdiction to determine the reasonableness of rates," 1999-NMSC-016, ¶ 57, 980 P.2d at 54 (quoting Tenore v. AT & T Wireless Servs., 962 P.2d 104, 108 (Wash. 1998)(en banc)); and (ii) to "further 'the policy of nondiscriminatory rates [such that] similarly situated customers [do not] pay different rates for the same services,'" 1999-NMSC-016, ¶ 57, 980 P.2d at 54 (quoting Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 223 (1998))(alterations added by the Supreme Court of New Mexico).

Three years later, the Supreme Court of New Mexico upheld a state district court's decision to apply the filed rate doctrine to damage claims challenging telephone rates for calls made from correctional facilities. See Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75. The Supreme Court of New Mexico concluded:

> The filed rate doctrine is a doctrine that allows for "any 'filed rate' -- that is, one approved by the governing regulatory agency -- [to be] per se reasonable and unassailable in judicial proceedings brought by ratepayers." Miranda v. Michigan, 141 F. Supp. 2d 747, 757 (E.D. Mich. 2001)(quoting Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir.1994)). As the district court noted in its ruling, "[t]he heart of the filed rate doctrine is not that the rate mirrors a competitive market, nor that the rate is reasonable or thoroughly researched, it is that the filed rate is the only legal rate." Daleure v. Kentucky, 119 F.Supp.2d 683, 689 (W.D.Ky. 2000). The policy behind the filed rate doctrine is to prevent price discrimination and to preserve the role of agencies in approving rates and to keep courts out of the rate-making process. Arsberry v. Illinois, 117 F.Supp.2d 743, 744 (N.D.Ill. 2000). . . . In light of the history behind the filed rate doctrine, we believe that this Court "should think deeply before avoiding its application without good reason." [Daleure v. Commonwealth of Kentucky, 119 F. Supp. 2d at 689).] In New Mexico, the New Mexico Public Regulation Commission (NMPRC) regulates intrastate calls. NMSA 1978, § 63-9A-8(A) (1987). The NMPRC has exempted inmate telephone services from several of its regulations

and has authorized the rates at issue. We hold that under the filed rate doctrine these rates are legal and that Plaintiffs' claims for damages, restitution, or imposition of a constructive trust were properly dismissed by the district court.

Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d at 74-75 (alterations added by the Supreme Court of New Mexico).

A few years later, the Court of Appeals of New Mexico determined that the filed rate doctrine did not preclude the plaintiff's claims against the Public Service Company of New Mexico ("PNM"), because its rates were not "filed rates" pursuant to the filed rate doctrine when a Public Service Commission staffer "merely reviewed" a contract containing the rates looking for glaring problems, and there was "nothing to indicate that the Commission approved of the specific amount to be rebated" to the plaintiff. Summit Properties, Inc. v. Pub. Serv. Co. of New Mexico, 2005-NMCA-090, ¶ 19, 118 P.3d 716, 724. The Court of Appeals of New Mexico concluded:

The Connection Fees under the 1990 Contract were set not for public benefit, but for the private benefit to Summit in rebating its costs for the Facilities. PNM, in breaching the contract, prevented Summit from recovering its costs. The 1990 Contract involves matters of private concern between Summit and PNM, and therefore the Commission does not have exclusive jurisdiction over the matter.

2005-NMCA-090, ¶ 20, 118 P.3d at 724.

Those three cases represent New Mexico courts' entire filed rate doctrine discussions. To summarize, the Supreme Court of New Mexico determined that the filed rate doctrine did not prevent the Supreme Court of New Mexico from enforcing the New Mexico State Corporation Commission's interim rate reduction for telephone services, see In re Comm'n Investigation Into 1997 Earnings of U S W. Commc'ns, Inc., 1999-NMSC-016, ¶ 57, 980 P.2d at 54, and that the filed rate doctrine precluded the plaintiffs' challenges to telephone rates on calls made from correctional facilities, see Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d at 74-75. The Court of

Appeals of New Mexico determined that rates are not "filed," for filed rate doctrine purposes, if a government staffer makes a cursory examination of a contract mentioning the rates. <u>Summit Properties, Inc. v. Pub. Serv. Co. of New Mexico</u>, 2005-NMCA-090, ¶ 19, 118 P.3d at 724. The Supreme Court of New Mexico described the filed rate doctrine as meaning that filed rates are "unassailable in judicial proceedings brought by ratepayers," <u>Valdez v. State</u>, 2002-NMSC-028, ¶ 5, 54 P.3d at 74 (quoting <u>Miranda v. Michigan</u>, 141 F.Supp.2d at 757), and that the policy behind the filed rate doctrine is to "prevent price discrimination and to preserve the role of agencies in approving rates and to keep courts out of the rate-making process," <u>Valdez v. State</u>, 2002-NMSC-028, ¶ 5, 54 P.3d at 74 (citing <u>Arsberry v. Illinois</u>, 117 F.Supp.2d at 744). In sum, the little that New Mexico courts have said about the filed rate doctrine gives no indication that the Supreme Court of New Mexico would apply the doctrine to bar misrepresentation claims against an insurer, given that New Mexico expressly authorizes such lawsuits.

**B.      <u>COLL V. FIRST AMERICAN TITLE INSURANCE</u> DOES NOT DICTATE HOW THE COURT SHOULD RULE IN THIS CASE.**

Financial Indemnity argues that the Tenth Circuit, in <u>Coll v. First American Title Insurance Co.</u>, determined that, under New Mexico law, there is no fraud exception to the filed rate doctrine, <u>see</u> Reply at 2 (citing 642 F.3d at 890), and that the filed rate doctrine bars any claim where ruling for the plaintiff would impact the regulatory agency's rate determination, <u>see</u> Reply at 2 (quoting 642 F.3d at 890). <u>Coll v. First American Title Insurance Co.</u>, however, considered how the filed rate doctrine applies to the title insurers operating under New Mexico's Title Insurance Act, N.M. Stat. Ann. § 59A-30-1, and therefore does not bind the Court's analysis on whether the filed rate doctrine applies to claims challenging rates approved pursuant to New Mexico's Insurance Code. <u>See</u> <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866

("[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit . . . unless an intervening decision of the state's highest court has resolved the issue."); supra n.6.

In Coll v. First American Title Insurance Co., a proposed class comprising New Mexicans who purchased title insurance in New Mexico sued titled insurance companies and various state agencies "alleg[ing] generally that the Title Insurance Act violates numerous New Mexico constitutional and statutory provisions precluding price fixing and the creation of monopolies, and that the Insurer Defendants conspired with the insurance superintendent to establish a premium rate that is unreasonably high." 642 F.3d at 883. The Tenth Circuit determined that New Mexico's filed rate doctrine precluded the plaintiffs' damage claims for restitution, unjust enrichment, and disgorgement of excessive title insurance premiums sold at the rate set by the superintendent of insurance. See 642 F.3d at 887 (citing Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75). The Tenth Circuit reasoned that New Mexico's filed rate doctrine "provides that 'any filed rate -- that is, one approved by the governing regulatory agency -- [is] per se reasonable and unassailable in judicial proceedings brought by ratepayers.'" Coll v. First Am. Title Ins. Co., 642 F.3d at 886-87 (alteration by the Tenth Circuit)(quoting Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75 (2002); Summit Props., Inc. v. Pub. Serv. Co. of N.M., 2005-NMCA-090, ¶ 12, 118 P.3d 716, 723-24 (2005)). The Tenth Circuit noted that the Supreme Court of New Mexico has described its filed rate doctrine's policy as preventing price discrimination, preserving the role of agencies in approving rates, "and . . . keep[ing] courts out of the rate-making process." Coll v. First Am. Title Ins. Co., 642 F.3d at 887 (citing Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d at 75).

The Tenth Circuit concluded that New Mexico's "pervasive regulation of title insurance

differs significantly from its regulation of other types of insurance under its general insurance code" in that the Insurance Code encourages competition among insurers to produces rates "'that are not excessive, inadequate, or unfairly discriminatory.'" Coll v. First Am. Title Ins. Co., 642 F.3d at 882 (quoting N.M. Stat. Ann. § 59A-17-6A). The Tenth Circuit adds that, "[i]mportantly, however, the New Mexico Insurance Code expressly does not apply to title insurers, except to the extent that the Title Insurance Act provides otherwise," and notes that the Title Insurance Act "has not incorporated Article 17's provisions promoting competition among insurers." 642 F.3d at 882-83 (citing N.M. Stat. Ann. § 59A-1-15(H); § 59A-1-17; § 59A-30-14). That distinction's practical effect in Coll v. First American Title Insurance Co. is that the plaintiffs' "heavy reliance" on Insurance Code-related statutes and cases are "frequently unavailing," 642 F.3d at 883 n.4, and the Tenth Circuit predicts that the Supreme Court of New Mexico would apply the filed rate doctrine to claims against title insurers as well as title insurance regulators given that the Title Insurance Act does not incorporate the Insurance Code's policy of promoting competition among insurers, see 642 F.3d at 887 n.9. In other words, the plaintiffs argued that, although the filed rate doctrine precluded claims made against a state utility, it should not preclude claims against insurers, because New Mexico's Insurance Code seeks to promote competition among private actors in a regulated market; the Tenth Circuit rejected that argument, because the statutory scheme regulating the title insurance industry has not adopted the Insurance Code's policy goal to promote competition.

Given that the Tenth Circuit's analysis is focused on the Title Insurance Act and its differences from the Insurance Code in general, the Court concludes its holding in Coll v. First American Title Insurance Co. speaks to the narrow issue of the filed rate doctrine's applicability

to Title Insurance Act, and does not bind the Court with any holding vis-à-vis the car insurance industry.[9]

### C. NOTWITHSTANDING THE FILED RATE DOCTRINE'S APPLICATION IN OTHER JURISDICTIONS, THE COURT CONCLUDES THAT THE SUPREME COURT OF NEW MEXICO WOULD NOT APPLY THE FILED RATE DOCTRINE TO BAN THE PLAINTIFFS' CLAIMS.

Many states apply the filed rate doctrine to bar consumer-protection claims against insurers. The Court concludes, however, that New Mexico would not apply the filed rate doctrine in this case, because: (i) New Mexico has signaled an intent to allow such claims by creating a private right of action against insurers for UIPA misrepresentation claims; and (ii) the burden that the doctrine would impose on defrauded consumers is substantial compared to the doctrine's underwhelming benefits in this context.

As discussed above, New Mexico adopted the filed rate doctrine in the public utilities context to bar, most notably, claims that telephone rates are too high. See Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75. To apply the filed rate doctrine in this case, the Court would

---

[9]Even if Coll v. First American Title Insurance Co. bound the Court in its current analysis, the Court would disagree with Financial Indemnity's assertion that there is no fraud exception to New Mexico's filed rate doctrine, and that, therefore, an insurer's conduct does not matter. See Reply at 2 (citing Coll v. First Am. Title Ins. Co. 642 F.3d at 890). In Coll v. First American Title Insurance Co., the plaintiffs alleged that insurers bribed the ratings agency to secure higher rates. See 642 F.3d at 887. In this case, by contrast, Bhasker alleges that Financial Indemnity or its agents made false or misleading statements or omissions to Bhasker when selling her an insurance policy. See Complaint ¶ 3, at 1. That distinction matters, because Bhasker asks the Court to consider questions of law -- with which the Court is familiar -- not to encroach onto the Superintendent of Insurance's turf by examining the ratemaking process. See Keeling v. Esurance Ins. Co., 2012 WL 699580, at *5 (determining that the filed rate doctrine does not apply, because the court "is not faced with a complex question of whether the amounts of defendant's rates were reasonable," but rather is "confronted with a more familiar issue -- namely, whether defendant's conduct was deceptive and fraudulent in violation of several statutes").

have to believe that New Mexico would expand the doctrine beyond heavily regulated public

utilities to: (i) cover the automobile-insurance industry; (ii) bar consumer-protection claims; and

(iii) bar claims that do not directly challenge approved rates.  Nothing in the New Mexico courts'

application of the filed rate doctrine or the New Mexico Legislature's enactments indicate that

New Mexico law applies the filed rate doctrine so expansively.

One major factor counseling against the filed rate doctrine's application here is New

Mexico Legislature's creation of a private right of action for consumers against  that engage in

misleading business practices.    See N.M. Stat. Ann §§ 59A-16-4, -30.    The UIPA's

"Misrepresentation, false advertising of policies" provision states:

> No person shall make, publish, issue or circulate any estimate, illustration, circular, statement, sales presentation or comparison which:
>
> A.    misrepresents the benefits, advantages, conditions or terms of any policy;
>
> B.    misrepresents the premium overcharge commonly called dividends or share of the surplus to be received on any policy;
>
> C.    makes any false or misleading statement as to dividends or share of surplus previously paid on any policy;
>
> D.    is misleading or a misrepresentation as to the financial condition of any person, or as to the reserve system upon which any life insurer operates;
>
> E.    uses any name or title of any policy or class of policies misrepresenting the true nature thereof;
>
> F.    misrepresents any policy as being shares of stock; or
>
> G.    fails to disclose material facts reasonably necessary to prevent other statements made from being misleading.

N.M. Stat. Ann. § 59A-16-4(A)-(G).  The UIPA also gives individuals a private right of action

for damages to "[a]ny person covered by Chapter 59A, Article 16 NMSA 1978 who has suffered

damages as a result of a violation of that article by an insurer or agent."   N.M. Stat. Ann.

§ 59A-16-30.  New Mexico law, thus, contemplates individuals like Bhasker bringing claims against insurers regarding misrepresentations of policies.

Out-of-state case law does not compel the Court to reach a contrary conclusion.  First, some of the to which Financial Indemnity cites for the proposition that the filed rate doctrine applies "regardless of the label used to describe the claims, including where fraud or other illegal activity is alleged," Reply at 1, are inapposite, because they involve allegations that the defendant either committed fraud against a regulatory commission or altered policy terms for existing policy holders, see Crumley v. Time Warner Cable, Inc., 556 F.3d at 880 (8th Cir. 2009) (alleging that a cable company overcharged its existing customers); Wegoland Ltd. v. NYNEX Corp., 27 F.3d at 18 (alleging that a utility company misled the rating agency); Sun City Taxpayers' Ass'n v. Citizens Utilities Co., 847 F. Supp. 281, 283 (D. Conn. 1994) (Cabranes, C.J.)(alleging that a utility company defrauded a utility commission to secure higher rates); Alabama Mut. Ins. Corp. v. City of Vernon, 178 So. 3d at 363 (alleging that an insurer amended its coverage to exclude "virtually every person who could properly collect benefits under the policy"); Porr v. NYNEX Corp., 230 A.D.2d 564, 567 (N.Y. App. Div. 1997)(alleging that the insurer did not disclose its billing policies to the regulatory commission).  Here, by contrast, Bhasker alleges that Financial Indemnity misled her into purchasing coverage that she did not want, which is a cause of action that the UIPA expressly authorizes.

Second, the filed rate doctrine has critics even though many state courts have applied it to bar claims against insurers under consumer-protection statutes.  See Richardson v. Standard Guar. Ins. Co., 853 A.2d 955, 962 (N.J. Super. Ct. App. Div. 2004)(collecting cases); Vonda Mallicoat Laughlin, The Filed Rate Doctrine and the Insurance Arena, 18 Conn. Ins. L.J. 373, 386 (2012)(stating that applying the filed rate doctrine to state-regulated insurance industries "is

the norm rather than the exception"). Courts have recognized its downsides even while applying the doctrine and enabling its expansion.[10] The Supreme Court of the United States has recognized that "the filed rate doctrine may seem harsh in some circumstances," Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. at 223 (citing Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 130-131 (1990), and that "there is considerable 'debate in other forums about the wisdom of the filed rate doctrine,'" MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 234 (1994)(quoting Security Services, Inc. v. Kmart Corp., 511 U.S. 431, 440 (1994)). The United States Court of Appeals for the Second Circuit stated that, "[w]hile the result we reach is mandated by the filed rate doctrine, that doctrine is plainly a creature of a different time." Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 491 (2d Cir. 1998).

Many courts have argued that the filed rate doctrine's scope is limited. See, e.g., Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. at 230-31 (Rehnquist, C.J., concurring). Chief Justice Rehnquist argued that the filed rate doctrine should not bar all state-law claims:

> The [approved] tariff does not govern . . . the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on petitioner to refrain from intentionally interfering with respondent's relationships with its customers by means other than failing to honor unenforceable side agreements, or to refrain from engaging in slander or libel, or to satisfy other contractual obligations. The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based in state law.

---

[10] As background, the Supreme Court of the United States first applied the filed rate doctrine, in the antitrust context, during the 1920s, see Laughlin, supra at 379, concluding that a private party could not recover damages even if railway companies conspired to set high freight rates because the Interstate Commerce Commission approved the rates, see Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 161 (1922). From there, the doctrine spread to interstate utilities, like energy and telecommunications. See Laughlin, supra at 382-83. The filed rate doctrine did not reach the insurance industry until the 1980s. See Laughlin, supra, at 384.

<u>Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.</u>, 524 U.S. at 230-31 (Rehnquist, C.J., concurring).

A Supreme Court of New Jersey case exemplifies the filed rate doctrine's controversial application to consumer claims. In a four-to-three decision, the Supreme Court of New Jersey applied the filed rate doctrine to bar claims against a cellular-telephone company brought under the state's consumer protection laws. See <u>Weinberg v. Sprint Corp.</u>, 801 A.2d 281, 293 (N.J. 2002). Justice Verniero authored a dissent, which two other justices joined, arguing that the filed rate doctrine should not apply to consumer protection claims:

> I would not rely on a legal fiction known as the "filed rate doctrine" to dismiss plaintiff's consumer protection claims. I also believe that the public policy behind the Consumer Fraud Act (Act) argues in favor of allowing those claims to proceed to trial.
>
> . . . .
>
> I would not apply a legal fiction whose days, according to some courts, are numbered. I recognize that for close to one hundred years, the filed rate doctrine has served to protect communications companies from suit, even in the face of fraud. The doctrine's future, however, is dim at best.
>
> . . . .
>
> [T]he Act has been hailed as "one of the strongest consumer protection laws in the nation[.]" *Governor's Press Release for Assembly Bill No. 2402,* at 1 (June 29, 1971). "The history of the Act is one of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 *A.*2d 350 (1997). The Act is remedial in nature and, for that reason, "[c]ourts have emphasized that like most remedial legislation, the Act should be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.*2d 454 (1994). When assessing individual claims, courts must remain "mindful that the Act's provision authorizing consumers to bring their own private action is integral to fulfilling the [statute's] legislative purposes[.]" *Id.* at 16, 647 *A.*2d 454. In sum, allowing plaintiff's claim to proceed would be consistent with the Act's uninterrupted history of expanding consumer protection in these circumstances.

<u>Weinberg v. Sprint Corp.</u>, 801 A.2d at 293-95 (Verniero, J., dissenting, and Stein, J., and Zazzali, J., joining)(citations omitted). In light of <u>Weinberg v. Sprint Corp.</u>, the Superior Court

of New Jersey reluctantly applied the filed rate doctrine to bar consumer protection claims against an insurer while commenting that "the continued existence of the filed rate doctrine is controversial" and that, "were we writing on a blank slate, perhaps we could be persuaded" otherwise.  See Richardson v. Standard Guar. Ins. Co., 853 A.2d at 962 (citing Weinberg v. Sprint Corp., 801 A.2d 281).

Meanwhile, a handful of courts have declined to apply the filed rate doctrine to consumer claims against insurers.  The United States District Court for the District of New Jersey determined that the Supreme Court of Ohio would not apply its filed rate doctrine to a claim against an insurer.  See Clark v. Prudential Ins. Co. of Am., No. CIV. 08-6197, 2011 WL 940729, at *11 (D.N.J. Mar. 15, 2011)(Debevoise, J.)(unpublished)[11]("Clark").  As a starting point, the Clark court acknowledged that the filed rate doctrine applies broadly to challenges to federally approved rates, but "[i]t is neither prudent nor appropriate for a federal court to impose the filed rate doctrine on a state which has not adopted it[,] [n]or should a court stretch or bend a state doctrine to more comfortably fit the contours of the federal rule."  Clark, 2011 WL 940729,

---

[11]Clark v. Prudential Ins. Co. of Am. is an unpublished opinion, but the Court can rely on it to the extent its reasoned analysis is persuasive in the present case.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Clark v. Prudential Ins. Co. of Am. and Hanson v. Acceleration Life Ins. Co., No. CIV A3-97-152, 1999 WL 33283345 (D.N.D. March 16, 1999)(unpublished) have persuasive value with respective to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

at *10. The <u>Clark</u> court predicted that the Supreme Court of Ohio would not apply the filed rate doctrine to block insurer-deception claims. <u>See</u> <u>Clark</u>, 2011 WL 940729, at *11. The court reasoned that Ohio applied the filed rate doctrine only in the public utilities context, <u>see</u> <u>Clark</u>, 2011 WL 940729, at *11, and that Ohio courts had rejected the filed rate doctrine when the plaintiffs' claims did not challenge the filed rates' reasonableness, <u>see</u> <u>Clark</u>, 2011 WL 940729, at *1 (citing <u>Gary Phillips & Assoc. v. Ameritech Corp.</u>, 759 N.E.2d 833, 836 (2001); <u>Lazarus v. Ohio Cas. Grp.</u>, 761 N.E.2d 649, 653 (2001)).

Another federal district court predicting a state's high court would not apply the filed rate doctrine to bar consumer claims against insurers in <u>Hanson v. Acceleration Life Ins. Co.</u>, No. CIV A3-97-152, 1999 WL 33283345, at *4 (D.N.D. March 16, 1999)(Webb, J.)(unpublished). In that case, the United States District Court for the District of North Dakota concluded that the North Dakota Supreme Court would not bar claims for insurer-deception, because North Dakota had never barred such a claim under the doctrine and because the state's rate approval process was not robust. <u>See</u> 1999 WL 33283345, at *4. Additionally, the United States Court of Appeals for the Eight Circuit has ruled that the filed rate doctrine should not bar plaintiffs' claims under the Fair Housing Act, 42 U.S.C. § 3601, because "the judicially created filed rate doctrine [should not] restrict Congress's broad grant of standing to seek judicial redress for race discrimination." <u>Saunders v. Farmers Ins. Exch.</u>, 440 F.3d 940, 946 (8th Cir. 2006).

Many other courts support the proposition that a company committing fraud should not avoid liability under the filed rate doctrine. <u>See</u> <u>Adamson v. WorldCom Commc'ns, Inc.</u>, 78 P.3d 577, 582 (Or. Ct. App. 2003)(stating that the filed rate doctrine does not apply when a company commits willful misconduct); <u>Nordlicht v. New York Tel. Co.</u>, 617 F. Supp. 220, 227-28 (S.D.N.Y. 1985)(Haight, J.)("The filed tariff doctrine is designed to protect utilities

charging filed rates for lawfully provided service. It is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud.").

Given New Mexico's consumers' rights protections -- including an express private cause of action for insurers' unfair business practices -- the Court doubts that the Supreme Court of New Mexico would consider the filed rate doctrine's purposes more important than protecting its consumers' rights.[12] The filed rate doctrine is meant to keep courts from interfering with the ratemaking process and to ensure that similarly situated individuals pay the same rates for the same services. See In re Comm'n Investigation Into 1997 Earnings of U S W. Commc'ns, Inc., 1999-NMSC-016, ¶ 57, 980 P.2d at 54. Those concerns have led courts to bar claims challenging approved rates' reasonableness, see, e.g., Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75, and to bar claims that do not directly challenge the rates but require a court to conjure a hypothetical rate to calculate damages, see, e.g., Alpert v. Nationstar Mortg. LLC, 243 F. Supp. 3d 1176, 1183 (W.D. Wash. 2017)(Jones, J.). The practical effect of such decisions,

---

[12]Many states that apply the filed rate doctrine to claims against insurers have not created a comparable private right of action for insurers unfair business practices. For example, Florida, Kansas, Mississippi, New Jersey, and Wisconsin apply the filed rate doctrine to the insurance industry. See Kirksey v. Am. Bankers Ins. Co. of Fla., 114 F. Supp. 2d 526, 530 (S.D. Miss. 2000)(Pickering, J.)(interpreting Mississippi law); Allen v. State Farm Fire & Cas. Co., 59 F. Supp. 2d 1217, 1229 (S.D. Ala. 1999)(Cassady, M.J.)(interpreting Alabama law); Morales v. Attorneys' Title Ins. Fund, Inc., 983 F. Supp. 1418, 1428 (S.D. Fla. 1997)(Highsmith, J.) (interpreting Florida law); Horwitz v. Bankers Life & Cas. Co., 745 N.E.2d 591, 605 (Ill. App. Ct. 2001); Amundson & Assoc. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc., 988 P.2d 1208 (Kan. 1999); Am. Bankers' Ins. Co. of Fla. v. Wells, 819 So. 2d 1196, 1210 (Miss. 2001); Byan v. Prudential Ins. Co. of Am., 242 A.D.2d 456, 456 (1997); N.C. Steel, Inc. v. Nat'l Council on Comp. Ins., 496 S.E.2d 369, 375 (N.C. 1998); Prentice v. Title Ins. Co. of Minn., 500 N.W.2d 658 (Wis. 1993)). None of those states' legislatures have created a private right of action for violations to its unfair insurance practices statute. See Ala. Code Ann. § 27-12-1; Fla. Stat. Ann. § 626.9521; Joseph v. Bernstein, 612 F. App'x 551, 557 (11th Cir. 2015)(noting that Florida's Unfair Insurance Trade Practices Act does not provide a private right of action); Kan. Stat. Ann. § 40-2404; Miss. Code. Ann. § 83-5-35; N.J. Stat. Ann. § 17B:30-2; N.C. Gen. Stat. Ann. § 58-63-15; Wis. Stat. Ann. § 628.34.

however, should not be overlooked; if consumers cannot sue insurers that deliberately lie about their policies unless the consumers can frame their damages theories in some tortuous way that manages to not implicate the rates, then insurers are unlikely to face civil liability for their deceptive practices. It is difficult to imagine the Supreme Court of New Mexico shielding insurers from virtually any liability claim alleging deceptive practices in the face of an expressly created private right of action for such claims simply to ensure that courts never bump up against an approved insurance rate.[13] Therefore, the Court concludes that the Supreme Court of New Mexico would join the courts that have permitted consumers' claims to proceed against insurers for unfair and deceptive business practices. See Clark v. Prudential Ins. Co. of Am., 2011 WL 940729, at *11; Hanson v. Acceleration Life Ins. Co., 1999 WL 33283345, at *4.

> **D. EVEN IF NEW MEXICO APPLIED THE FILED RATE DOCTRINE TO CONSUMER-PROTECTION CLAIMS AGAINST INSURERS, BHASKER AND THE PROPOSED CLASS MAY, NONETHELESS, SEEK PREMIUM-BASED DAMAGES, BECAUSE THE SUPREME COURT OF NEW MEXICO WOULD DETERMINE THAT THE MINIMUM-LIMIT UIM COVERAGE IS ILLUSORY.**

In the previous subsection, see supra I.D., the Court determined that New Mexico's filed

---

[13]The Court considered whether New Mexico might bar misrepresentation claims against insurers insofar as they challenge the rates or require the Court to consider rates when calculating damages. Under such a limitation, the plaintiffs' attorneys would have to steer clear of approved rates by putting in extra hours conjuring clever damage theories -- e.g., by arguing that damages equal the amount a plaintiff paid because of the misrepresentation less the amount that a plaintiff would have paid, but for the misrepresentations, for a different plan that a regulatory agency had approved. The Court determines that placing such restrictions -- permitting the claims but only if the plaintiffs can plead them cleverly enough -- is something that the Supreme Court of New Mexico would find inappropriate in light of New Mexico's policy protecting consumers from unfair business practices.

That conclusion is not to say that the rate approval system does not matter. It may be, for instance, that the practical and legal realities of New Mexico's motorist insurance industry mean that calculating damages under certain theories is difficult or impossible. It may be that new legal barriers arise that could prevent a Court's ability to order certain damages in certain amounts. Clever damage theories may, in the end, rule the day. The Court does not, however, foreclose any damage theories in advance based on the filed rate doctrine.

rate doctrine does not apply to Bhasker's claims. If, however, the Court determined that the filed rate doctrine applied, the Court would still not dismiss this case, because the Court can think of damages theories that might get around the filed rate doctrine. For instance, Bhasker and the proposed class would be able to seek premiums-based damages, because the Supreme Court of New Mexico would find the UIM coverage illusory.

The Court conducts the following analysis by applying the filed rate doctrine's rules and principles to determine whether premium-based claims could work in this case. One reason for the filed rate doctrine is to prevent courts from doing a regulatory agency's job by deciding whether a rate for a particular insurance plan is too high, and, if so, by how much. See Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d at 75 ("The policy behind the filed rate doctrine is to prevent price discrimination and to preserve the role of agencies in approving rates and to keep courts out of the rate-making process."). At first glance, it might appear that some proposed class members would necessarily have to challenge the rates to calculate their damages. The proposed class includes individuals who purchased UIM coverage; it is not necessary that they actually suffer damages in an automobile accident with an underinsured motorist. For those proposed class members who purchased UIM coverage, their damages would be the amount they overpaid -- i.e., the amount they paid less the value that they received. See First Interstate Bank of Gallup v. Foutz, 1988-NMSC-087, ¶ 8, 764 P.2d 1307, 1309 (defining out-of-pocket loss as the "difference between the amount the Foutzes gave and the amount they received"); Dollens v. Wells Fargo Bank, N.A., 2015-NMCA-096, ¶ 18, 356 P.3d 531, 538 (awarding out-of-pocket damages for a UPA violation).[14] Determining the insurance coverage's actual value would

---

[14]The Court is aware that, under Erie, it is not bound to follow Court of Appeals of New Mexico if it concludes that the Supreme Court of New Mexico would decide the issue

require the Court to perform the Superintendent of Insurance's job: determining a fair rate for a particular policy.

In this case, however, the Court would not need to step outside its purview by evaluating an insurance policy's true value, because the Supreme Court of New Mexico would conclude that the UM/UIM coverage that Bhasker purchased is illusory.  See Keeling v. Esurance Ins. Co., No. 10-0835-DRH, 2012 WL 699580, at *5 (concluding that the filed rate doctrine does not apply when the "plaintiff's complaint contains claims of deception and fraud and seek damages and equitable relief on the basis that the insurance coverage was a sham").  In other words, there would be no need for the Court to determine fair rates for UM/UIM coverage, because an illusory insurance policy's value is $0.00.  See Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 897 (concluding that, in light of Montana's public policy, a UIM policy is illusory despite the few instances wherein the coverage may provide some benefits); Pristavec v. Westfield Ins. Co., 400 S.E.2d at 577 (concluding a UIM policy is illusory despite two possible scenarios in which the plan may provide benefits).

Bhasker asserts that Financial Indemnity's UIM coverage is illusory.  See Response at 8-9; id. at 12-14 (citing Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 896-97; Pristavec v. Westfield Ins. Co., 400 S.E.2d at 579 n.5).  Financial Indemnity counters that the UIM coverage is not illusory, because there are some scenarios in which the UIM coverage would provide benefits.  See Reply at 8.  Financial Indemnity summarizes three such scenarios:

> (a)  the tortfeasor had an out-of-state policy with lower bodily injury liability minimum limits than in the policy state;

---

differently.  See supra, n.7.  The Court will rely on the Court of Appeals of New Mexico's decision in Dollens v. Wells Fargo Bank, N.A. for this analysis, however, because the Court finds no indication that the Supreme Court of New Mexico would apply a contrary rule.

(b) there are multiple injured parties in an accident, such that no single policyholder will recover the entirety of the tortfeasor's liability limit; and

(c) the insured receives less than the tortfeasor's policy limits due to a contractual exclusion for punitive damages, and the insurer offsets the full amount of the tortfeasor's liability limits.

Reply at 8. Financial Indemnity argues that, although these scenarios are rare, they are possible, and therefore provide at least some value. See Reply at 9-10. If the UIM has some value, Financial Indemnity asserts, "it's not the Court's job to figure out whether or not [the rate paid] was too much, too little, or just right, [because] that's the job of the Superintendent of Insurance under the Filed Rate Doctrine." Tr. at 28:21-29:2 (Hanover).

Although the Court is receptive to the argument that the rare scenarios where a policyholder would benefit from a policy suggests that the policy has at least some value, the Court predicts that the Supreme Court of New Mexico would see it another way. In Weed Warrior, the Supreme Court of New Mexico considered whether purchasing UM/UIM insurance "in an amount less than the policy liability limits constitutes a rejection of the maximum amount of UM/UIM coverage permitted" under N.M. Stat. Ann. § 66-5-301. Weed Warrior, 2010-NMSC-050, ¶ 1, 245 P.3d at 1210. The Supreme Court of New Mexico determined that insurers must offer UM/UIM coverage "in an amount greater than the minimum." Weed Warrior, 2010-NMSC-050, ¶ 10, 245 P.3d at 1212. The Supreme Court of New Mexico explained:

> In the Mandatory Financial Responsibility Act, the Legislature determined that $25,000 insurance coverage for injury or death per accident is an adequate amount of coverage. See § 66-5-215(A)(1). Section 66-5-301(A) requires that same amount of coverage for UM coverage. Read together, an uninsured motorist is one who does not carry the statutory minimum for liability coverage, or $25,000, and injury caused by such a driver would be covered by the injured individual's UM coverage. . . . If the tortfeasor carried the statutory minimum of liability insurance and the injured driver carried the statutory minimum of

UM/UIM coverage, the injured driver would have no recourse for injuries suffered over the minimum amount of $25,000.  <u>The injured driver, though in theory having purchased UIM coverage, would in fact have purchased only UM coverage . . . .  An insured carries UIM coverage only if the UM/UIM limits on her or his policy are greater than the statutory minimum of $25,000.</u>[15]

<u>Weed Warrior</u>, 2010-NMSC-050, ¶ 10, 245 P.3d at 1212 (emphases added).  In other words, the Supreme Court of New Mexico determined that: (i) an uninsured motorist is any driver carrying less than the minimum $25,000.00 liability coverage, and (ii) an injured driver with UM/UIM coverage will collect only UIM benefits if both the UM/UIM coverage and the damages exceed $25,000.00.  According to the Supreme Court of New Mexico, it is the UM, not the UIM, that compensates the injured driver for all damages up to $25,000.00.

In so holding, the Court discounts the possibility that UIM benefits may pay out in the rare instances in which the insured carries only the minimum $25,000 UM/UIM coverage, such as if the tortfeasor carries the minimum liability coverage but must split that amount between multiple claimants.  In light of this omission, the Court predicts that the Supreme Court of New Mexico would deem Financial Indemnity's UIM coverage illusory when its UM/UIM coverage is not greater than $25,000.00.  Because the UIM coverage is illusory, the proposed class would not be challenging the filed rates if they can separate the premiums paid for UM and UIM, and, therefore, the filed rate doctrine does not preclude the proposed class' claims.

In conclusion, the Court decides that, even if the filed rate doctrine applies to the

---

[15]The Supreme Court of New Mexico states that "[a]n insured carries UIM coverage only if the UM/UIM limits on her or his policy are greater than the statutory minimum of $25,000."  If the Court were the Supreme Court of New Mexico, it would not have so decided.  It is not clear, from its opinion, that the Supreme Court of New Mexico imagined all the scenarios in which UIM may pay.  That oversight, if it was an oversight, means that the possibilities are so remote as to not warrant consideration, and that the Supreme Court of New Mexico would join Montana and West Virginia in determining that the UIM coverage is illusory.  The Court's reasoning is sound, but if it had a vote, it would not have allowed <u>Weed Warrior</u> to foreclose the Plaintiffs' claims on this issue of illusory coverage.

plaintiffs' claims, the Supreme Court of New Mexico would conclude that: (i) the UIM coverage is illusory; and (ii) because the UIM coverage would be illusory, the plaintiffs may seek premium damages without challenging the filed rates -- and, thus, ask the Court to determine a reasonable rate -- because the illusory UIM coverage would be worth zero dollars.[16]

## II. BHASKER'S CLAIMS ARE WELL-PLEADED EVEN IF THE UIM COVERAGE IS NOT ILLUSORY.

Financial Indemnity contends that Bhasker's claims fail as a matter of law, because her UIM coverage was not, as Bhasker asserts, illusory. See Reply at 8-9. According to Financial Indemnity, the UIM coverage is not illusory, because there are a few scenarios over which the UIM coverage would provide coverage. See Reply at 8. Financial Indemnity's arguments on this point are unavailing, because Bhasker need not prove that the UIM coverage is "illusory" to succeed on her claims. For starters, Bhasker's references to "illusory" coverage indicates that she uses the term loosely. In her Complaint, she alleges that Financial Indemnity sold her "illusory" UIM coverage. Complaint ¶¶ 1, 46, 66, 68, at 1, 7, 13-14. She also alleges that the UIM coverage is illusory "in part," Complaint ¶ 67, at 14, and "illusory in the event of a covered occurrence, as in this case, involving a minimally insured driver," Complaint ¶ 32, at 5. Her inconsistent use of "illusory" is a good clue that her claims are not based on legal theories in

---

[16]The Court is cognizant that its conclusions may affect how litigation unfolds. The plaintiffs may later argue that the Court has already de3termined that the UIM portion of the UM/UIM coverage is worth zero dollars; that the Court has already determined that the UIM portion is illusory; and that, therefore -- for example -- the policy is void and should be rescinded. The Court is not making any decisions about damages or remedies, but is trying to give Bhasker and Financial Indemnity information as much as possible to help them shape how to proceed. The Court does not necessarily foreclose any of Financial Indemnity's arguments on damages or remedies.

which the coverage's "illusory" nature is an element necessary to prove.[17]   Rather, Bhasker

seems to be arguing, generally, that her UM/UIM policy did not cover what she thought it would,

in which case the UIM coverage was illusory in the sense that it appeared to be something it was

not.  According to her Complaint, she believes her policy's UIM component is worth nothing or

close to nothing.  Consequently, even if the Court agreed with Financial Indemnity that the

policy's UIM coverage has some value, that designation would not foreclose Bhasker's claims

that Financial Indemnity misled her about what the UM/UIM policy covered.

### III.   THE VOLUNTARY PAYMENT DOCTRINE DOES NOT BAR THE PLAINTIFFS' CLAIMS, BECAUSE THEY ALLEGE THEY DID NOT HAVE FULL KNOWLEDGE OF MATERIAL FACTS, AND DO NOT SEEK RESTITUTION.

New Mexico's voluntary payment doctrine bars plaintiffs from recovering payments

made voluntarily and with full knowledge of the material facts, unless the plaintiff was the

victim of fraud or under duress.  See Rabbit Ear Cattle Co. v. Frieze, 1969-NMSC-043, ¶ 5, 453

P.2d 373, 374 ("It is . . . a well established rule that payments voluntarily made with full

knowledge of all material facts cannot be recovered back in absence of fraud or duress");

Cheesecake Factory, Inc. v. Baines, 1998-NMCA-120, ¶ 6, 964 P.2d 183, 185 86 (noting the

"general rule that one who makes a voluntary payment to another has no right to restitution"

(citing Restatement (First) of Restitution § 112 (1937)).  The voluntary payment doctrine does

not bar Bhasker's or the proposed class' claims, because they allege they did not know the

material facts relating to Financial Indemnity's UM/UIM insurance policy, and because they do

not seek restitution.

---

[17]For example, Bhasker does not make a contracts-based claim that Financial Indemnity
made an illusory promise that does not constitute consideration.

**A.  BHASKER AND THE PROPOSED CLASS ALLEGE THAT THEY WERE NOT IN FULL KNOWLEDGE OF MATERIAL FACTS REGARDING THEIR UM/UIM COVERAGE.**

Bhasker alleges that Financial Indemnity gave her an "incorrect and inappropriate form from another state, [which] included ambiguous language that Plaintiff could purchase underinsured coverage in excess of her selected liability limits."  Complaint ¶ 27, at 4.  Bhasker submits several documents in support: (i) Bhasker's insurance application summarizing her policy, see Policy Application at 1-2 (Doc. 12-1); and (ii) a form that Bhasker signed that features a one-paragraph description of UM/UIM coverage, see New Mexico Auto Supplement at 1 (Doc. 12-1)("Policy Form").  That UM/UIM description reads:

> Under New Mexico Insurance Law (NMSA 1978 sec. 66-5[-]301), we are required to provide Uninsured and Underinsured Motorist coverage up to the Bodily Injury and Property Damage liability limits provided in this policy. Uninsured/Underinsured Motorist bodily injury protects the name insured, resident relatives and occupants of uninsured vehicle if any of those persons sustain bodily injury in an accident for which the owner or operator of the motor vehicle that is legally liable, either does not have insurance, is a hit and run vehicle, or has insurance in an amount less than the limit of your Uninsured Motorist Coverage.  If selected, Uninsured/Underinsured Motorist limits must be the same for all the vehicles on the policy, and no less than the limits of your bodily injury liability limits.  You have the right to reject such coverage, stack the coverage for bodily injury, or select higher limits of your bodily injury and property damage limits.  If you choose to add together the limits of your coverage (stack) for each vehicle listed on the policy, your premium will be higher.

Policy Form at 1 (emphasis added).  Bhasker alleges that Financial Indemnity "failed to state that the underinsured coverage is illusory in the event of a covered occurrence, as in this case, involving a minimally insured driver."  Complaint ¶ 33, at 5.  Bhasker asserts that "[a] purchase of higher limits, for example, at a premium of $201 would yield a[n] . . . underinsured indemnification to premium ration of 308/1, which compared to the purchase of minimal combined coverage for virtually no underinsured indemnification."  Complaint ¶ 34, at 6.

Bhasker alleges that Financial Indemnity "failed to act fairly, honestly, and in good faith when dealing with the Plaintiff [by] fail[ing] to fully inform Plaintiff of illusory underinsured coverage with a disproportionate premium/indemnification ratio when compared to the next tier of available coverage and to not materially misrepresent the terms of underinsured coverage." Complaint ¶ 35, at 6.

Bhasker also asserts that Financial Indemnity misled the proposed class in the same way. See Complaint ¶ 52, at 9 (stating that, "[u]pon information and belief, all underinsured applications and insurance policies issued by the Defendant to New Mexico policyholders are uniform in all respects material to the claims brought herein"); Complaint ¶ 73, at 15 (alleging that Financial Indemnity "failed to deliver the quality or quantity of services applied for and purchased by Plaintiff and other insured" by not providing sufficiently clear "applications and policies"); Complaint ¶ 83, at 17 (alleging that Financial Indemnity "misrepresented the terms of the policy sold and provided to Plaintiff and other insureds"); Complaint ¶ 93, at 19 (stating that Financial Indemnity "failed to provide underinsured coverage and/or denied underinsured claims for benefits to Plaintiff and other members of the Class").

The Court, in its motion to dismiss analysis, must accept all facts as true. Bhasker has asserted facts supporting her allegations that Financial Indemnity misled her and the proposed class when selling them UM/UIM coverage. Consequently, the Court will not block her claims under the voluntary payment doctrine, because it is plausible that neither she nor the proposed class paid for UM/UIM coverage with full knowledge of material facts.

## B. BHASKER AND THE PROPOSED CLASS DO NOT SEEK RESTITUTION.

The voluntary payment doctrine typically bars only claims for restitution. See Shaw v. Marriott Int'l, Inc., 474 F. Supp. 2d at 150 ("The voluntary payment doctrine is an old common law doctrine that bars a claim for restitution by a plaintiff who volunteer[ed] payment under a claim of right with full knowledge of all relevant facts." (quotations omitted)). Bhasker does not seek restitution for premiums paid on UM/UIM coverage. See Complaint ¶¶ (A)-(I), at 22 (stating that Bhasker seeks compensatory damages, punitive damages, declaratory judgment, injunctive relief, and reasonable fees and costs); Tr. at 15:18 24 (Bhasker)(stating that she does not seek restitution or unjust enrichment); Tr. at 24:3-7 (Bhasker)(stating that, if the Court "believes that our Complaint seeks restitution, unjust enrichment, and disgorgement, we would be happy to amend the complaint and make it clear that we seek the underinsured motorist coverage"). The proposed class need not seek restitution even to the extent that some of its members may never have considered or actually filed a claim for UIM benefits. Those class members who never got in an accident with an underinsured tortfeasor may seek to recover out-of-pocket damages, which would total the UIM premiums they paid minus the value they received. See Dollens v. Wells Fargo Bank, N.A., 2015-NMCA-096, ¶ 18, 356 P.3d 531, 538 (awarding out-of-pocket damages for a UPA violation); First Interstate Bank of Gallup v. Foutz, 1988-NMSC-087, ¶ 8, 764 P.2d 1307, 1309 (defining out-of-pocket loss in the fraudulent misrepresentation context as the "difference between the amount the Foutzes gave and the amount they received"). As the Court determined that the Supreme Court of New Mexico would conclude the UIM coverage is illusory, see supra I.B., the value they received would be $0.00.

Financial Indemnity urges the Court to expand the voluntary payment doctrine to

preclude damage claims, arguing that that "there is no case that suggests that [New Mexico courts] wouldn't apply [the voluntary payment doctrine] more broadly than restitution." Tr. at 22:3-9 (Hanover). Financial Indemnity, however, provides no authority or substantive argument convincing the Court that the Supreme Court of New Mexico would expand the voluntary payment doctrine to bar damage claims. The voluntary payment doctrine traditionally relates only to restitution. See Shaw v. Marriott Int'l, Inc., 474 F. Supp. 2d at 150 ("The voluntary payment doctrine is an old common law doctrine that bars a claim for restitution by a plaintiff who volunteer[ed] payment under a claim of right with full knowledge of all relevant facts." (quotations omitted)); Konik v. Cable, No. CV 07-763, 2009 WL 10681970, at *23 n.21 (C.D. Cal. Dec. 2, 2009)(Wilson, J.)("[T]he voluntary payment doctrine is generally a defense to an action for restitution of money paid to defendants."); 66 Am. Jur. 2d Restitution and Implied Contracts § 92 (explaining that the "'voluntary payment doctrine' . . . is considered an exception to the principle of restitution"). The New Mexico cases mentioning the voluntary payment doctrine refer only to it precluding restitution claims. See Rabbit Ear Cattle Co. v. Frieze, 1969-NMSC-043, ¶ 5, 453 P.2d 373, 374; Cheesecake Factory, Inc. v. Baines, 1998-NMCA-120, ¶ 6, 964 P.2d 183, 185-86.

    **IT IS ORDERED** that the requests in the Defendant's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support, filed April 28, 2017 (Doc. 15), are denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

William Ferguson
Adrian O. Vega
Kedar Bhasker
Will Ferguson & Associates
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Kerri Lee Allensworth
Alicia M. Santos
O'Brien & Padilla, PC
Albuquerque New Mexico

--and--

Mark L. Hanover
Dentons
Chicago, Illinois

      *Attorneys for the Defendant*