# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HELEN BHASKER,

       Plaintiff,

vs.                                                                 No. CIV 17-0260 JB\JHR

KEMPER CASUALTY INSURANCE
COMPANY; UNITRIN SPECIALTY
FINANCIAL INDEMNITY COMPANY;
FINANCIAL INDEMNITY COMPANY;
ELITE FINANCIAL INSURANCE and
NOELIA LUNA SUCET,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Judgment on the

Pleadings and Memorandum of Law in Support, filed April 4, 2018 (Doc. 58)("MJP"). The

Court held a hearing on August 10, 2018. The primary issues are: (i) whether Defendant

Financial Indemnity Company is entitled to judgment as a matter of law as to all claims for

insureds who have non-minimum limits underinsured motorist ("UIM") coverage;[1] and (ii)

whether, as a matter of law, Financial Indemnity can be liable to Plaintiff Helen Bhasker for

---

[1]Uninsured motorist ("UM") and UIM coverage

> provides the insured with a mechanism to recover economic damages caused by
> the negligence of uninsured or underinsured motorists. As a result, the insured
> can recover what would have been recovered had the uninsured motorist
> maintained liability insurance or if the underinsured motorist maintained the same
> amount of liability coverage as the insured.

Lee R. Russ & Thomas F. Segalla, 9 Couch on Insurance § 171:2 (3d ed. 2018)(footnotes
omitted). See McMillan v. Allstate Indem. Co., 2004-NMSC-002, ¶ 17, 135 N.M. 17, 23, 84
P.3d 65, 71 ("[T]he UM statute is designed to protect individuals against the hazard of culpable
but uninsured motorists . . . , and to place the insured in the same position as he or she would
have been had the tortfeasor had liability insurance.").

extracontractual or punitive damages. The Court concludes that: (i) Financial Indemnity is not entitled to judgment as a matter of law as to all claims for insureds who have non-minimum limits UIM coverage, because Bhasker has alleged that Financial Indemnity's business practices misled and deceived not only herself but also proposed class members who purchased greater-than-minimum-limits UIM coverage; and (ii) Financial Indemnity can be liable to Bhasker for extracontractual and punitive damages, at this stage in the proceedings, because Bhasker has alleged that Financial Indemnity's decision to sell illusory UIM coverage was willful or reckless. Although the Court will not dismiss Bhasker's claims on behalf of proposed class members who purchased greater-than-minimum-limits UIM coverage, the Court predicts that the Supreme Court of New Mexico would conclude that higher-than-minimum limits UIM coverage has value, because New Mexico's statutory offset provision is in accord with New Mexico public policy. The Court therefore permits Bhasker's claims on behalf of proposed class members to proceed on the theory that Financial Indemnity misled her and a class of insureds who, like Bhasker, purchased UIM coverage believing that they would receive the full UIM coverage reflected on their declarations pages, whether minimum limits or some greater figure. Accordingly, the Court denies the MJP.

## FACTUAL BACKGROUND

Bhasker contends that, "[b]ased on the information provided by the Defendant," she agreed to "pay a six-month premium for the State of New Mexico mandated minimum automobile bodily injury and uninsured/underinsured motorist coverage." First Amended Class Action Complaint for Breach of Statutory, Common Law, and Contractual Duties ¶ 30, at 5, filed March 23, 2017 (Doc. 12)("Complaint"). According to Bhasker, her insurance policy features:

(i) liability coverage on one vehicle for $25,000.00 per person and $50,000.00 per accident, per vehicle; and (ii) underinsured coverage on one vehicle for $25,000.00 per person and $50,000.00 per occurrence, per vehicle. See Complaint ¶¶ 42-43, at 7 (citing Coverage for 1995 Lexus LS 500 4D at 1 (dated May 14, 2015), filed March 23, 2017 (Doc. 12-2)). Bhasker asserts that Financial Indemnity did not "fully inform" her that "a purchase of 25/50 underinsured coverage, when triggered by a crash with a tortfeasor who has 25/50 bodily injury liability limits, will result in a payment of premium for which no payment of benefits will occur . . . ." Complaint ¶ 48, at 8.

Bhasker avers that, on June 24, 2015, she was driving eastbound on I-40 in Albuquerque, New Mexico, when another driver, Stephanie Martinez, "failed to stop for the traffic in front of her vehicle" and struck Bhasker's car in the rear, causing "serious bodily injuries and other damages." Complaint ¶¶ 12-14, at 2-3. Bhasker asserts that Martinez "was an underinsured motorist at the time of the collision" as Bhasker's insurance policy and New Mexico law define the term. Complaint ¶ 17, at 3. Bhasker contends that she "received the full extent of liability coverage carried by Ms. Martinez," which was $25,000.00. Complaint ¶ 18, at 3. Bhasker asserts that, after the accident, Financial Indemnity provided a certified copy of a document summarizing her policy. See Complaint ¶ 38, at 6 (citing New Mexico Personal Auto Application at 1-4 (dated July 14, 2011), filed March 23, 2017 (Doc. 12-1)("Policy Application")). Bhasker contends that the "certified copy of the [Policy Application] materially misrepresented the terms of [its] underinsured [motorist] coverage and did not contain clear, unambiguous language regarding the effects of New Mexico's underinsured coverage offset laws." Complaint ¶ 39, at 6. Furthermore, Bhasker contends that the Policy Application's

language is "deceptive and clearly ambiguous in that it states that the applicant may purchase underinsured coverage in excess of the bodily injury coverage limits, which is the opposite of the legislative intent" of N.M. Stat. Ann. § 66-5-301 and New Mexico case law. Complaint ¶ 40, at 6. Bhasker contends that Financial Indemnity's Policy Application

> did not alert [her], nor make clear to the ordinary and similarly situated insured, the fact that the New Mexico offset law drastically and materially diminished payment of benefits arising from a covered occurrence under the policy. . . . Specifically, there is virtually no possible underinsured minimum limits claim available to the Plaintiff and other similarly situated members of the class.

Complaint ¶ 43, at 7. Bhasker avers that, when she, "through counsel, demanded Defendant provide [her] with underinsured benefits that Defendant solicited and for which the Plaintiff paid a premium," Financial Indemnity denied her claim for underinsured benefits. Complaint ¶ 44, at 7. Bhasker further contends that Financial Indemnity has "written direct premium automobile insurance to thousands of New Mexico residents and, from 2010-2014, wrote direct premiums" around the United States totaling $1.09 billion. Complaint ¶ 22, at 4.

## PROCEDURAL BACKGROUND

Bhasker originally brought this case in the Second Judicial District Court, County of Bernalillo, State of New Mexico. See Class Action Complaint for Breach of Statutory, Common Law, and Contractual Duties, filed in the Second Judicial District Court, County of Bernalillo, State of New Mexico (filed in state court on December 30, 2016), filed in federal court February 24, 2016 (Doc. 1-1)("State Complaint").[2] Financial Indemnity removed the action to federal

---

[2]Although Bhasker's original state court lawsuit named several Defendants, see State Complaint at 1 (naming Kemper Casualty Insurance Company, Unitrin Specialty Financial Indemnity Company, Financial Indemnity Company, Elite Financial Insurance, and Noelia Luna Sucet as Defendants), Bhasker's Complaint names Financial Indemnity as the sole defendant, see Complaint at 1 (listing Financial Indemnity as the sole defendant); Notice of Consent to Removal

court on February 24, 2017.  See Notice of Removal, filed February 24, 2017 (Doc. 1).  Financial Indemnity removed the case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because "this is a putative class action with more than 100 putative class members that seeks to recover more than $5,000,000.00."  Notice of Removal at 1.

Financial Indemnity filed a Motion to Dismiss.  See Defendant's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support, filed April 28, 2017 (Doc. 15)("MTD").  In the MTD, Financial Indemnity argues that the filed rate and voluntary payments doctrines bar Bhasker's claims.  See MTD at 1.  Financial Indemnity also asserts that Bhasker's illusory coverage argument is "simply wrong" as a matter of law, "because minimum limits underinsured motorists coverage does provide tangible benefits to those who choose it." MTD at 1.  The Court held a hearing on July 24, 2017.  See Hearing Transcript (taken July 24, 2017) (Doc. 34).

The Court filed a Memorandum Opinion and Order ("MOO") denying Financial Indemnity's requests in the MTD.  See Memorandum Opinion and Order, filed January 10, 2018 (Doc. 48); Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d 1191, 1191 (D.N.M. 2018)(Browning, J.).  Specifically, the Court concluded that: (i) the filed rate doctrine does not bar Bhasker's claims, because the Supreme Court of New Mexico would not apply the filed rate

---

by Defendant Unitrin Specialty Financial Indemnity Company at 1-2, filed March 13, 2017 (Doc. 9)("Defendants Elite Financial Insurance and Noelia Luna Sucet hereby provide Notice of Consent to Removal and joins the Notice of Removal by Defendant Unitrin Specialty Financial Indemnity Company."); Notice of Removal ¶ 46, at 18 (explaining that "there is no such entity as Unitrin Specialty Financial Indemnity Company" and that Kemper Casualty Insurance Company "had no affiliation with Financial Indemnity Company . . . during any time period relevant to this case").

doctrine[3] to bar claims against insurers for unfair or deceptive business practices; (ii) Bhasker's claims are well-pled even if the UIM insurance is not illusory; and (iii) the voluntary payment doctrine[4] does not bar Bhasker's claims, because she alleges that she did not know all the material facts. See MOO at 56; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1226.

## 1. **The MJP.**

In the MJP, Financial Indemnity, pursuant to rule 12(c) of the Federal Rules of Civil Procedure, moves for the entry of an order granting Financial Indemnity partial judgment on the pleadings as to two of Bhasker's claims: "1. Defendant is entitled to judgment as a matter of law as to all claims for insureds who have non-minimum limits underinsured motorist . . . coverage; and 2. Defendant cannot, as a matter of law, be liable to Plaintiff for extra-contractual or punitive damages." MJP at 1. Financial Indemnity asserts that, although the Court, in its MOO, denied Financial Indemnity's MTD, the MOO reflects that all Bhasker's claims "are premised on the

---

[3]New Mexico's "filed rate" doctrine provides that "any filed rate -- that is, one approved by the governing regulatory agency -- [is] per se reasonable and unassailable in judicial proceedings brought by ratepayers." Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d 71, 74-75 (internal quotation marks and alterations omitted). See Summit Props., Inc. v. Pub. Serv. Co. of N.M., 2005-NMCA-090, ¶ 12, 118 P.3d 716, 723-24. "[T]he heart of the filed rate doctrine is not that the rate mirrors a competitive market, nor that the rate is reasonable or thoroughly researched, it is that the filed rate is the only *legal* rate." Valdez v. State, 2002-NMSC-028, ¶ 5, 54 P.3d at 75 (emphasis in original). "The policy behind the filed rate doctrine is to prevent price discrimination[,] to preserve the role of agencies in approving rates[,] and to keep courts out of the rate-making process." Valdez v. State, 54 P.3d at 75.

[4]New Mexico's voluntary payment doctrine bars plaintiffs from recovering payments made voluntarily and with full knowledge of the material facts, unless the plaintiff was the victim of fraud or under duress. See Rabbit Ear Cattle Co. v. Frieze, 1969-NMSC-043, ¶ 5, 453 P.2d 373, 374 ("It is . . . a well established rule that payments voluntarily made with full knowledge of all material facts cannot be recovered back in absence of fraud or duress"); Cheesecake Factory, Inc. v. Baines, 1998-NMCA-120, ¶ 6, 964 P.2d 183, 185-86 (noting the "general rule that one who makes a voluntary payment to another has no right to restitution" (citing Restatement (First) of Restitution § 112 (1937)).

theory that the minimum limits UIM coverage at issue in this case is 'illusory.'" MJP at 1. Financial Indemnity further asserts that the Court should hold that Bhasker is not entitled, as a matter of law, to the extracontractual or putative damages that she seeks, because Financial Indemnity "certainly had a reasonable basis for enforcing the offset as it did, and for believing its minimum limits UIM coverage was neither illusory nor otherwise unlawful." MJP at 2.

Financial Indemnity argues that "[t]his Court's Order indicates clearly that the illusory coverage claim raised by this case applies to minimum limits UIM coverage, not where any level of UIM limits above the minimum is at issue." MJP at 4. Financial Indemnity cites language from the Court's MOO which emphasizes, for example, that Bhasker's UIM insurance is illusory and that, because of New Mexico's offset law, "there is virtually *no possible underinsured minimum limits claim* available" to Bhasker and "other similarly situated members of the class." MJP at 4 (quoting MOO at 3; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1194)(emphasis in MJP). Financial Indemnity summarized Bhasker's illusory insurance coverage theory: "when the tortfeasor's minimum bodily injury liability limits, which would be at least $25,000/$50,000, are offset against the insured's minimum $25,000/$50,000 UIM limits, the injured insured would have paid a premium for which no payment of benefits will occur once the offset is applied." MJP at 4-5. Financial Indemnity argues that this theory does not apply outside the minimum limits UIM context, because, for example, "if the insured has UIM limits of $50,000, $100,000 or any amount greater than $25,000, and the tortfeasor has $25,000 in bodily injury liability limits and that amount is offset, the injured insured *will* recover UIM benefits where the damages exceed the tortfeasor's limits." MJP at 5 (emphasis in MJP).

Financial Indemnity further asserts that the Court should limit Bhasker's illusory coverage theory to insureds with minimum limits UIM coverage, because Progressive Northwest Insurance Co. v. Weed Warrior Services, 2010-NMSC-050, 245 P.3d 1209 ("Weed Warrior"), which, according to Financial Indemnity, Bhasker "primarily relie[s]" for her illusory coverage theory, does not contemplate insureds with greater than minimum limits UIM coverage. See MJP at 5. Hence, according to Financial Indemnity, Weed Warrior confirms that

> the problem of "illusory" UIM coverage arises, if at all, only in connection with minimum limits UIM coverage -- i.e., where an injured insured's minimum UIM limits of $25,000 are offset by a tortfeasor's $25,000 bodily injury liability limits. It would not arise in cases involving UIM coverage limits above the minimum -- e.g., where an insured's $50,000 or $100,000 UIM limits (or any amount above $25,000) are only partially offset by a tortfeasor's $25,000 bodily injury liability limits.

MJP at 6.

Financial Indemnity adds that the Court "would directly contravene the purpose of New Mexico's UM/UIM statute" if the Court permits Bhasker to apply her theory beyond the minimum limits UIM coverage context, because the Supreme Court of New Mexico has stated that § 66-5-301's purpose "is to assure that, in the event of an accident with an underinsured vehicle, an insured motorist entitled to compensation will receive at least the sum certain in underinsurance coverage purchased for his or her benefit," and that the UIM insurer must satisfy the difference only "[t]o the extent the amount of other available insurance proceeds from responsible underinsured tortfeasors does not equal or exceed the amount of coverage purchased." MJP at 7 (quoting Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶ 13, 253 P.3d 944, 948 (emphasis in MJP only)). According to Financial Indemnity, these cases demonstrate that "the purpose of the UIM statute and offset provision is to make the injured

insured whole up to the level of UIM coverage he or she has purchased." MJP at 7. Financial Indemnity suggests that the Supreme Court of New Mexico in <u>Fasulo v. State Farm Mutual Automobile Insurance Co.</u>, 1989-NMSC-060, ¶ 15, 780 P.2d 633, 637, offers further support for this position when it concluded: "Regardless of the number of underinsured tortfeasors at fault, the legislature intended that the injured party's underinsurance recovery should be limited to the amount of UIM coverage purchased, less available liability proceeds." MJP at 8 (quoting <u>Fasulo v. State Farm Mut. Auto. Ins. Co.</u>, 1989-NMSC-060, ¶ 15, 780 P.2d at 637). Similarly, Financial Indemnity asserts, § 66-5-301(B) mandates offset "*to ensure that the insured does not receive payment from his or her insurer greater than the coverage purchased*." MJP at 8 (quoting <u>Samora v. State Farm Mut. Auto. Ins. Co.</u>, 1995-NMSC-022, ¶ 10, 892 P.2d 600, 603 (emphasis in MJP only)). Financial Indemnity also asserts that federal courts have reached the same conclusion regarding New Mexico's UM/UIM statute. <u>See</u> MJP at 8 (citing <u>Ortiz v. Safeco Ins. Co. of Am.</u>, 207 F. Supp. 3d 1216, 1219 (D.N.M. 2016)(Lynch, M.J.)("[The] purpose of New Mexico's UM/UIM statute is to expand such coverage in New Mexico to protect the public from damages caused by uninsured or underinsured motorists by putting the insured in the same position as if the tortfeasor had liability insurance.")). According to Financial Indemnity, these cases show that the purpose of New Mexico's UIM statute, with its express offset provision, "is to put the insured in the same position as he or she would have been had the tortfeasor had liability insurance coverage in the amount of UIM coverage purchased by the insured." MJP at 8. Hence, Financial Indemnity alleges:

> If Plaintiff's "illusory" UIM coverage approach were adopted beyond the minimum UIM limits context, and the offset provision could therefore not be applied, that would defeat the whole purpose of the statute. It would create a windfall for insureds by requiring UIM insurers to put the insured in a *better*

position than he or she would have been had the tortfeasor had liability insurance coverage. It would also result, in contravention of the statute's purpose, in insureds receiving UIM payments in amounts greater than the coverage they purchased.

MJP at 8-9 (emphasis in MJP).

According to Financial Indemnity, that New Mexico law offsets the first $25,000.00 of coverage should not result in Financial Indemnity's penalization, regardless whether that provision aggrieves insureds. See MJP at 9. Financial Indemnity adds that, even in jurisdictions where courts have held that minimum limits UIM coverage is illusory, "these same courts have *rejected* the theory that UIM coverage above the statutory minimum limits is illusory." MJP at 9 (emphasis in MJP). For example, contends Financial Indemnity, the Supreme Court of Wisconsin in <u>Taylor v. Greatway, Insurance Co.</u>, 628 N.W.2d 916 (Wis. 2001), rejected the argument that the insured's coverage was illusory because of a reducing clause which, when applied, meant that the insured "could never recover $25,000 of the $50,000 in UIM coverage under each policy, due to the requirement . . . that drivers have at least $25,000 in liability insurance," and instead stated that the tortfeasor's vehicle was not underinsured, because the tortfeasor and the insured had equal liability and UIM coverage limits of $50,000.00. MJP at 9 (quoting <u>Taylor v. Greatway, Ins. Co.</u>, 628 N.W.2d at 919). Financial Indemnity adds that the Supreme Court of Wisconsin distinguishes <u>Taylor v. Greatway, Insurance Co.</u> from cases where minimum limits UIM coverage is involved when it states that in the minimum limits context "there was no possibility . . . that the insured driver could recover under her UIM policy because the policy defined an underinsured vehicle as a vehicle with liability limits less than the limits of the UIM coverage and because [the insured] had a UIM coverage limit of $25,000," which was the minimum amount for liability insurance that the law required. MJP at 9-10 (quoting <u>Taylor</u>

v. Greatway, Ins. Co., 628 N.W.2d at 923).  For the same proposition, Financial Indemnity refers the Court to DeGrand v. Motors Ins. Corp., 903 F.2d 1100, 1103 n.2 (7th Cir. 1990)("[U]nderinsurance would not be illusory to drivers who purchase underinsured motorist coverage in an amount greater than the minimum amount of uninsured motorist coverage required by law.").  Financial Indemnity concludes by arguing that, "even if minimum limits UIM coverage is considered 'illusory,' UIM coverage above the minimum limits would not be . . . because the insured will recover UIM coverage where the tortfeasor has liability coverage in excess of the statutory minimum."  MJP at 10.

Financial Indemnity next turns to its argument that the Court should not permit the factfinder to consider extracontractual damages and begins by reciting the New Mexico legal standard for awarding such damages: "the existence of 'willful, wanton, malicious, reckless, oppressive, fraudulent or in bad faith' conduct."  MJP at 10 (quoting Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1225 (D.N.M. 2011)(Browning, J.); and citing Gallup Med Flight, LLC v. Phoenix Ins. Co., No. CV 16-01197 KG/KBM, 2018 WL 344956, at *2 (D.N.M. Jan. 9, 2018)(Gonzales, J.); NMRA, Civ. UJI 13-1827).  Financial Indemnity contends that punitive damages are not available when a defendant's conduct "is neither willful, wanton, nor in bad faith."  MJP at 11 (citing Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d at 1226; Ensey v. Ozzie's Pipeline Padder, Inc., No. CIV 08-0801 JAP/CG, 2009 WL 10665015, at *10 (D.N.M. Oct. 6, 2009)(Parker, J.), aff'd, 446 F. App'x 977 (10th Cir. 2011); Bevan v. Valencia, No. CIV 15-73 KG/SCY, 2017 WL 5054703, at *5 (D.N.M. Nov. 2, 2017)(Gonzales, J.)).  Financial Indemnity asserts that the Court may not award punitive damages "where, as here, a defendant has a justifiable basis for its conduct," MJP at 11 (citing Lite Cookies Ltd. v. Tassy & Assocs.,

Inc., No. CV 08-1172 BB/WDS, 2011 WL 13162088, at *3 (D.N.M. Sept. 1, 2011)(Black, J.)("[I]ntentional breach of contract by itself is not enough to support an award of punitive damages. . . . Plaintiff must show that Defendant's acts were without justification.")), and "where, as here, the applicable area of law is unsettled," MPJ at 12 (citing Equal Emp't Opportunity Comm'n v. Flambeau, Inc., 846 F.3d 941, 948 (7th Cir. 2017)("An employer's or its attorney's disagreement with EEOC guidance does not by itself support a punitive damages award, at least where the guidance addresses an area of law as unsettled as this one."); McCann v. Coughlin, 698 F.2d 112, 127 (2d Cir. 1983)("Given the unsettled state of the law on this issue . . . we decline to find that the district court's decision not to award McCann punitive damages was an abuse of discretion.").

Financial Indemnity further asserts that, "where, as here, the insurer had a legitimate basis for disputing the claim," courts have refused to award punitive damages, even for erroneous coverage determinations. MJP at 12-13 (citing United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶ 17, 709 P.2d 649, 654 ("[S]ince there were legitimate questions regarding the amount of [the insured's] claimed damages . . . we cannot say that [the insurer's] failure to pay [the insured's] claim was malicious or in bad faith . . . . Thus, we determine that the trial court's award of $25 million in punitive damages was erroneous."); T.G.S. Transp., Inc. v. Canal Ins. Co., 216 F. App'x 708, 708 (9th Cir. 2007); Crenshaw v. MONY Life Ins. Co., No. 02CV2108-LAB RBB, 2004 WL 7094011, at *8 (S.D. Cal. May 3, 2004)(Bruns, J.)("[I]f there is a proper basis to dispute coverage, even an erroneous denial of a claim in breach of the insurer's contract will not by itself support tort liability . . . . Only the damages flowing from the breach of contract . . . are at issue.").

Financial Indemnity contends that the Court in its MOO recognized that "this was an issue of first impression in New Mexico" and that numerous courts have held that a limits offset in these circumstances is not unlawful.  MJP at 13-14.  Hence, Financial Indemnity asserts that, although the Court predicted that the Supreme Court of New Mexico would conclude that the minimum limits UIM coverage in this case is illusory, the Court is correct when it states that it "is receptive to the argument that the rare scenarios where a policyholder would benefit from a policy suggests that the policy has at least some value."   MJP at 13-14 (citing MOO at 74; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1237).  Financial Indemnity then discusses several cases where courts have concluded that minimum limits UIM coverage is not illusory, thereby suggesting, according to Financial Indemnity, that Financial Indemnity had a reasonable basis for its position that minimum limits UIM coverage provides value, "and therefore did not act with the requisite animus to allow for a valid extra-contractual or punitive damages claim." MJP at 14.  For example, according to Financial Indemnity, the Supreme Court of Idaho in Vincent v. Safeco Insurance Co. of America, 136 Idaho 107, 29 P.3d 943 (Idaho 2001), held that UIM coverage equal to minimum bodily injury liability limits was not illusory, even if no vehicle covered by a policy issued in the state could satisfy the definition of an underinsured motor vehicle, because, if the tortfeasor was a driver with an out-of-state policy with lower bodily injury liability minimum limits than in the state policy, the policyholder could recover the difference as to those limits.  See MJP at 14 (citing Vincent v. Safeco Ins. Co. of Am, 29 P.3d at 948).  A further example is seen in Meridian Mutual Insurance Co. v. Richie, 544 N.E.2d 488 (Ind. 1989), asserts Financial Indemnity, because there the Supreme Court of Indiana concluded that underinsured automobiles could include "vehicles from other states which require lesser

amounts than does Indiana of liability insurance, so that conceivably [the insured] could have benefitted from his underinsured motorist coverage. . . .  Consequently, the policy . . . does not violate the public policy against illusory coverage."  MJP at 15 (quoting <u>Meridian Mut. Ins. Co. v. Richie</u>, 544 N.E.2d at 489-90).

Financial Indemnity asserts that additional support for its position -- that it had a reasonable basis to believe that minimum limits UIM coverage is not illusory -- is seen in cases where courts have found that minimum limits UIM coverage provides value "where there are multiple injured parties in an accident, such that no single policy holder will recover the entirety of the tortfeasor's liability limit."  MJP at 15-16 (citing <u>Showman v. Busser</u>, No. 311141, 2013 WL 6037161, at *4 (Mich. Ct. App. Nov. 14, 2013)("Although the policy limits equal the statutory minimum in Michigan, the insurance policy in question still provides underinsured motorist benefits . . . when the tortfeasor's liability insurance is reduced to less than $20,000 by payments to other injured persons other than resident relatives."); <u>Hallihan v. Progressive Direct Ins. Co.</u>, No. 315CV01068NJRSCW, 2016 WL 4617243, at *6 (S.D. Ill. Sept. 6, 2016)(Rosenstengel, J.)("[T]he Court concludes that Progressive's minimum UIM coverage is not illusory. There are certainly circumstances where a claimant may recover less than the minimum liability limits from the at-fault driver; the insured is then entitled to seek the difference, up to the UIM policy limits, from Progressive.")).

Financial Indemnity avers that a third scenario where a minimum limits policy has at least some value occurs when the insured receives less than the tortfeasor's policy limits because of a contractual exclusion for punitive damages, in which case, under New Mexico law, the insurer may not offset the full amount of the tortfeasor's liability limits.  MJP at 16 (citing

Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶ 13, 253 P.3d at 946). In addition, argues Financial Indemnity, because Bhasker paid a single premium for combined UM and UIM coverage, and because, under New Mexico law, rates must be charged based on the insurer's loss history, see MJP at 17 (citing N.M. Stat. Ann. § 59A-17-7 ("In determining whether rates comply with the rate standards . . . due consideration shall be given to past and prospective loss and expense experience within and without this state[.]"); N.M. Stat. Ann. § 59A-17-6 ("Rates are inadequate if they are clearly insufficient, together with the investment income attributable to them, to sustain projected losses and expenses in the line, kind or class of business to which they apply."), the portion of the rate for the combined UM/UIM coverage that is attributable to UIM coverage would be minimal, according to Bhasker's theory, based on a minimal loss payment history, see MJP at 17. Hence, Financial Indemnity contends, it cannot, as a matter of law, be collecting excessive premiums for UIM coverage that has an allegedly small or "illusory" value. MJP at 17. Moreover, Financial Indemnity maintains that the UM portion of the combined coverage "certainly" has value even at minimum limits. MJP at 17. Finally, an insured can recover minimum limits UIM benefits, contends Financial Indemnity, when he or she has stackable UIM coverage and multiple vehicles. See MJP at 17.

Financial Indemnity concludes by arguing that the above caselaw and potential minimum limits recovery scenarios prove that its coverage position in enforcing its minimum limits UIM offset was, as a matter of law, reasonable. See MJP at 17. Thus, avers Financial Indemnity, because it "had solid grounds, particularly in this case of first impression," for its position that its limits offset was valid, which "is the antithesis of the willful, wanton, bad faith or fraudulent conduct necessary to warrant extra-contractual or punitive damages," the Court should grant it

judgment on the pleadings as to all Bhasker's extracontractual and punitive damage claims. MJP at 18.

### 2. The MJP Response.

Bhasker responds to Financial Indemnity's MJP. See Plaintiff's Response and Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and Memorandum in Support, filed April 4, 2018 (Doc. 59)("MJP Response"). Bhasker argues that the Court should deny the MJP, because "it is duplicative of defendant's previous motion or raises factual issues inappropriate for a motion under Rule 12(c), issues about which plaintiff has not yet had an opportunity to conduct discovery." MJP Response at 1. Bhasker summarizes her theory of the case, i.e., that Financial Indemnity deceptively solicited and sold UIM coverage in amounts equal to the statutory minimum limits liability coverage without properly advising her that such UIM coverage under New Mexico law was illusory. See MJP Response at 1-2 (citing Complaint ¶¶ 1, 43, 46, 48, at 1, 7-8). Bhasker asserts that she "brings this action on her own behalf, and on behalf of the many insured around the state who have been deceived by Defendant's practices," MJP Response at 2 (quoting Complaint ¶ 4, at 2)(alteration in MJP Response), because, according to Bhasker, Financial Indemnity "committed the same unfair and/or deceptive practices, omissions of material fact, wrongful failures to provide UIM, wrongful denials of claims for UIM benefits, and/or breaches of the implied covenant of good faith and fair dealing" against other New Mexico policyholders or insureds, MJP Response at 2 (citing Complaint ¶ 53, at 9).

According to Bhasker, in its MOO, the Court not only concluded that Bhasker's claims were well-pled, see MJP at 2 (citing MOO at 76; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp.

3d at 1237), but also "implicitly found that underinsured motorist coverage at minimal and higher limits is illusory when it stated that, 'the Supreme Court of New Mexico would join Montana and West Virginia in determining that the UIM coverage is illusory,'" MJP Response at 2 (quoting MOO at 75 n.15; <u>Bhasker v. Kemper Cas. Ins. Co.</u>, 284 F. Supp. 3d at 1237 n.15). Hence, Bhasker contends, appropriate relief may include a punitive damages award. <u>See</u> MJP at 2.

Bhasker further contends that the MJP is premature, because it moves the Court to rule on Bhasker's claims pertaining to the proposed class before the Court rules on class certification. <u>See</u> MJP Response at 2-3. According to Bhasker, only when the Court certifies a class, "which includes individuals who purchased UIM coverage at higher limits," may Financial Indemnity litigate its claim that Bhasker's illusory coverage theory does not apply to insureds with greater than minimum limits UIM coverage. MJP Response at 4. Bhasker contends that, because such claims are not presently before the Court, Financial Indemnity "now serves to waste the Court's time" with a motion duplicative of the MTD, which the Court denied. MJP Response at 4. Nonetheless, Bhasker asserts that the putative class members who purchased UIM coverage at higher limits deserve relief, and intends, through information gleaned from her discovery requests, "to satisfy 'the district court's requirement that [it] must undertake a rigorous analysis' to satisfy itself that a putative class meets the applicable Rule 23 requirements." MJP at 4 (quoting <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 345 (2011)("Wal-Mart")).

Bhasker next insists that the MOO and relevant caselaw support her allegations that non-minimum limits UIM coverage is illusory and that the MJP is incorrect in stating that no courts have concluded that UIM coverage levels above minimum limits are illusory. <u>See</u> MJP

Response at 5. According to Bhasker, the MOO cites caselaw which concludes that "UIM coverage at ***higher*** limits of $100,000.00 and $50,000.00, respectfully, to be illusory because of an offset that went against the interests of public policy." MJP Response at 5 (emphasis in MJP Response)(citing Pristavec v. Westfield Ins. Co., 400 S.E.2d 575 (W. Va. 1990); Hardy v. Progressive Specialty Ins. Co., 67 P.3d 892 (Mont. 2003); Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1236 n.15). That the MOO cites Pristavec v. Westfield Insurance Co. and Hardy v. Progressive Specialty Insurance Co. indicates that the Court "implicitly recognized" that Bhasker's illusory coverage theory applies to higher limits. MJP Response at 5 (citing MOO at 75 n.15; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1237 n.15 ("[T]he Supreme Court of New Mexico would join Montana and West Virginia in determining that UIM coverage is illusory.")).

Bhasker quotes heavily from Pristavec v. Westfield Ins. Co. to support her assertion that non-minimum limits UIM coverage is illusory:

> We believe underinsured motor vehicle status is required, but we believe that, despite the literal meaning of the definitional part of the statute in isolation, the unmistakable spirit of the statute as a whole provides for such status when the amount of the tortfeasor's motor vehicle liability insurance actually available to the injured person in question is less than the amount of *damages* sustained by the injured person, regardless of whether such liability insurance limits actually available are less than the underinsured motorist coverage limits.

MJP Response at 5-6 (quoting Pristavec v. Westfield Ins. Co., 400 S.E.2d at 577). Bhasker contends that further support for her illusory coverage theory is in the Supreme Court of West Virginia's discussion of the legislative intent behind that state's UIM statute:

> we will not ascribe to the legislature an intent to "shortchange" the public by an overly restrictive definition of an "underinsured motor vehicle." An overly restrictive definition of that term would be one which is inconsistent with the preeminent public policy of the statute as a whole, specifically, the full

compensation of the injured party for his or her damages not compensated by a negligent tortfeasor, up to the limits of the underinsured motorist coverage. Some well established rules of statutory construction support our holding on legislative intent under the underinsured motorist statute.

MJP Response at 5-6 (quoting Pristavec v. Westfield Ins. Co., 400 S.E.2d at 581).  Bhasker adds that the Supreme Court of West Virginia recognized that West Virginia's UM/UIM statute was remedial in nature and that a remedial statute "must be construed liberally to effect its purpose." MJP Response at 6 (citing Pristavec v. Westfield Ins. Co., 400 S.E.2d at 581).

Bhasker asserts that, in Hardy v. Progressive Specialty Insurance Co., the Supreme Court of Montana concluded that UIM coverage at higher limits, in that case $50,000.00, is illusory, because "the offset provision, as well as the definition of underinsured motorist, violate Montana public policy because they create an ambiguity regarding coverage, render coverage that Progressive promised to provide illusory, and defeat the insured's reasonable expectation."  MJP Response at 6 (quoting Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 897).  Bhasker insists that the Supreme Court of Montana is in accord with the Supreme Court of West Virginia when the former states:

When we look at an insurance contract for purpose and intent we examine the contract as a whole, giving no special deference to any specific clause. The terms and words used in an insurance contract are to be given their usual meaning and construed using common sense.  Any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage.  An ambiguity exists where the contract, when taken as a whole, is reasonably subject to two different interpretations. Whether an ambiguity exists is determined through the eyes of a consumer with average intelligence but not trained in the law or insurance business.

MJP Response at 6-7 (quoting Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 895-96). Bhasker requests that the Court apply "the same logical analysis" to this case, because, according to Bhasker, Financial Indemnity applied § 66-5-301's offset in the same manner under similar

statutory language. MJP Response at 7. Moreover, Bhasker asserts that New Mexico caselaw states that § 66-5-301 is a remedial statute and recognizes the reasonable expectations doctrine.[5] See MJP Response at 7 (citing Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977; Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 5, 803 P.2d 243, 245; Computer Corner, Inc. v. Fireman's Fund Ins. Co., 2002-NMCA-054, ¶ 13, 46 P.3d 1264, 1268; Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 24, 245 P.3d 1214, 1221).

Bhasker contends that Financial Indemnity has not identified "any logical explanation, reasoning or case law" to support its argument that the Court should distinguish between insureds with minimum limits coverage and insureds with non-minimum limits UIM coverage. MJP Response at 7. According to Bhasker, Financial Indemnity benefits at insureds' expense each time it applies a "Schmick offset"[6] to prevent insureds from receiving their purchased UIM

---

[5]The reasonable expectations doctrine describes whether an insured's belief as to the coverage of an insurance policy is based on reasonable expectations. See Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 13, 127 P.3d 1111, 1114. The Supreme Court of New Mexico has described the doctrine in detail:

> We acknowledge that an insured's purposes in purchasing insurance are important considerations. Our interpretation of language within an insurance policy, however, is not based on a subjective view of coverage, but rather "our focus must be upon the objective expectations the language of the policy would create in the mind of a hypothetical reasonable insured who, we assume, will have limited knowledge of insurance law."

Battishill v. Farmers All. Ins. Co., 2006-NMSC-004, ¶ 13, 127 P.3d 1111, 1114 (quoting Computer Corner, Inc. v. Fireman's Fund Ins. Co., 2002-NMCA-054, ¶ 7, 46 P.3d 1264)). See Truck Ins. Exch. v. Gagnon, 2001-NMCA-092, ¶ 7, 33 P.3d 901 ("When a court interprets the terms of an insurance policy that is unclear and ambiguous, the reasonable expectations of the insured guide the analysis. However, when the policy language is clear and unambiguous, we must give effect to the contract and enforce it as written." (citation omitted)).

[6]Bhasker uses the term "Schmick offset" to describe the offset that the Supreme Court of New Mexico gleaned from § 66-5-301 in its Schmick v. State Farm Mut. Auto. Ins. Co., 1985-

- 20 -

coverage's "the full dollar value."  MJP Response at 7.  For this reason, asserts Bhasker, the

UIM coverage at higher limits is equally illusory to the insured who, because of the <u>Schmick v.</u>

<u>State Farm Mut. Auto. Ins. Co.</u>, 1985-NMSC-073, ¶ 28, 704 P.2d 1092 ("<u>Schmick</u>"), offset,

cannot enjoy the higher UIM benefits they thought they had purchased.  <u>See</u> MJP Response at 7-

8.

Bhasker contends that a rule 12(c) motion is inappropriate "where, as here," the

Complaint displays disputed issues of material fact.  MJP Response at 8.  In this case, maintains

Bhasker, one such disputed issue is that insureds with non-minimum limits UIM coverage did

not receive benefits for which they paid and, thus, reasonably expected.  <u>See</u> MJP Response at 8.

According to Bhasker, because her policy application evidences that she reasonably expected

UIM benefits, contains inaccurate statements of New Mexico insurance law, and fails to inform

her about the <u>Schmick</u> offset, she is entitled, through discovery, to obtain similar documents,

testimony, and admissions from Financial Indemnity, so that a jury may decide if Financial

Indemnity's business practices misled and deceived the proposed class in the same manner.  <u>See</u>

---

NMSC-073, ¶ 28, 704 P.2d 1092, 1099, automobile insurance ruling.  MJP Response at 7.  In
<u>Schmick v. State Farm Mut. Auto. Ins. Co.</u>, the Supreme Court of New Mexico stated:

> While our statute does not specifically provide that the insured's underinsured
> motorist liability insurance is to be offset by the tortfeasor's liability coverage as
> do the statutes of other states, *see e.g.,* Fla. Stat. § 627.727(1) (1983); Tex. Ins.
> Code Ann. § 5.06-1 (Vernon 1981), such an offset is inherent in our statutory
> definition of underinsured motorist.  The state of being underinsured exists when
> the aggregate of the insured's uninsured motorist coverage reduced by the
> tortfeasor's liability coverage is greater than zero.  Hence, offset is required.  Our
> statute limits the insured's recovery to the amount of uninsured motorist coverage
> purchased for the insured's benefit; that amount will be paid in part by the
> tortfeasor's liability carrier and the remainder by the insured's uninsured motorist
> insurance carrier.

<u>Schmick v. State Farm Mut. Auto. Ins. Co.</u>, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099.

MJP Response at 8. According to Bhasker, the disputed issue of material fact is whether Financial Indemnity "knew or should have known that the sale of illusory UIM coverage at higher limits would harm putative class members." MJP Response at 8. Moreover, adds Bhasker, the jury must determine whether Financial Indemnity's alleged misleading and deceptive business practices breach the covenant of good faith and fair dealing, given that Bhasker intends to prove that Financial Indemnity was consciously aware of its misleading and deceptive practices, and nevertheless proceeded with deliberate disregard for the potential harm to the proposed class members that purchased non-minimum limits UIM coverage. See MJP Response at 8.

Bhasker asserts that additional material facts in dispute include the punitive damages question, resolution of which is premature, according to Bhasker, because discovery is ongoing and because Financial Indemnity has not responded to most of Bhasker's discovery requests. See MJP Response at 9. Moreover, adds Bhasker, because the Complaint's allegations assert that Financial Indemnity knew of and failed to avoid the harm that selling "illegal coverage in New Mexico these many years" caused insureds, punitive damages are appropriate pursuant to the Supreme Court of New Mexico's "reckless disregard" definition. MJP Response at 9 (quoting Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308 (defining "reckless disregard," for punitive damages purposes, as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm").

Bhasker next contends that the cases which Financial Indemnity cites in the MJP do not support its position that Bhasker has failed to plead conduct that could support a punitive

damages award.  See MJP Response at 9.  Bhasker asserts, for example, that Farmers Insurance Co. of Arizona v. Sandoval considers only how a third-party tortfeasor's aggravating conduct affects a claim for UIM coverage -- and not whether such coverage is illusory -- because the insured in that case did not dispute the contractual offset.  See MJP at 9 (citing Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶ 4, 253 P.3d at 946).  Farmers Insurance Co. of Arizona v. Sandoval supports Bhasker's theory that the sale of illusory coverage is against public policy, contrary to New Mexico law, and contrary to § 66-5-301's legislative intent, contends Bhasker, because the Court of Appeals of New Mexico in that case stated:  "Because we liberally interpret [§ 66-5-301] in order to implement its remedial purpose, language in the statute that provides for an exception to uninsured coverage should be construed strictly to protect the insured."  MJP Response at 9-10 (quoting Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶ 4, 253 P.3d at 946).  Similarly, argues Bhasker, the Supreme Court of New Mexico in Fasulo v. State Farm Mutual Automobile Insurance Co. does not consider the illusory nature of the UIM coverage purchased, as Financial Indemnity asserts, because the insured in that case sought a declaratory judgment to obtain $100,000.00 in UIM coverage when the insured paid for only $75,000.00, excluding any offset.  See MJP Response at 10 (citing Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 3, 780 P.2d at 634).

In addition, charges Bhasker, Financial Indemnity errs when it states that § 66-5-301 has an "express offset provision," MJP Response at 10 (quoting MJP at 8), because, according to Bhasker, the Supreme Court of New Mexico recognizes that the statute does not expressly authorize an offset when it states: "While our statute does not specifically provide that the insured's underinsured motorist liability insurance is to be offset by the tortfeasor's liability

coverage as do the statutes of other states . . . such an offset is inherent in our statutory definition of underinsured motorist." MJP Response at 10 (quoting Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099). "This matters because defendant insists that its insureds are charged to read and understand New Mexico case law in the same manner lawyers and members of the Supreme Court of New Mexico would," which, Bhasker contends, "goes against established New Mexico case law that protects the rights of consumer laymen." MJP Response at 10 (citing Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d at 977). Bhasker contends that Financial Indemnity errs further when it states that, should the Court consider UIM coverage at higher limits, the insured will receive a windfall, because "as demonstrated in *Pristavec* and *Hardy*, higher limits may be considered illusory when the insureds UIM limits are equal or less than the bodily injury limits." MJP Response at 11 (citing Pristavec v. Westfield Ins. Co., 400 S.E.2d at 577 and Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 894). Bhasker asserts that these cases stand for the proposition that the reasonable expectation of an insured with non-minimum limits UIM coverage is not met, in the same manner as an insured with minimal limits, and that applying a Schmick offset "similarly shortchange[s]" an insured with higher limits, "except that they may be shortchanged for even more premium money lost and even more benefits denied." MJP Response at 11.

Bhasker asserts that her Complaint is well-pled, that it includes facts sufficient to support a plausible claim for punitive damages, and that the Court should not dismiss her punitive damage claims "[a]t this early stage of litigation," because, according to Bhasker, the Court must consider her allegations as true, "including factual allegations that the defendant was willful or reckless in its decision to continue to sell illusory coverage to consumers in this state." MJP

Response at 11-12. Bhasker argues that, because Financial Indemnity alone possesses information regarding whether it knew that it was violating New Mexico consumer protections laws, the Court should postpone ruling on punitive damages questions while discovery is ongoing. See MJP Response at 12. Bhasker contends that the Court's MOO concludes that she "properly and sufficiently pled that defendant acted in bad faith," and that Financial Indemnity may present its defense to such allegations at trial and after class certification. MJP Response at 12 (citing United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶16, 709 P.2d 649, 654 ("To assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim.")). Bhasker further contends that, contrary to Financial Indemnity's assertions that the law is unsettled and that extracontractual damages are therefore unavailable, "underinsured motorist law in New Mexico on how to properly inform an insured is well-settled and consistent with longstanding principles." MJP Response at 12. For example, Bhasker asserts that the Supreme Court of New Mexico established that, to properly inform an insured, insurers must "meaningfully incorporate[]" into an insured's policy the insured's rejection of UM/UIM coverage equal to the liability limits and that insurers must provide the insured with the premium charges corresponding to each available coverage. MJP Response at 12-13 (citing Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 16, 245 P.3d at 1219). Bhasker adds that the Supreme Court of New Mexico has determined that such disclosure requirements "will enable the insured to make an informed decision about the level of UM/UIM coverage he or she wants to purchase and can afford and will minimize uncertainty and litigation with regard to the coverage that the insured has obtained." MJP at 13 (Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 16, 245 P.3d at 1219). According to Bhasker,

Jordan v. Allstate Insurance Co. requires Financial Indemnity to disclose that it rarely pays UIM claims, and that, therefore, a jury could find that Financial Indemnity's "lack of disclosure . . . was indeed intentional, reckless, and worthy of the imposition of punitive damages."  MJP Response at 13.

Bhasker maintains that Financial Indemnity is "well aware" that the UIM coverage it sells at minimum and higher limits is illusory, because "numerous" courts have concluded that UIM coverage nearly identical to the coverage that Financial Indemnity offers is illusory in jurisdictions where Financial Indemnity does business.  MJP at 13 (citing Pristavec v. Westfield Ins. Co., 400 S.E.2d at 577; Hardy v. Progressive Specialty Ins. Co., 67 P.3d at 894; Glazewski v. Coronet Ins. Co., 483 N.E.2d 1263 (Ill. 1985)("Underinsured coverage in the minimum limits . . . is indeed illusory because it would never be payable when recovery is sought from another Illinois resident.  Furthermore, it would not be payable . . . where the at-fault driver is insured in other states which have financial responsibility limits equal to or greater than . . . Illinois."); Hoglund v. Secura Ins., 500 N.W.2d 354, 357 (Wis. Ct. App. 1993)("Because the insured had paid a premium for a benefit that would never be available, the court found the coverage illusory and contrary to public policy.")).

Bhasker contends that Financial Indemnity violated the "special duty" that arises from a "superior knowledge of insurance law over . . . insureds," the existence of which requires Financial Indemnity to "fully and properly inform" its insureds about the Schmick offset.  MJP Response at 14 (citing N.M. Stat. Ann. § 57-12-2(E)(1); Weed Warrior, 2010-NMSC-050, ¶ 13, 245 P.3d at 1213 (citing Computer Corner, Inc., 2002-NMCA-054, ¶ 7, 46 P.3d 1264 ("[W]e will not impose on the consumer an expectation that she or he will be able to make an informed

decision as to the amount of UM/UIM coverage desired or required without first receiving information from the insurance company."))).  Given that the Supreme Court of New Mexico decided <u>Schmick</u> in 1985, Bhasker asserts that Financial Indemnity "has benefited from its superior knowledge for over 33 years and counting but has nevertheless continued to sell illusory coverage in this state."  MJP Response at 14.

Bhasker concludes that the Court should not preclude her punitive damages claim while discovery is ongoing, because discovery may produce evidence that Financial Indemnity knew that it "would never have to pay out on the vast majority of the UIM claims situations" given New Mexico's status as an offset state, and, thereafter, "proceeded with deliberate disregard for the potential harm and detriment to Helen and putative class members."  MJP Response at 14. Such conduct, asserts Bhasker, "is precisely the sort of information, which, if presented to a jury, could lead to an award of punitive damages."  MJP Response at 14.

### 3.    **The MJP Reply.**

Financial Indemnity replies to Bhasker's MJP Response. <u>See</u> Reply in Support of Defendant's Motion for Partial Judgment on the Pleadings, filed May 1, 2018 (Doc. 61)("MJP Reply").  Financial Indemnity argues that, in <u>Schmick</u>, the Supreme Court of New Mexico expressly held that § 66-5-301 entitles insurers, in the UIM context, to offset the tortfeasor's liability limits payments.  MJP at 1 (citing <u>Schmick</u>, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099). Should the Court rule that Financial Indemnity cannot offset the tortfeasor's liability limits payments where the UIM coverage limits exceed the statutory minimum "and thus indisputably provide a potential monetary benefit to the policyholder," asserts Financial Indemnity, the Court would "eviscerate *Schmick*."    MJP Reply at 1.  Financial Indemnity

contends that, because the Court in its MOO recognizes that its mandate in this case is to ascertain what the Supreme Court of New Mexico would conclude, see MJP at 1 (citing MOO at 46-47), the Court should interpret Schmick as requiring the Court to grant the MJP with respect to non-minimum limits UIM coverage, which, according to Financial Indemnity, is the conclusion that the Supreme Court of New Mexico would reach, see MJP Reply at 2. Financial Indemnity charges that Bhasker knows that the Supreme Court of New Mexico would rule in Financial Indemnity's favor and that Bhasker argues that the MJP is premature merely to postpone such a ruling. See MJP at 2. Financial Indemnity contends, however, that Bhasker has put her illusory-coverage-at-all-levels theory "squarely before the court," and, in doing so, made the issue ripe for decision, given that Financial Indemnity "has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." MJP Reply at 2 (quoting Newsome v. The GEO Grp., Inc., No. CIV 12-0733 MCA/GBW, 2014 WL 12796733, at *1 (D.N.M. Jan. 22, 2014)(Wormuth, M.J.), report and recommendation adopted, No. CIV 12-0733 MCA/GBW, 2014 WL 12796748 (D.N.M. Apr. 8, 2014)(Armijo, J.)(citation and internal quotation omitted)). Financial Indemnity asserts that, in Schmick, the Supreme Court of New Mexico

> addressed two questions: (1) "whether New Mexico's UIM laws allow an insured to stack two UIM policies for purposes of determining the tortfeasor's underinsured status"; and (2) "whether underinsured motorist benefits are calculated by subtracting the amount of the tortfeasor's liability coverage from the amount of the insured's uninsured motorist coverage or whether the underinsurance benefits due equal the amount of uninsured motorist coverage purchased for the insured's benefit in addition to the amount of liability insurance proceeds available from the tortfeasor."

MJP Reply at 2 (quoting Schmick, 1985-NMSC-073, ¶ 6, 704 P.2d at 1094). The Supreme Court of New Mexico explains, according to Financial Indemnity, that the intent behind New

Mexico's UIM scheme is "to put an injured insured in the same position he would have been in had the tortfeasor had liability coverage in an amount equal to the uninsured/underinsured motorist protection purchased for the insured's benefit."  MJP Reply at 3 (quoting Schmick, 1985-NMSC-073, ¶ 10, 704 P.2d at 1095).   Financial Indemnity quotes extensively from Schmick to support its proposition that insurers must reduce or "offset" UIM benefits by the amount of liability insurance that the insured receives from the tortfeasor:

> The state of being underinsured exists when the aggregate of the insured's uninsured motorist coverage reduced by the tortfeasor's liability coverage is greater than zero.  Hence, offset is required.  Our statute limits the insured's recovery to the amount of uninsured motorist coverage purchased for the insured's benefit; that amount will be paid in part by the tortfeasor's liability carrier and the remainder by the insured's uninsured motorist insurance carrier.

MJP at 3 (quoting Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099).  Hence, the Court should reject Bhasker's theory, asserts Financial Indemnity, because to conclude otherwise, i.e., to apply Bhasker's illusory coverage theory to higher limits UIM coverage, would mean that insurers could not offset the first $25,000.00 in UIM coverage, which "turns Schmick on its head."  MJP at 3.

Financial Indemnity characterizes Bhasker's assertion that the Court's MOO supports her position that the first $25,000.00 in UIM coverage is illusory even at non-minimum limits as "wholly without merit," because, although Financial Indemnity concedes that the Court accepted Bhasker's theory as true for MTD purposes, "nothing in the Court's Order can even remotely be construed to apply to non-minimum limits UIM coverage."  MJP Reply at 4.  Rather, according to Financial Indemnity, the Court's MOO "leaves no doubt" that the ceiling of Bhasker's illusory coverage theory is capped at minimum limits, "*not* where any level of UIM limits above the minimum is at issue."  MJP Reply at 4 (emphasis in MJP Reply)(citing MOO at 2 ("Bhasker and

the proposed class could still seek premium-based damages, because the Supreme Court of New Mexico would determine that the UIM coverage was illusory *in light of little coverage it provides*." (emphasis in MJP Reply))). Financial Indemnity adds that the Court properly characterizes Bhasker's theory when the Court quotes from the portion of Bhasker's Complaint which states that "there is virtually *no possible underinsured **minimum limits** claim* available to the Plaintiff and other similarly situated members of the class." MJP at 4 (emphasis in MJP) (quoting MOO at 3 (quoting Complaint ¶ 43, at 4))). Financial Indemnity adds that further portions of Bhasker's Complaint emphasize that her theory applies to only minimum limits. See MJP Reply at 4 (citing Complaint ¶ 1, at 1 ("Basically, there is *no such thing as '**minimum limits** underinsured motorist coverage*.'" (emphasis in MJP)); id. ¶ 23, at 4 ("[U]nderinsured coverage is superfluous *when the tortfeasor and the injured driver both carry the statutory **minimum** of liability and underinsured coverage*." (emphasis in MJP))). The Court's reasoning in its MOO, therefore, according to Financial Indemnity, was restricted to the minimum limits UIM coverage context. See MJP Reply at 4-5.

Financial Indemnity contends that Bhasker's MJP Response ignores Financial Indemnity's point that Weed Warrior, which compelled the Court, according to Financial Indemnity, to deny the MTD as to minimum limits UIM coverage, concerns only minimum limits situations. See MJP Reply at 5 (citing MOO at 74-75). Hence, Financial Indemnity maintains, the MOO's Weed Warrior citations emphasize that the illusory UIM coverage problem arises, "if at all," only where a tortfeasor's bodily injury liability limits offset completely an insured's minimum limits UIM coverage. MJP Reply at 5 (citing Weed Warrior, 2010-NMSC-050, ¶ 10, 245 P.3d at 1213 ("An insured carries UIM coverage only if the

UM/UIM limits on her or his policy *are greater than the statutory minimum of $25,000.*"

(emphasis in MJP)).

Financial Indemnity alleges that Bhasker does not address the caselaw which shows that, even in jurisdictions where courts have held that minimum limits UIM coverage is illusory, courts have rejected her theory that UIM coverage is illusory at higher than minimum limits. See MJP Reply at 5. To support this proposition, Financial Indemnity cites to <u>Taylor v. Greatway Insurance Co.</u>, for example, wherein the Supreme Court of Wisconsin states:

> Taylor's UIM coverage limit in each of her policies issued by American Family is $50,000. Hermanson's $50,000 liability coverage limit is equal to, not less than, Taylor's $50,000 UIM coverage limit in each policy. The vehicle driven by Hermanson is not an underinsured vehicle as defined by American Family's policies. Taylor is therefore not entitled to UIM coverage under her policies with American Family.

MJP Reply at 5-6 (quoting <u>Taylor v. Greatway Ins. Co.</u> 628 N.W.2d at 921). According to Financial Indemnity, the above quotation distinguishes <u>Taylor v. Greatway Insurance Co.</u> from minimum limits UIM coverage cases when considered alongside the Supreme Court of Wisconsin's assertion that, in the minimum limits context, "there was no possibility . . . that the insured driver could recover under her UIM policy because the policy defined an underinsured vehicle as a vehicle with liability limits less than the limits of the UIM coverage," whereas Taylor had "a UIM coverage limit . . . greater than the minimum amount of liability coverage required. . . . As a result, it is possible for another driver to have a liability coverage limit less than Taylor's UIM coverage limit and, therefore, satisfy the American Family policy definition of underinsured vehicle." 628 N.W.2d at 923. Financial Indemnity also cites to <u>DeGrand v. Motors Insurance Corp.</u>, wherein the United States Court of Appeals for the Seventh Circuit concludes that "underinsurance would not be illusory to drivers who purchase underinsured

motorist coverage in an amount greater than the minimum amount of uninsured motorist coverage required by law." MJP Reply at 6 (citing DeGrand v. Motors Ins. Corp., 903 F.2d at 1103 n.2).

Financial Indemnity disputes Bhasker's contention that Pristavec v. Westfield Insurance Co. is persuasive, because, according to Financial Indemnity, New Mexico and West Virginia use different methods to determine whether a motorist is underinsured. See MJP Reply at 6. Financial Indemnity avers that determining whether a vehicle is "underinsured" under West Virginia law requires comparing the tortfeasor's liability coverage limit with the injured insured's total damages and not with the insured's UIM coverage limit, see MJP Reply at 6 (citing Pristavec v. Westfield Ins. Co., 400 S.E.2d. at 582-83 ("This Court holds that underinsured motorist coverage is activated . . . when the amount of such tortfeasor's motor vehicle liability insurance actually available to the injured person . . . is less than the total amount of damages sustained . . . regardless of the comparison between such liability insurance limits actually available and the underinsured motorist coverage limits."), whereas New Mexico determines whether a motorist is underinsured by comparing the tortfeasor's liability coverage limit with the total amount of UIM coverage limits available to the injured insured, see MJP Reply at 6 (citing Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099). Hence, asserts Financial Indemnity, the Court has no basis to conclude that the Supreme Court of New Mexico would follow West Virginia's approach to determining whether a motorist in underinsured. See MJP Reply at 7.

Additionally, Financial Indemnity disputes Bhasker's contention that Hardy v. Progressive Specialty Insurance Co. is persuasive, because, Financial Indemnity contends, in that

case, which involved an insured who argued that $25,000.00 of his $50,000.00 UIM coverage was illusory because of his insurer's offset provision, the Supreme Court of Montana concluded that the offset provision violates Montana public policy and is therefore unenforceable.  See MJP Reply at 7-8 (citing 67 P.3d at 897 ("[T]he offset provision, as well as the definition of underinsured motorist, violate Montana public policy because they create an ambiguity regarding coverage, render coverage that Progressive promised to provide illusory, and defeat the insured's reasonable expectation.").  Unlike the Supreme Court of Montana, avers Financial Indemnity, the Supreme Court of New Mexico ruled in Schmick that New Mexico's public policy mandates the UIM limits reduction.  See MJP Reply at 8 (citing Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099).  Financial Indemnity disputes Bhasker's assertion that, because "New Mexico 'case law states that Section 66-5-301 is a remedial statute and recognizes the reasonable expectations doctrine,'" MJP Reply at 8 (quoting MJP Response at 7), such cases therefore stand for the proposition that non-minimum limits UIM coverage is illusory or unlawful; "that could not be the law in light of Schmick."  MJP Reply at 8.

Financial Indemnity repeats its argument that both Farmers Insurance Co. of Arizona v. Sandoval and Fasulo v. State Farm Mutual Automobile Insurance Co. demonstrate that the Court would directly contravene the purpose behind New Mexico's UIM coverage statute if the Court applies Bhasker's illusory coverage theory beyond the minimum limits UIM context.  See MJP Reply at 8.  The Court of Appeals of New Mexico in Farmers Insurance Co. of Arizona v. Sandoval concludes, according to Financial Indemnity, that the UIM coverage statute's purpose and offset provision are designed to make the injured insured whole only up to the UIM coverage level that he or she has purchased, and to put the insured in the same position as he or she would

have been had the tortfeasor had liability insurance coverage equal to the amount of UIM coverage that the insured purchased.  See MJP Reply at 8-9 (citing Farmers Ins. Co. of Arizona v. Sandoval, 2011-NMCA-051, ¶¶ 9-13, 253 P.3d at 947-48).  Financial Indemnity maintains, without providing argument, that Fasulo v. State Farm Mutual Automobile Insurance Co. stands for the same proposition.  See MJP Reply at 9 (citing Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 15, 780 P.2d at 637).  Extending Bhasker's illusory coverage theory beyond the minimum limits context would mean, according to Financial Indemnity, that insurers could not offset the first $25,000.00 of coverage, thereby putting "the insured in a *better* position than he or she would have been had the tortfeasor had commensurate liability insurance coverage," and granting insureds "UIM coverage payments in amounts greater than the coverage they purchased."  MJP Reply at 9 (emphasis in original).

Financial Indemnity reiterates that the Court should grant the MJP as to Bhasker's extracontractual and punitive damage claims, because Financial Indemnity maintains that it has a reasonable basis for its coverage position in this case.  See MJP Reply at 9.  Financial Indemnity contends that Bhasker does not address the authorities, which the MJP cites and which conclude that "extra-contractual and punitive damages are not available unless, unlike here, the defendant's conduct is 'willful, wanton, malicious, reckless, oppressive, fraudulent or in bad faith.'"  MJP Reply at 9 (quoting Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d at 1225).  Moreover, Financial Indemnity continues, that the Court "expressly noted that Defendant's position was not without merit . . . alone shows that Defendant's position did not, as a matter of law, rise to the level of conduct required under New Mexico law for extra-contractual and punitive damages to be assessed."  MJP Reply at 9-10 (citing MOO at 74).  Financial Indemnity

adds that "*Schmick* alone demonstrates the reasonableness of Defendant's position" as to Bhasker's non-minimum limits arguments, which thereby forecloses Financial Indemnity's liability for extracontractual and punitive damages that could result from applying the limits offset. MJP Reply at 10.

Financial Indemnity reasserts that, although the Court did not accept its argument that minimum limits UIM coverage is not illusory, "the fact that the clear majority of cases throughout the country to have considered the issue had held minimum limits UIM coverage not to be illusory demonstrate, as a matter of law, that Defendant had a reasonable basis for its position." MJP Reply at 10. Financial Indemnity adds that Bhasker does not address the caselaw which states that extracontractual damages are not available where the law is unsettled, see MJP Reply at 10 (citing MJP at 13-14), and instead "merely cites *Jordan v. Allstate Ins. Co.* . . . for the general principle that New Mexico law is settled on how insurers must advise insureds regarding underinsured motorist coverage," MJP Reply at 10. According to Financial Indemnity, Jordan v. Allstate Insurance Co. does not discuss whether minimum or higher limits UIM coverage is illusory. See MJP Reply at 11. Moreover, Financial Indemnity maintains that "no New Mexico case had ever held, prior to this Court's decision, that, despite *Schmick*, a limits offset could not be taken in the minimum limits UIM coverage context," and asserts that, accordingly, "the case law showing that extra-contractual and punitive damages should not be awarded where the law is unsettled plainly applies here." MJP Reply at 11.

Financial Indemnity concludes by arguing that the Court should discredit Bhasker's insistence that disputed issues of fact exist and that the Court should thus permit her to proceed with discovery before it decides the MJP, see MJP Reply at 11 (citing MJP Response at 8),

because, avers Financial Indemnity, Bhasker's claims fail "as a matter of law," MJP Reply at 11

(citing <u>Chavez v. City of Albuquerque</u>, No. CIV 13-0557 WJ/SMV, 2014 WL 12796831, at *2

(D.N.M. March 7, 2014)(Vidmar, M.J.)("[T]he disputes are purely questions of law.

Accordingly, Plaintiff's requests for discovery . . . will be denied.")).  Bhasker asserts that no

amount of discovery in this case "could change New Mexico law as set forth in *Schmick*, so

discovery cannot possibly have any bearing on Defendant's arguments regarding non-minimum

limits UIM coverage."  MJP Reply at 11.  Moreover, Financial indemnity adds that no amount of

discovery in this case "can change the unsettled nature of the question regarding use of the offset

in the minimum limits UIM coverage context or the reasonable coverage position, based on

ample case law, that Defendant took regarding that issue."  MJP Reply at 11.

### 4.    The August 10, 2018, Hearing.

The Court held a hearing on August 10, 2018.  <u>See</u> Transcript of Hearing at 1:13 (taken

August 10, 2018), filed August 22, 2018 (Doc. 83)("Aug. 10 Tr.").  The Court began by stating

that the MJP "sure seems like a motion to reconsider" its MOO, and asking why Financial

Indemnity did not label the MJP as such, "which then forces it to go through the standards for a

motion to reconsider, which are high, rather than just something that seems . . . to be raising the

same issues under the same standard."  Aug. 10 Tr. at 3:10-22 (Court).  Financial Indemnity

replied by summarizing the arguments made before the Court in its MTD, <u>see</u> Aug. 10 Tr. at

4:1-19 (Hanover), and asserted:

> Since that time, several things have occurred.  First, the plaintiff's bar of
> New Mexico has filed parallel punitive class actions against State Farm, Liberty
> Mutual, Safeco, GEICO, and Young America.  In all but one of those cases, the
> insurance company has moved to certify questions to the New Mexico Supreme
> Court, and in at least one of the cases the parties jointly agree that a question
> should be certified to the Supreme Court, though they don't agree on the wording.

The second thing that's occurred is that there has been extensive discovery in the present case, including multiple discovery disputes. Plaintiffs currently have pending two motions to compel, and FIC has pending a motion for protective order. While the discovery disputes between the parties include many discrete issues, the source of some of them arises from disagreements about the scope of the plaintiff's case and that's partly what drove FIC to file the present motion.

Aug. 10 Tr. at 4:20-5:15 (Hanover).

The Court stated that filing a motion on the pleadings after the Court has decided a 12(b)(6) motion is "a very unusual practice" that the Court has neither seen before nor wants to encourage. Aug. 10 Tr. at 5:16-24 (Court). Financial Indemnity replied that it is not asking the Court to reconsider its decision but is asking instead that the Court clarify the scope of how Bhasker can proceed in this case, which will affect ongoing discovery disputes between the parties. See Aug. 10 Tr. at 5:1-6 (Hanover). Financial Indemnity added that it understands the Court's ruling as to Bhasker's minimum limits UIM theory, but is asking the Court to rule as a matter of law that Financial Indemnity is entitled to judgment in its favor for anyone who has greater than minimum limits UIM coverage. See Aug. 10 Tr. at 6:23-7:1 (Hanover).

Financial Indemnity asserted that the problem with Bhasker's position "is that it makes no sense for any policyholder who has limits higher than the statutory minimum." Aug. 10 Tr. at 7:8-10 (Hanover). Financial Indemnity then provided the Court with several examples involving a hypothetical policyholder with $100,000.00 in UIM coverage who suffers damages exceeding her $100,00.00 liability limits. See Aug. 10 Tr. at 7:10-13 (Hanover). Financial Indemnity first conceded that, if the hypothetical tortfeasor has $100,000.00 in liability limits, the policy holder would not recover anything under her UIM claim, see Aug. 10 Tr. at 7:15-17 (Hanover); however, Financial Indemnity then asserted that in most cases the policyholder would recover,

for example, "if the tortfeasor has liability limits of $25,000, $50,000, . . . because the Schmick offset would still leave the policyholder with a positive dollar differential of recovery," Aug. 10 Tr. at 7:21-8:4 (Hanover). Under Bhasker's theory, contended Financial Indemnity, the <u>Schmick</u> offset renders all UIM coverage illusory, and, should the Court adopt it for limits above the minimum, the Court would, in effect, overrule <u>Schmick</u>. <u>See</u> Aug. 10 Tr. at 7:21-8:4 (Hanover).

The Court then asked Financial Indemnity to summarize what Financial Indemnity wants the Court to say, <u>see</u> Aug. 10 Tr. at 8:19-20 (Court), and Financial Indemnity replied: "The Court grants judgment to Financial Indemnity Company as to any putative class member with limits above the statutory minimum," Aug. 10 Tr. at 8:21-24 (Hanover). The Court asked why, <u>see</u> Aug. 10 Tr. at 8:25 (Court), and Financial Indemnity replied that, in addition to the previously articulated reasons, UIM policies have value with respect to anyone who has liability limits lower than the UIM policy limits, "which is going to be a lot of people in the state." Aug. 10 Tr. at 9:2-9 (Hanover). Financial Indemnity then quoted from <u>Schmick</u> to describe how New Mexico's offset provision permits insurers to offset the UIM coverage purchased for the insured's benefit by any available liability proceeds. <u>See</u> Aug. 10 Tr. at 9:17-10:6 (Hanover). Financial Indemnity returned to its $100,000.00 coverage hypothetical and stated that, pursuant to New Mexico law, if the policyholder collided with a tortfeasor with $25,000.00 of liability coverage, then the $25,000.00 is offset, and the most that the policyholder could recover from her insurer is $75,000.00; "that's how premiums are determined, and that's how people have been paid, and it has value, and it has value for everyone over the minimum." Aug. 10 Tr. at 10:7-15 (Hanover).

Financial Indemnity stated that, when it last appeared before the Court, it had the impression that Bhasker's theory was limited to insureds with minimum limits only, because, in a collision, insureds with such coverage face two possibilities: "You're in a collision with someone who has no insurance coverage, in which case your uninsured motorist coverage has full value; or you're insured [sic] with someone who's got $25,000 minimum limits, in which case the plaintiffs say there's no value at all." Aug. 10 Tr. at 10:16-11:3 (Hanover). Financial Indemnity added that it still thinks that value exists in the latter scenario, but that those two scenarios alone is where the Court made its prediction about how the Supreme Court of New Mexico would rule. See Aug. 10 Tr. at 11:3-6 (Hanover). Financial Indemnity argued that, because nothing in the Court's MOO considers what would happen if the limits were higher than the minimum, the Court should grant judgment in its favor, which would also resolve ongoing discovery disputes and enable Financial Indemnity to gauge its exposure in this case. See Aug. 10 Tr. at 11:7-13 (Hanover).

Financial Indemnity next alleged that a second problem with Bhasker's theory is that it is inconsistent with the Court's MOO, because, according to Financial Indemnity, the MOO "envisioned" that the case is about minimum limits. Aug. 10 Tr. at 11:17-19 (Hanover)(citing MOO at 2-5). A third problem with Bhasker's theory, alleged Financial Indemnity, is that it contradicts Progressive v. Weed Warrior. See Aug. 10 Tr. at 11:20-22 (Hanover). Financial Indemnity argued that, in Progressive v. Weed Warrior, the Supreme Court of New Mexico was considering only minimum limits coverage when it stated that "an insured carries UIM coverage only if the UM/UIM limits on her or his policy are greater than the statutory minimum of $25,000." Aug. 10 Tr. at 11:20-22 (Hanover)(quoting Weed Warrior, 2010-NMSC-050, ¶ 10,

245 P.3d at 1213).  Hence, Financial Indemnity charged, the Court's reliance on <u>Progressive v.</u> <u>Weed Warrior</u> to predict how the Supreme Court of New Mexico would rule is "explicitly limited to situations where the UM/UIM coverage is not greater than $25,000."  Aug. 10 Tr. at 12:3-8 (Hanover).

Financial Indemnity alleged that the final problem with Bhasker's theory is that it is inconsistent with caselaw from both within and outside New Mexico.  <u>See</u> Aug. 10 Tr. at 12:10-12 (Hanover).  Financial Indemnity insisted that the reasoning behind both <u>Farmers Insurance</u> <u>Co. of Arizona v. Sandoval</u>, and <u>Fasulo v. State Farm Mutual Automobile Insurance Co.</u> is on making the policyholder whole, <u>i.e.</u>, to the purchased UIM coverage limits.  <u>See</u> Aug. 10 Tr. at 12:12-17 (Hanover).  Under Bhasker's theory, however, argued Financial Indemnity, insurers could not apply a <u>Schmick</u> offset at any UIM coverage level, thereby permitting policy holders to recover their UIM limits plus the tortfeasor's liability limits.  <u>See</u> Aug. 10 Tr. at 12:17-21 (Hanover).  Financial Indemnity returned to its $100,000.00 UIM limits hypothetical and asserted that, under Bhasker's theory and a tortfeasor with $25,000.00 of liability limits, "the policyholder recovers $25,000 in liability, and they get the full $100,000 in UIM for a grand total of $125,000 of insurance recovery."  Aug. 10 Tr. at 12:21-13:3 (Hanover).  This result, insisted Financial Indemnity, ignores <u>Schmick</u>, which says that insurers measure UIM limits based on the "dec page,[7] $100,000" in the hypothetical, and apply an offset.  Aug. 10 Tr. at 13:6-9 (Hanover).  Financial Indemnity contends that, when it explained the <u>Schmick</u> offset to Bhasker,

---

[7]In the insurance policy context, the "dec" or "declarations" page refers to "[t]he front page (or pages) of a policy that specifies the named insured, address, policy period, location of premises, policy limits, and other key information that varies from insured to insured. The declarations page is also known as the information page." Declarations, International Risk Management Institute, Inc., https://www.irmi.com/term/insurance-definitions/declarations (last visited Jan. 11, 2019).

Bhasker replied: "All UIM coverage is illusory"; Financial Indemnity thus seeks a ruling from the Court that this case involves only minimum limits UIM coverage. Aug. 10 Tr. at 13:13-18 (Hanover).

Financial Indemnity turned to out-of-state caselaw and asserted that it cited to <u>Taylor v. Greatway, Insurance Co.</u> -- a case from a state where the state supreme court had held previously that minimum limits UIM coverage is illusory -- as a real-world example of the $100,000.00 hypothetical, with the only material difference being that the insured in that case had $50,000.00 of UIM coverage. <u>See</u> Aug. 10 Tr. at 13:21-14:5 (Hanover). In rejecting the insured's theory that recovery was illusory, because the entirety of her $50,000.00 UIM coverage was offset, the Supreme Court of Wisconsin concluded that, because in most situations the tortfeasor will have less than $50,000.00 in liability coverage, which would permit an insured to recover, her UIM coverage had value. <u>See</u> Aug. 10 Tr. at 14:5-11 (Hanover). Financial Indemnity insisted that the Supreme Court of Wisconsin rejected "basically" the same theory that Bhasker advances in this case. Aug. 10 Tr. at 14:12-14 (Hanover).

Financial Indemnity contended that <u>Pristavec v. Westfield Insurance Co.</u>, the first of two out-of-state cases on which Bhasker relies, although similar to New Mexico caselaw in that West Virginia defines underinsured situations to include those where the tortfeasor's liability limit was lower than the insured's UIM limits, involves a statute which, unlike § 66-5-301, specifies that insurers evaluate UIM coverage by comparing the tortfeasor's liability limit with the insured's damages -- not with the insured's UIM limits -- and that this results in an offset scheme that differs from what New Mexico law requires. <u>See</u> Aug. 10 Tr. at 14:16-15:10 (Hanover). Financial Indemnity conceded that <u>Hardy v. Progressive Specialty Insurance Co.</u>, the second of

Bhasker's two out-of-state cases, indeed found UIM coverage illusory at all levels, as Bhasker argues here, but asserted that the Supreme Court of Montana did so as a matter of Montana public policy, which differs significantly from New Mexico public policy. See Aug. 10 Tr. at 15:11-22 (Hanover). Pursuant to Schmick, New Mexico public policy, urged Financial Indemnity, requires offsets. See Aug. 10 Tr. at 15:19-22 (Hanover).

The Court then asked to hear from Bhasker on the illusory coverage issue before turning to Financial Indemnity's extracontractual damages argument. See Aug. 10 Tr. at 16:2-7 (Hanover, Court). Bhasker replied that, as she described in the prior hearing, this case is about Financial Indemnity's misleading and deceptive business practices, and that the illusory coverage question "is a subissue to the overarching theme." See Aug. 10 Tr. at 16:11-15 (Bhasker).[8] Bhasker stated that she believes, as the Court opined at the beginning of the hearing, that "this is just a motion to reconsider," Aug. 10 Tr. at 16:16-19 (Bhasker), and disputed Financial Indemnity's contention that the Court narrowed the case to UIM coverage at minimum limits: "However, if defendants had taken a thorough reading of the complaint, as the Court did, and a thorough reading of the class definition, the defendants would understand that this case is for the deceptive and misleading practices for all insureds who have ever had an offset applied against them," Aug. 10 Tr. at 16:20-17:3 (Bhasker). Bhasker insisted that specific language from the Court's MOO indicates the Court's support for this proposition:

> Bhasker also asserts that [F]inancial [I]ndemnity misled the proposed class in the same way. See complaint (paragraph 52 at 9) stating that upon information and belief all underinsured applications and insurance policies issued by the defendant to New Mexico policyholders are uniform in all respects material to the claims brought herein (complaint, paragraph 73 at page 15) alleging that [F]inancial

---

[8]Kedar Bhasker of Will Ferguson & Associates argued before the Court on behalf of the Plaintiff, Helen Bhasker. See Aug. 10 Tr. at 16:10-11 (Bhasker).

> [I]ndemnity failed to deliver the quality or quantity of the services applied for and purchased for plaintiffs and other insureds by not providing sufficiently clear applications and policies (complaint, paragraph 83 at 17), alleging that [F]inancial [I]ndemnity misrepresented the terms of the policy sold and provided to plaintiff and other insureds (complaint, paragraph 93, at page 19), stating that [F]inancial [I]ndemnity failed to provide underinsured coverage and/or denied underinsured claims for benefits to plaintiff and other members of the class.

Aug. 10 Tr. at 17:3-25 (Bhasker)(quoting MOO at 79). Consequently, Bhasker asserted that she is "dumbfounded" as to why Financial Indemnity has the impression that the Court narrowed the case to minimum limits UIM coverage. Aug. 10 Tr. at 18:1-3 (Bhasker). Bhasker added that the Court also determined that Bhasker's allegations, which include negligence, New Mexico's Unfair Insurance Practices Act, N.M. Stat. Ann. § 59A-16-20 ("UIPA") violations, and misleading and deceptive business practices that "amount[] to punitive conduct," are well pled. Aug. 10 Tr. 18:3-15 (Bhasker). To that end, Bhasker admitted that she "did launch discovery requests which also include discovery that would encompass insureds who purchase coverage at higher limits." Aug. 10 Tr. at 18:19-22 (Bhasker).

Bhasker next turned to Financial Indemnity's $100,000.00 UIM limits hypothetical and asserted that, although a collision with a minimum limits tortfeasor would result in a maximum offset of $25,000.00, a collision with a $100,000.00 liability limits tortfeasor -- "maybe they're in the Northeast Heights or driving around Academy school"[9] -- would result in a $100,000.00 offset, "even though they have damages that are outstanding." Aug. 10 Tr. at 18:24-19:11

---

[9]The Northeast Heights is an affluent Albuquerque neighborhood that includes Albuquerque Academy, a well-known private, college preparatory day school. See Mike Bush, If you want to live a longer life, choose the NE Heights, Albuquerque Journal (Feb. 9, 2014), https://www.abqjournal.com/350497/if-you-want-to-live-a-longer-life-choose-the-ne-heights.html.

(Bhasker).  Bhasker reasoned that such higher limits UIM policyholders "were mislead and deceived in the same manner as the class representative."  Aug. 10 Tr. at 19:11-15 (Bhasker).

Bhasker argued that cases like Pristavec v. Westfield Insurance Co. and Hardy v. Progressive Specialty Insurance Co., provide the Court with persuasive authority to support her assertion that a total offset, like the offset described above, goes against public policy.  See Aug. 10 Tr. at 19:16-21 (Bhasker).  Bhasker added that New Mexico has robust public policy concerns, as evidenced by its "consumer-friendly framework," to include a consumer protection act which permits private rights of action for instances such as Bhasker's allegations against Financial Indemnity.  Aug. 10 Tr. at 19:21-20:1 (Bhasker).  The Court asked Bhasker whether the statutory structure of Montana's laws are too different to help the Court predict how the Supreme Court of New Mexico would decide this case.  See Aug. 10 Tr. at 20:8-12 (Court).  Bhasker replied that the Supreme Court of West Virginia in Pristavec v. Westfield Insurance Co. ignored the statutory structure's "internal inconsistency with what an underinsured is" and decided to calculate the offset from the total damages, rather than from the limits and liabilities, which is how New Mexico calculates the offset despite having the same UIM definition as West Virginia.  Aug. 10 Tr. at 20:13-25 (Bhasker).  Bhasker contended that, in answer to the Court's question, New Mexico's UIM statute and how New Mexico defines a UIM is similar to West Virginia.  See Aug. 10 Tr. at 21:3-6 (Bhasker).  Bhasker added that the statute in Hardy v. Progressive Specialty Ins. Co., as Financial Indemnity acknowledged, is ambiguous, and therefore the Supreme Court of Montana concluded that the statute goes against public policy.  See Aug. 10 Tr. at 21:3-6 (Bhasker).  Bhasker implied that New Mexico's Schmick offset creates an absurd result that the Supreme Court of New Mexico could change.  See Aug. 10 Tr. at 21:6-

11 (Bhasker).  The Court asked whether Bhasker's position requires the Court to do something that is inconsistent with Schmick.  See Aug. 10 Tr. at 21:12-14 (Court).  Bhasker replied that the Court has the power "to go that far . . . . However . . . the coverage does not have to be considered illusory for claims of deceptive and misleading practices to survive," which does not require the Court overrule Schmick.  See Aug. 10 Tr. at 21:15-21 (Bhasker).  Bhasker concluded her arguments on the illusory coverage issue by reiterating her position that, in the Court's MOO, the Court recognized that there are two separate, viable claims: "One, that minimum limits UIM coverage was illusory; and two, that defendant failed to meaningfully explain the circumstances in which it would not pay UIM benefits.  Those two theories could apply at higher limits, and that's why the class definition also covers claims for those at higher limits."  Aug. 10 Tr. at 22:4-12 (Bhasker).

The Court asked whether Financial Indemnity had concluding thoughts on the illusory coverage issue.  See Aug. 10 Tr. at 22:15-16 (Court).  In response, Financial Indemnity questioned whether the Court could overrule Schmick and reasserted that, assuming the Court follows Schmick, Bhasker's theory falls apart for above minimum limits policyholders, because Schmick means that insureds recover only what is on their declarations page, which in both Bhasker and Financial Indemnity's $100,000.00 UIM limits hypotheticals is "a grand total of $100,000"; "it's the way the law has worked in New Mexico since 1985."  Aug. 10 Tr. at 23:2-16 (Hanover).

The Court then asked whether Financial Indemnity wanted to argue the extracontractual damages issue.  See Aug. 10 Tr. at 23:19-20 (Court).  Financial Indemnity replied that, regarding extracontractual damages, New Mexico requires willful, wanton, malicious, reckless, oppressive,

fraudulent, or in bad faith conduct; "no punitive damages are awardable when the defendant has a justifiable basis for its conduct." Aug. 10 Tr. at 23:21-24:2 (Hanover). Financial Indemnity contended that it is thus entitled to judgment as a matter of law, because, according to Financial Indemnity, "the only conduct that's well-pleaded in the complaint is that the plaintiff purchased an insurance policy with minimum limits UM/UIM coverage, she paid premiums on the coverage; FIC did not pay her UIM claim because the tortfeasor's $25,000 liability limits were offset on her UIM limits. And that's it." Aug. 10 Tr. at 24:3-11 (Hanover). Because Bhasker's Complaint neither alleges oral statements nor alludes to unattached documents, "even if FIC were wrong about the offset, this could not rise as a matter of law to the level of willful, wanton, malicious, oppressive, fraudulent, or bad faith." Aug. 10 Tr. at 24:12-18 (Hanover). Financial Indemnity asserted that, although the Court denied the MTD because, in the absence of controlling New Mexico law, the Court predicted how the Supreme Court of New Mexico would rule, the Court also acknowledged out-of-state caselaw wherein courts ruled in the insurers' favor. See Aug. 10 Tr. at 24:19-25 (Hanover). Hence, contended Financial Indemnity, because this issue is a matter of first impression, and because there are several pending parallel matters wherein the parties have sought to certify questions to the Supreme Court of New Mexico, the Court, therefore, should grant judgment on Bhasker's request for extracontractual and punitive damages. See Aug. 10 Tr. at 24:25-25:14 (Hanover).

The Court then asked to hear from Bhasker on the extracontractual damages question. See Aug. 10 Tr. at 25:15 (Court). Bhasker replied that the Court should grant a motion for judgment on the pleadings only when a complaint fails to state a claim for relief that is plausible on its face and when the factual allegation fail to raise the right to relief above the speculative

level.  See Aug. 10 Tr. at 25:21-24 (Bhasker).  Bhasker asserted that the MJP does not recognize that the Court must accept all facts as true and grant Bhasker all reasonable inferences.  See Aug. 10 Tr. at 25:25-26:3 (Bhasker).  Bhasker further contended that the issue whether Bhasker and proposed class members are entitled to punitive damages is separate from whether the class is entitled to "out-of-pocket premium-based" damages or "benefit-of-the-bargain" damages.  Aug. 10 Tr. at 26:3-8 (Bhasker).  Bhasker added that, because the Court is sitting in diversity, Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), applies, and, therefore, the issue is whether the Supreme Court of New Mexico would allow punitive damages here.  See Aug. 10 Tr. at 26:8-12 (Bhasker).

Bhasker charged that the Supreme Court of New Mexico would look to Uniform Jury Instruction 13-1718, which defines dishonest judgment as "[a] failure by the insured [sic] to honestly and fairly balance its own interests and the interests of the insured."  Aug. 10 Tr. at 26:12-17 (Bhasker).  Bhasker added that the Complaint pleads factual allegations that, taken as true, support a claim against Financial Indemnity for dishonest business judgment, because Weed Warrior, which the Supreme Court of New Mexico decided in 2010, states that UIM coverage is illusory and that insureds do not carry UIM coverage at minimum limits.  See Aug. 10 Tr. at 26:19-27:1 (Bhasker).  Nevertheless, argued Bhasker, "since Weed Warrior, defendant FIC continues to market, solicit, and . . . sell and receive premiums for this illusory minimal UIM coverage."  Aug. 10 Tr. at 27:2-5 (Bhasker).  Bhasker asserted that this practice amounts to dishonest business judgement, which the Complaint details, and thus, the Court must accept such assertions as true and draw inferences in Bhasker's favor.  See Aug. 10 Tr. at 27:6-10 (Bhasker).

Bhasker adds that Financial Indemnity could have litigated this issue in its MTD "but failed to do so." Aug. 10 Tr. at 27:13-16 (Bhasker).

Bhasker argued that the discovery which she is seeking would support her theory that Financial Indemnity misled and deceived her and the proposed class with the knowledge that Bhasker and the proposed class will not receive their policy's benefits in circumstances that permit a complete offset. See Aug. 10 Tr. at 27:17-23 (Bhasker). Bhasker added that she is "very confident" that, because there was an offset in her case, "there are other insureds out there who have been in the same situation . . . whether it was minimal limits or at higher limits. It's not a hypothetical." Aug. 10 Tr. at 27:24-28:3 (Bhasker).

The Court then asked to hear from Financial Indemnity. See Aug. 10 Tr. at 28:9 (Court). Financial Indemnity responded that it does not deny that it, together with "the entire industry," has applied a Schmick offset to a lot of insureds over the last thirty years, resulting in stipulations where the policyholder does not recover under UIM, so Financial Indemnity does not see a problem with the number of people affected. Aug. 10 Tr. at 28:10-17 (Hanover). The question, contended Financial Indemnity, is whether such an offset is permissible at minimum limits, and, although the Court must assume as true the Complaint's factual allegations, those allegations include "nothing that the plaintiff can point to that would possibly justify anything other than some sort of contract-based compensatory damages if it's ultimately determined that minimum limits coverage has no value." Financial Indemnity added that the MOO expressly leaves open Financial Indemnity's possible defenses to Bhasker's damages claims, see Aug. 10 Tr. at 29:2-7 (Hanover)(citing MOO at 76; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1238 n.16), but regarding such claims for punitive damages, "this is an issue of first impression in which FIC

and, frankly, the rest of the industry has taken a justifiable decision, . . . regardless of whether it's legally correct or not," Aug. 10 Tr. at 29:10-17 (Hanover).  Financial Indemnity asserted that it has nothing further to say on its motion.  See Aug. 10 Tr. at 29:18 (Hanover).

The Court asked whether Bhasker had concluding remarks.  See Aug. 10 Tr. at 29:19-22 (Court).  Bhasker directed the Court to her Complaint, specifically paragraphs 70, 87, 95, and 102, which, according to Bhasker, describe bad-faith conduct and assert Bhasker's entitlement to punitive damages.  See Aug. 10 Tr. at 29:23-30:3 (Bhasker).

The Court expressed its disinclination to overrule Schmick, but that it would need to decide whether Bhasker's position requires such a decision.  See Aug. 10 Tr. at 30:8-15 (Court). The Court added that, although it intends to look at the Uniform Jury Instructions that Bhasker referenced and to relook at Bhasker's theory, the case does not seem to have the intentional or reckless element that New Mexico law requires for punitive damages.  See Aug. 10 Tr. at 30:18-24 (Court).

### 5.     **The October 26, 2018, Hearing**.

The Court held a hearing on October 26, 2018.  See Transcript of Hearing at 1:22 (taken October 26, 2018)("Oct. 26 Tr.").[10]   During the hearing, which focused primarily on ongoing discovery disputes, Financial Indemnity alleged that Bhasker "wanted documents that reach beyond minimum limits," but that the Honorable Jerry H. Ritter, Jr., United States Magistrate Judge for the District of New Mexico, to whom the Court has delegated discovery and other pretrial matters, denied Bhasker's motion to compel, because "the case is clearly limited to m[inimum] limits UIM" coverage.  Oct. 26 Tr. at 28:15-18 (Hanover).  Financial Indemnity

---

[10]The Court's citations to the trial transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

stated that it agrees with Judge Ritter's ruling, although it conceded that the Court has not ruled on the issue. See Oct. 26 Tr. at 28:18-20 (Hanover). Financial Indemnity alleged that, because Bhasker did not object to Judge Ritter's ruling within the prescribed two-week period to object, "that shouldn't be at issue." Oct. 26 Tr. at 28:22-24 (Hanover). What remains at issue, argued Financial Indemnity, is its motion for a protective order, because, in seeking to fulfil its obligations under rule 30(b)(6), Financial Indemnity desires to limit its corporate representative to the minimum limits UIM context, and Judge Ritter "takes the opposite approach." Oct. 26 Tr. at 28:24-29:4 (Hanover). Financial Indemnity insisted that both it and Bhasker agree that Judge Ritter's position is inconsistent, albeit Bhasker, according to Financial Indemnity, disagrees with Judge Ritter's ruling on the motion to compel and not with his ruling on the motion for a protective order. See Oct. 26 Tr. at 29:5-9 (Hanover).

The Court asked Bhasker whether she is ready to begin depositions in this case. See Oct. 26 Tr. at 29:15-16 (Court). Bhasker responded in the negative, because, according to Bhasker, she has another motion to compel pending either before Judge Ritter or before the Court. See Oct. 26 Tr. at 29:17-20 (Bhasker). The Court then asked Bhasker whether the Court could hold this issue, i.e., not compel anything further from Financial Indemnity on her illusory-at-greater-than-minimum-limits claim, until issuing a memorandum opinion and order on Financial Indemnity's MJP. See Oct. 26 Tr. at 30:1-7 (Court). Both parties consented to the Court's proposal. See Oct. 26 Tr. at 30:8-11 (Bhasker, Hanover).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."

Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a MTD."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents

referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir.

2005)(unpublished).[11]  In <u>Douglas v. Norton</u>, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See <u>Mocek v. City of Albuquerque</u>, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack

---

[11]<u>Nard v. City of Okla. City</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>Nard v. City of Oklahoma City</u>, <u>Douglas v. Norton</u>, 167 F. App'x 698 (10th Cir. 2006), <u>Rhoads v. Miller</u>, [352 F. App'x 289 (10th Cir. 2009), and <u>Hamilton v. Water Whole International Corp.</u>, 302 F. App'x 789, 798 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to an motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See also Sec. & Exch. Comm'n v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v.

<u>Anderson</u>, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties. See <u>Kruzitis v. Okuma Mach. Tool, Inc.</u>, 40 F.3d 52, 54 (3d Cir. 1994)("Under Rule 12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." (citation and internal quotation marks omitted)). A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" <u>Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.</u>, 442 F.3d 1239, 1244 (10th Cir. 2006)(citing <u>United States v. Any & All Radio Station Transmission Equip.</u>, 207 F.3d 458, 462 (8th Cir. 2000)). Claims dismissed pursuant to a motion under rule 12(c) are dismissed with prejudice. See <u>In re Great Lakes Dredge & Dock Co. LLC</u>, 624 F.3d 201, 209 (5th Cir. 2010).

"Any party may move for judgment on the pleadings if no material facts are in dispute and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice." <u>Ramirez v. Wal-Mart Stores, Inc.</u>, 192 F.R.D. at 304 (citing Fed. R. Civ. P. 12(c)). A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to

dismiss under rule 12(b)(6).  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304 (citing Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998)).  A motion for a judgment on the pleadings will be granted if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.

A court considering a motion for judgment on the pleadings should "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." Park Univ. Enters. Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244. The court must view the facts presented in the pleadings and draw the inferences therefrom in the light most favorable to the nonmoving party.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.  All of the nonmoving parties' allegations are deemed to be true, and all of the movants' contrary assertions are taken to be false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

The same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c).  See Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1160 (10th Cir. 2000).  Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A complaint's sufficiency is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all of the

complaint's well-pleaded factual allegations, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).  "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 558, 562).  "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(alterations omitted).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177.  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,

much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1965 n.3. See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."). The Twombly Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." 127 S. Ct. at 1971 n.10. Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin." Id.

Robbins v. Oklahoma, 519 F.3d at 1247-48 (footnote and citations omitted).

In determining the complaint's sufficiency, all well-pled factual allegations are to be taken as true. See Timpanogos Tribe v. Conway, 286 F.3d 1195, 1204 (l0th Cir. 2002). "Nevertheless, conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Belman, 935 F.2d 1106, 1110 (l0th Cir. 1991). "Moreover, in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations." Hall v. Belman, 935 F.2d at 1110. Only well-pled facts, as distinguished from conclusory allegations, are admitted when considering a motion to dismiss for failure to state a claim upon which relief can be granted. See Smith v. Plati, 258 F.3d 1167, 1174 (10th Cir. 2001).

A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(d). Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment. See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A Federal Procedure, Lawyers' Ed. § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir.2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001). A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim, and the parties do not dispute the documents' authenticity. See Jacobsen v. Deseret Book Co., 287 F.3d 936, 941-42 (10th Cir. 2002). If, however, a complaint does not reference or attach a document, but the complaint refers to the document and the document is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss." GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997). See 5A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1327 (3d ed. 2004)("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading . . . the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

<u>**LAW REGARDING CLASS CERTIFICATION UNDER RULE 23**</u>

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 23.  All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  <u>See</u> Fed. R. Civ. P. 23(a)-(b).  The plaintiff[12] bears the burden of showing that the requirements are met, <u>see</u> <u>Rex v. Owens ex rel. Okla.</u>, 585 F.2d 432, 435 (10th Cir. 1978); <u>Pueblo of Zuni v. United States</u>, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, <u>see</u> <u>Esplin v. Hirschi</u>, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); <u>Eisen v. Carlisle & Jacquelin</u>, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that [end].").  In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[13]  <u>See</u>

---

[12]Technically, it is the party seeking certification, <u>i.e.</u>, the movant, who bears the burden of proof, and defendants may also move for class certification.  <u>See</u> William B. Rubenstein, <u>Newberg on Class Actions</u> § 7:20 (5th ed. 2017)("Newberg").  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[13]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to a complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing <u>Shook v. El Paso Cty.</u>, 386 F.3d 963, 968 (10th Cir. 2004); <u>J.B. v. Valdez</u>, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. at 178).  Since the Court's statement in <u>In re Thornburg</u>

Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234 ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690 F.2d at 799. See Vallario v. Vandehey, 554 F.3d at 1267 ("We, of course, adhere to the principle that class certification does not depend on the merits of a suit."). Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Actual, not presumed, conformance with Rule 23(a) remains indispensable." Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class

Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues. Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013). This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); Newberg § 7.21 (5th ed. 2017)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart, 564 U.S. at 350-52.  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).  To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence but will allow the parties to challenge these findings during the subsequent merits stage of this case.  This approach is analogous to preliminary injunction practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).  In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson Living Trust v. WPX Energy Prod. LLC, 306 F.R.D. 312, 378 n.39 (D.N.M. 2015)(Browning, J.).

1.      **Rule 23(a).**

All classes must satisfy the prerequisites of rule 23(a):

(a)     **Prerequisites**.  One or more members of a class may sue or be sued as
        representative parties on behalf of all members only if:

        (1)     the class is so numerous that joinder of all members is
                impracticable;

        (2)     there are questions of law or fact common to the class;

        (3)     the claims or defenses of the representative parties are
                typical of the claims or defenses of the class; and

        (4)     the representative parties will fairly and adequately protect
                the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the
requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir.
1988).  "Although the party seeking to certify a class bears the burden of proving that all the
requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of
whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cty., 386 F.3d
963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982),
and citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as
numerosity, commonality, typicality, and adequacy, respectively.  See Fed. R. Civ. P. 23(a).

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.
R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual putative class
members should not result in a denial of class certification where common questions of law
exist."  In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See
Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative

class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996); Adamson v. Bowen, 855 F.2d at 676)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." Wal-Mart, 564 U.S. at 349. "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.).

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion. See 564 U.S. at 343-45. The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias

against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 564 U.S. at 345. The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157]. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> > What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, supra). In EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011), the United States Court of Appeals for the Fourth Circuit stated:

We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In <u>Wal-Mart</u>, the Honorable Antonin Scalia, then-Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. From this observation, he then concluded:

Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

<u>Wal-Mart</u>, 131 U.S. at 367. Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

### 2. <u>Rule 23(b)</u>.

Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." <u>Adamson v. Bowen</u>, 855 F.2d at 675. <u>See</u> <u>DG ex rel. Stricken v. Devaughn</u>, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)** **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual putative class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> >
> > **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injective relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    **(3)**    the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

        **(A)**    the putative class members' interests in individually controlling the prosecution or defense of separate actions;

        **(B)**    the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

        **(C)**    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        **(D)**    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought

for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire. <u>See</u> Fed. R. Civ. P. 23(c)(2)(B); <u>Phillips Petrol. Co. v. Shutts</u>, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. <u>See</u> Fed. R. Civ. P. 23(c)(2)(B); <u>Phillips Petrol. Co. v. Shutts</u>, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments"). The Court will focus on the most important form of class action, the (b)(3) damages class action.[14]

---

[14]The Court will briefly address the other class-action types. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified. <u>See</u> Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication. <u>See</u> Fed. R. Civ. P. 23(b)(1)(A). "Incompatible" means more than simply inconsistent. A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings. What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, <u>e.g.</u>, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school. Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments. <u>See</u> Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money

or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*. For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*. Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. <u>See</u> Fed. R. Civ. P. 23(c)(2)(A). Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." . . . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

<u>Wal-Mart</u>, 564 U.S. at 360-61 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. <u>See</u> <u>Newberg</u> § 4:26. The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails,

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the

---

she can generally get all of the remedy that she needs without going through the hurdles of certifying a class. For example, to return to <u>Brown v. Board of Education</u>, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons. First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal. Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances. Second, the scope of the plaintiff's relief is likely augmented by certifying a class. It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy. Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms. Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

<u>Newberg</u> § 4:26 (footnotes omitted). Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member." Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1225 (D.N.M. 2012)(Browning, J.)("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement."). As the Tenth Circuit, addressing a Title VII claim, put it:

The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).

. . . .

Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. 569 U.S. at 31. The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis." 569 U.S. at 31-32.

To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

569 U.S. at 31-32 (citations omitted).

The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question of "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 569 U.S. at 39. Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34. Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 35 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages. It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages. There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards. First, the Court could decide that Comcast Corp. v.

Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages. Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages. Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages. As to the first option, while much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards. Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages. The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." 569 U.S. at 42 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that <u>Comcast Corp. v. Behrend</u> says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage.  Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims[15] does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).  A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[16]  Other recurring

---

[15]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[16]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.  Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg, supra, § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

individual issues present more serious challenges to predominance, such as: (i) the prima facie

element of reliance or due diligence in common-law fraud and other cases;[17] (ii) differences in

---

[17]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg, supra, § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is

the applicable law in a multi-state, state-law-based class actions,[18] see Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual personal injury

presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[18]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast Corp. v. Behrend, stated:

No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeat class treatment:

Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid

damages, which presents such a challenge to predominance that class certification of mass tort

---

for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000. Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled. The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

288 F.3d at 1018-20.

claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625. There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance. The Honorable Richard A. Posner, United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013). Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" Butler v. Sears, Roebuck & Co., 702 F.3d at 362. In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective. See 702 F.3d at 360-61. The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing

machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

. . . .

[T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend."  Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013).  On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.  That's incorrect.  An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.  [Wal-Mart, 564 U.S. at 338].  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S.  . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in <u>Carnegie v. Household Int'l., Inc.</u>, 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . .  The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability.  Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses.  See, <u>e.g.</u>, <u>Johnson v. Meriter Health Services Employee Retirement Plan</u>, 702 F.3d [364,] 365[ 7th Cir. 2012] (10 subclasses).

<u>Butler v. Sears, Roebuck & Co.</u>, 727 F.3d at 801-02 (emphasis in original).[19]

---

[19]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed <u>Comcast Corp. v. Behrend</u>'s impact on the Seventh Circuit's case:

So how does the Supreme Court's <u>Comcast</u> decision bear on the rulings . . . in our first decision?

<u>Comcast</u> holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.  <u>Comcast</u> was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages.  [569 U.S. at 37](emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite

competition (*a theory of liability that is not capable of classwide proof*)."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."  (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in <u>Comcast</u>, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in <u>Comcast</u>.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis.  As we explained in <u>McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

<u>Butler v. Sears, Roebuck & Co.</u>, 727 F.3d at 799-800 (emphasis in <u>Butler v. Sears, Roebuck & Co.</u> but not <u>Comcast Corp. v. Behrend</u>, except as noted)(citations omitted).

The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[20]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted). That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

---

[20]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013)(citations omitted).  The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.  This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense.  If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

> The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.  When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third Circuit, Tenth Circuit, and United States Court of Appeals for the Eleventh Circuit stake out a different test.

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's

underlying cause of action."  Common issues of fact and law predominate if they
"'ha[ve] a direct impact on every class member's effort to establish liability' *that
is more substantial than the impact of individualized issues* in resolving the claim
or claims of each class member."  If "after adjudication of the classwide issues,
plaintiffs must still introduce a great deal of individualized proof or argue a
number of individualized legal points to establish most or all of the elements of
their individual claims, [their] claims are not suitable for class certification under
Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1170

(11th Cir. 2010)(emphasis in original)(citations omitted).[21]  The Eleventh Circuit, however,

---

[21]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in
2004 in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), and gave renewed articulations of
the test in 2009 in Vega v. T-Mobile USA, Inc., 564 F.3d 1256 (11th Cir. 2009), and in 2010, in
Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the
Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals
for the Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird
> Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if
> common issues truly predominate over individualized issues in a lawsuit, then
> "the addition or subtraction of any of the plaintiffs to or from the class [should
> not] have a substantial effect on the substance or quantity of evidence offered."
> Put simply, if the addition of more plaintiffs to a class requires the presentation of
> significant amounts of new evidence, that strongly suggests that individual issues
> (made relevant only through the inclusion of these new class members) are
> important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or
> subtraction of plaintiffs does affect the substance or quantity of evidence offered,
> then the necessary common question might not be present.").  If, on the other
> hand, the addition of more plaintiffs leaves the quantum of evidence introduced
> by the plaintiffs as a whole relatively undisturbed, then common issues are likely
> to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military
Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all
questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or
from the class [should not] have a substantial effect on the substance or quantity of evidence
offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v.
Humana, Inc.).

imposes a different, more rigorous, second step: the district court's trial plan must spend more time adjudicating the common questions than it does adjudicating the individual questions. The Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value cases that can be fairly and efficiently adjudicated via class action should not be certified[22] -- but

---

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized. The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

[22]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater quantity or importance; preponderate." Predominate, The American Heritage Dictionary of the English Language, (5th ed. 2019), https://www.ahdictionary.com/word/search.html?q=predominate (last visited January 22, 2019). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is

more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from <u>Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.</u>:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.
>
> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," <u>Manual for Complex Litigation</u> § 21.23 (4th ed. 2004); <u>see also</u> <u>Harding v. Tambrands Inc.</u>, 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.
>
> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

601 F.3d at 1176 (citations omitted). These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different

contractual language into a single category -- the sixth category. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed <u>Castano v. American Tobacco Company</u>, 84 F.3d 734 (5th Cir. 1996) case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted). This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is

admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d [at ]745 n.21 . . . .

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part). Despite Judge Niemeyer's concern with creating a circuit split, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc. See Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001). See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d . . . 745 n.21 . . . ("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)),

---

trial."). We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original). The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001). Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 600 (3d Cir. 2012)(exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087-88.

## LAW REGARDING DISCOVERY

Rule 34 governs discovery requests for tangible objects and states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)** to produce and permit the requesting party or its representative to

- 94 -

> inspect, copy, test, or sample the following items in the responding
> party's possession, custody, or control:
>
> **(A)**    any designated documents or electronically stored
>            information -- including writings, drawings, graphs, charts,
>            photographs, sound recordings, images, and other data or
>            data compilations -- stored in any medium from which
>            information can be obtained either directly or, if necessary,
>            after translation by the responding party into a reasonably
>            usable form; or
>
> **(B)**    any designated tangible things; or
>
> **(2)**    to permit entry onto designated land or other property possessed or
>            controlled by the responding party, so that the requesting party
>            may inspect, measure, survey, photograph, test, or sample the
>            property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Discovery's proper scope is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26 (b)(1).

Discovery's scope under rule 26 is broad.  See Gomez v. Martin Marietta Corp., 50 F.3d at 1520; Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").  The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. at 507.  A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope

of supporting his claim." McGee v. Hayes, 43 F. App'x. 214, 217 (10th Cir. 2002)(unpublished).[23]  "Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." Rivera v. DJO, LLC, No. 11-1119, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. 00-7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery and injected courts deeper into the discovery process. See Simon v. Taylor, No. 12-0096, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.).  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The

---

[23]McGee v. Hayes is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that McGee v. Hayes, Miller v. Regents of the Univ. of Colo., Price v. Cochran, and Ruleford v. Tulsa World Pub. Co. have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  The 2000 amendments made the following changes, shown here with the deleted language stricken and the added material underlined:

Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant ~~to the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.</u>  <u>Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on

the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial

intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford–El v. Britton, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis. The change in substantive scope from "subject matter," to "claim or

defense," would, therefore, seem to "add teeth" to the relevance standard instead of narrowing that standard. It is not surprising that the Supreme Court of the United States of America and Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial. Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings about the rules, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of

discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations and footnote omitted)(alteration in original).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing discovery's substantive scope and injecting courts further into the discovery process. The 2015 amendment made notable deletions and additions, both of which emphasized the need to make discovery proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1), provides[24]:

> (1)   *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)~~ <u>and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.</u>

Fed. R. Civ. P. 26(b)(1)(alterations added).

The Committee Notes state that the first deletion does not make a substantive change. Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in

[24]The deletions are stricken through and the additions are underlined.

standard discovery that including it would be "clutter."  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[25]

Regarding the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[26]  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery. As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery."  The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision. . . ."  The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments.  It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable."  Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  The deletion, therefore, did not necessarily change discovery's scope, but clarified it.  Accordingly, "[r]elevance is still to be

---

[25]The Court regrets this deletion.  Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language.  The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents.  The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in advisory notes' thicket.  What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case.  This deletion might incrementally increase unnecessary litigation rather than shorten it.  Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[26]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades.  If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this really is.

'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." State Farm Mutual Auto. Ins. Co. v. Fayda, No. 14-9792, 2015 WL 7871037, at *2 (S.D.N.Y. 2015)(Francis IV, M.J.)(internal quotation marks omitted)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept. Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality. See Fed. R. Civ. P. 26(b)(2)(C)(iii) (pre-2015 version). The proportionality requirement was relocated to 26(b)(1) to address the "explosion" of information that "has been exacerbated by the advent of e-discovery."[27] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment. Describing how e-discovery is the driving factor in the 2015 amendment, the Committee Notes state:

---

[27]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs. Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins. Co., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. 11-0260, 2012 WL 592874, at *11-12 (D.N.M. 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended. It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already. It is also unclear what was wrong with the old goal of discovery of being largely self-executing. The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs, and rewrite these new sections to use the correct language. Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the thrust of the drafting. Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection. In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

The burden or expense of proposed discovery should be determined in a realistic way. This includes the burden or expense of producing electronically stored information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice John Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[28] Chief

---

[28]The Rules Enabling Act, 28 U.S.C. §§ 2071-2077, empowers the federal courts to prescribe rules for the conduct of their business. See 28 U.S.C. § 2071. The Judicial Conference -- the policy making body of the federal judiciary -- has overall responsibility for formulating those rules. See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/yearend/year-endreports.aspx ("2015 Year-End Report"). The Chief Justice leads the Judicial Conference. The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration. See 2015 Year-End Report. Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee. Campbell and David Levi, Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George H.W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments. See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committeereports/advisory-committee-rules-civil-procedure-may-2013. After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them. Chief Justice Roberts submitted the proposed rules to Congress for its examination. See 2015 Year-End Report at 6. Because Congress did not intervene by December 1, the new rules took effect. Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments. See Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U.

Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report"). He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need." 2015 Year-End Report at 7. This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." State Farm Mutual Auto. Ins. Co. v. Fayda, 2015 WL 7871037, at *2 (internal quotation marks omitted). The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations." Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment. See Dao v. Liberty Life Assurance Co. of Boston, No. 14-4749, 2016 WL 796095, at *3 (N.D. Cal. Feb. 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); Williams v. U.S. Envt'l Servs., LLC, No. 15-0168, 2016 WL 617447, at *1 n.2 (M.D. La. Feb. 16, 2016)(Bourgeois, M.J.). In general, "the parties' responsibilities . . . remain the same" as they were under the rule's earlier iteration so that the

Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013). In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments." Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone, at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016). The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

party resisting discovery has the burden of showing undue burden or expense. Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment. See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope. Instead of being Aristotelian and trying to draft rules, the drafters largely opted to make federal judges Plato's enlightened guardians. They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors. They have dropped all discovery disputes into judges' laps. The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Rule 34 allows a party to serve requests to produce certain items "on any other party . . . in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1)(emphasis added). See Hickman v. Taylor, 329 U.S. at 504 (explaining that rule 34 "is limited to parties to the proceeding, thereby excluding their counsel or agents"). Applying this standard, courts have found that corporations control documents in their subsidiaries' hands,

clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands.   See United States v. Stein, 488 F. Supp. 2d 350, 360-62 (S.D.N.Y. 2007)(Kaplan, J.); CSI Inv. Partners II, L.P. v. Cendant Corp., 2006 WL 617983, at *6 (S.D.N.Y. March 13, 2006)(Eaton, M.J.)(compelling a client's attorney to disclose documents in the attorney's possession regarding the attorney's representation of that particular client, but only insofar as the documents were relevant).   An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control. See, e.g., Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue, 839 F.2d 131, 140-41 (3d Cir. 1988)(where "agent-subsidiary can secure documents of the principal-parent to meet its own business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J. 1991)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control).

Courts have specifically considered whether clients control information in their attorneys' hands.   Because a client has the right "to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control." Am. Soc. For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.).   See Poppino v. Jones Store Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)("It is quite true that if an attorney for a party comes into possession of a document *as attorney for that party* his possession of the document is the possession of the party."   (emphasis in original).   Consequently, a party may be required to produce a document that it has turned over to its attorney when the document relates to the

attorney's representation of that client on a specific matter.  See In re Ruppert, 309 F.2d 97, 98

(6th Cir. 1962)(per curiam); Hanson v. Garland S.S. Co., 34 F.R.D. 493, 495 (N.D. Ohio

1964)(Connell, J.)(concluding that witness statements taken by a party's attorney in preparation

of the case were within the party's control and subject to production under rule 34 on a proper

showing); Kane v. News Syndicate Co., 1 F.R.D. 738, 738-39 (S.D.N.Y.

1941)(Mandelbaum, J.)(determining that a plaintiff in an action for copyright infringement could

require the defendants' attorneys to produce a document from which the plaintiff hoped to

ascertain whether material had been obtained from his copyrighted works).

> The mere fact, however, that the attorney for a party has possession of a document
> does not make his possession of the document the possession of the party.  The
> paper may be one of his private papers which he had before the relation of
> attorney and client was established.  It is inconceivable that he should be required
> to produce such a paper for the inspection of his client's adversary.  The paper
> which he has in his possession may be the property of some other client.  It is
> inconceivable that he should be compelled to produce the document belonging to
> another client because the adversary of one of his clients demands it.

Poppino v. Jones Store Co., 1 F.R.D. at 219.  See Hobley v. Burge, 433 F.3d 946 (7th Cir.

2006)(observing that a party may not have had control over its former attorney's documents);

Ontario Inc. v. Auto Enterprises, Inc., 205 F.R.D. 195 (E.D. Mich. 2000).  Simply put, if a

person, corporation, or a person's attorney or agent can pick up a telephone and secure the

document, that individual or entity controls it.  See Simon v. Taylor, 2014 WL 6633917, at *34

("Control is defined as the legal right to obtain documents upon demand.").

## LAW REGARDING PROTECTIVE ORDERS

The trial court has discretion to grant a protective order pursuant to rule

26(c).  See Morales v. E.D. Etnyre & Co., 229 F.R.D. 663, 663 (D.N.M. 2005)(Browning,

J.).  Rule 26(c) provides that, upon a good cause showing, a court may "issue an order to protect

a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which may include forbidding disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A). Accord Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir. 1999)(unpublished)("The district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties.").

"It is the party seeking the protective order who has the burden to show good cause for a protective order." Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.). The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted). Although rule 26(c) is silent on when "the movant must file for a protective order, the Tenth Circuit has held that 'a motion under [rule] 26(c) for protection . . . is timely filed if made before the date set for production.'" Montoya v. Sheldon, No. 10-0360, 2012 WL 2383822, at *5 (D.N.M. June 8, 2012)(Browning, J.)(quoting In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982)).

In Velasquez v. Frontier Med. Inc., 229 F.R.D. 197 (D.N.M. 2005)(Browning, J.), the Court denied the defendants' Motion for a protective order. See 229 F.R.D. at 201. The defendants objected to two requests for production from the plaintiff and sought a protection order against the two requests. See 229 F.R.D. at 198-99. The defendants did not provide any affidavits or documentation to support good cause; the court could not discern any specific harm

that the defendants would receive if they would answer the two requests for production, and the defendants asserted only general concerns. See 229 F.R.D. at 200. The Court concluded, accordingly, that the defendants did not show that the requests for production would cause annoyance, embarrassment, oppression or undue burden. See 229 F.R.D. at 200.

## LAW REGARDING MOTIONS TO COMPEL

Rule 37 provides enforcement mechanisms for rule 34. According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond. See Fed. R. Civ. P. 37(a)(2)(B). "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). See Lewis v. Goldsberry, No. 11-0283, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.). Rule 37(a) provides:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a). If a party refuses to produce documents through proper discovery, a defendant should move to compel production pursuant to rule 37. See Lane v. Page, 727 F. Supp. 2d 1214, 1236 n.15 (D.N.M. 2010)(Browning, J.). Rule 37(a)(5)(B)-(C) provide:

> **(B)** *If the Motion Is Denied.* If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

**(C)** *If the Motion Is Granted in Part and Denied in Part.* If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed. R. Civ. P. 37(a)(5). Where parties have taken legitimate positions, and the Court grants in part and denies in part a motion to compel discovery responses, courts generally conclude that justice requires that each party be responsible for their own fees and costs. See Pulsecard, Inc. v. Discover Card Servs., 168 F.R.D. 295, 310-11 (D. Kan. 1996)(Rushfelt, M.J.); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 138 F.R.D. 530, 539 (C.D. Ill. 1991)(Mills, J.).

## LAW REGARDING 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

[A] party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30(b)(6). "Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject." Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999).

As a general matter, a corporation may designate any person as a corporate representative if he or she can meet the necessary criteria to satisfy rule 30(b)(6). See Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., No. 06-1165, 2007 WL 5704041, at *5 (D.N.M. Oct. 24, 2007)(Browning, J.)(discussing how, sometimes, it may be necessary for a corporation to

designate former employees as a rule 30(b)(6) deponent); Moore, § 30.25[3], at 30-71 ("There is no rule that would prevent corporate counsel, or even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent.").

Courts have split whether to allow parties to use 30(b)(6) depositions to explore facts underlying legal claims and theories. Compare JPMorgan Chase Bank v. Liberty Mut. Ins. Co., 209 F.R.D. 361, 362 (S.D.N.Y. 2002)(Rakoff, J.)(denying the discovery request seeking the "defendants' mental impressions, conclusions, opinions, and legal theory"), and SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992)(Leisure, J.)(asserting that "the proposed Rule 30(b)(6) deposition constitutes an impermissible attempt by defendant to inquire into the mental processes and strategies of the SEC"), with EEOC v. Caesars Entm't, Inc., 237 F.R.D. 428, 432-34 (D. Nev. 2006)(Leen, M.J.)(denying the "defendant's request for a protective order to limit the scope of Rule 30(b)(6) deposition questioning to preclude inquiry into the factual bases for defendant's asserted position statements and affirmative defenses"), and In Re Vitamins Antitrust Litigation, 216 F.R.D. 168, 171-74 (D.D.C. 2003)(Hogan, C.J.)(allowing 30(b)(6) facts and admissions in corporation's antitrust submission to European Commission, stating: "Bioproducts argument that the Rule 30(b)(6) discovery is unnecessary and duplicative is without merit."). The Court has held that the better rule is to allow parties to craft rule 30(b)(6) inquiries similar to contention interrogatories, because this rule will ultimately lead to fewer disputes about what subject matter is permitted in 30(b)(6) depositions and advances the policy underlying the rules favoring disclosure of information. See Radian Asset Assur., Inc. v. Coll. of the Christian Bros., 273 F.R.D. 689, 691-92 (D.N.M. 2011)(Browning, J.). If the Court limits rule 30(b)(6) depositions as the Southern District of New York has, courts would have to

referee endless disputes about what is permitted and what is not. Moreover, rule 30(b)(6)'s plain language does not limit the deposition in that way. See Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information known or reasonably available to the organization.").

Rule 26(b)(1) states:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any part's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Rule 30(b)(6) is not "otherwise limited," but unlimited. The Court sees no great problem with allowing overlap between the sorts of information obtained through contention interrogatories and 30(b)(6) depositions. While counsel will have to carefully prepare the 30(b)(6) representative, they must always do so.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction

should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[29]   If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must

---

[29]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[30]  The Court may also

[30]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the

rely on Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX

Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[31]

---

highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at
465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed.
1999)("Moore's")("Decisions of intermediate state appellate courts usually must be
followed . . . [and] federal courts should give some weight to state trial courts
decisions."(emphasis and title case omitted)).


[31]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state
court interpretations of state law with the need for uniformity among federal judges.  If the Court
adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the
ensuing years, then parties litigating state-law claims will be subject to a different body of
substantive law, depending on whether they litigate in state court or federal court.  This result
frustrates the purpose of Erie, which held that federal courts must apply state court
interpretations of state law, rather than their own, in part so that parties achieve a consistent
result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit
precedent less weight and according state court decisions issued in the ensuing years more
weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be
uniformity among federal judges as to its proper interpretation.  Otherwise, different federal
judges within the same circuit -- or even the same district, as district courts' decisions are not
binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.
This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a
Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least
provides consistency at the federal level, so long as federal district judges are required to follow
it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state
court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to
Tenth Circuit precedent unless there is intervening case law directly on point from the state's
highest court, on one end; and independently interpreting the state law, regarding the Tenth
Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the
Court notes that it is generally more concerned about systemic inconsistency between the federal
courts and the state courts than it is about inconsistency among federal judges.  Judges, even
those within a jurisdiction with ostensibly identical governing law, sometimes interpret and
apply the law differently from one another; this inconsistency is part and parcel of a common-
law judicial system.  More importantly, litigants seeking to use forum selection to gain a
substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned
randomly to district judges in this and many federal districts; and, regardless, litigants cannot
know for certain how a given judge will interpret the state law, even if they could determine the
identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever

federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing

- 118 -

the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

Ultimately, "the Court's task is to predict what the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause[32] of the plaintiff's damages. See Coffey v.

---

In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

[32]The 2004 amendments to Uniform Instruction 13-305 eliminated the word "proximate" within the instruction. Use Note, N.M. Rul. Amend. Civ. UJI 13-305. The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not

United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. See Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Schear v. Bd. of Cty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186. New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

signal any change in the law of proximate cause." Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305 (alteration added).

"As a general rule, an individual has no duty to protect another from harm." Edward C. v. City of Albuquerque, 2010-NMSC-043, ¶ 16, 241 P.3d 1086, 1090 (quoting Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84 (citing Restatement (Second) of Torts, § 315 (1965))). "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84 (citing Restatement (Second) of Torts, § 314(A) (1965)). "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the

injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING NEGLIGENT MISREPRESENTATION

To prevail on a negligent misrepresentation in New Mexico courts, a plaintiff must show: "(1) the defendant made a material representation to plaintiff, (2) the plaintiff relied upon the representation, (3) the defendant knew the representation was false or made it recklessly, and (4) the defendant intended to induce reliance by the plaintiff."  Robey v. Parnell, 2017-NMCA-038, ¶ 31, 392 P.3d 642, 652 (citing Saylor v. Valles, 2003-NMCA-037, ¶ 17, 63 P.3d 1152, 1158).[33]

---

[33]The Supreme Court of New Mexico has not expressly adopted this four-part negligent misrepresentation definition, but has stated that New Mexico follows the Restatement (Second) of Torts § 552 (1977) when it comes to negligent misrepresentation.  See Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 16, 750 P.2d 118, 122.  That restatement section states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).  The Court cannot discern a meaningful difference between the Court of Appeals of New Mexico's four elements and the Restatement (Second) of Torts § 552(1)-(2).  Under those sections, a defendant is liable for negligent misrepresentation when he or she "supplies false information" to the plaintiff; the plaintiff "justifiabl[y] reli[es] upon the information"; the defendant "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information"; and the defendant "intend[ed] the information to influence or knows that the recipient so intends" to use the information.  Restatement (Second) of Torts § 552.  Those elements mirror the Court of Appeals of New Mexico's negligent misrepresentation test.

The Restatement (Second) of Torts § 552 states, however, that those with a public duty to give information may be liable for negligent misrepresentation for statements made to "the class of persons for whose benefit the duty is created in any of the transactions in which it is intended to protect them."  Restatement (Second) of Torts § 552(3).  The Court could not locate a New Mexico case applying negligent misrepresentation liability based on the public duty theory.  New Mexico's Uniform Jury Instructions for negligent misrepresentation mirror Court of Appeals of New Mexico's test:

A party is liable for damages caused by his negligent and material misrepresentation.

A material misrepresentation is an untrue statement which a party intends the other party to rely on and upon which the other party did in fact rely.

A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement made was true.

N.M.R.A., Civ. UJI 13-1632.  Although this jury instruction does not mention the public duty theory of negligent misrepresentation, its omission is not determinative.  See State v. Wilson, 1994-NMSC-009, ¶ 5, 796, 867 P.2d 1175, 1178 (stating that, although the Supreme Court of New Mexico's "adoption of uniform jury instructions proposed by standing committees . . . establishes a presumption that the instructions are correct statements of law, that fact alone is not sufficient precedent to tie the hands of the Court of Appeals").  Given the Supreme Court of New Mexico's express adoption of the Restatement (Second) of Torts' definition for negligent misrepresentation, see Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 16, 750 P.2d at 122, the Court sees no reason why the Supreme Court of New Mexico would

"The theory of liability for this tort is one of negligence rather than of intent to mislead." <u>Sims v. Craig</u>, 1981-NMSC-046, ¶ 4, 627 P.2d 875, 877 (citing W. Prosser, <u>Handbook of the Law of Torts</u> § 107 (4th ed. 1971)). <u>See</u> <u>Ledbetter v.Webb</u>, 1985-NMSC-112, ¶ 26, 711 P.2d 874, 879 (distinguishing negligent misrepresentation from the intentional torts of fraud or deceit). These elements do not require that the parties have entered into a contract or partnership. <u>See</u> <u>Leon v. Kelly</u>, No. CIV 07-0467, 2008 WL 5978926, at *7 (D.N.M. Dec. 8, 2008)(Browning, J.) ("Negligent misrepresentation is a tort, and while it requires a professional or business relationship to a certain degree, it does not require an actual contract or partnership."); <u>Sims v. Craig</u>, 1981-NMSC-046, ¶ 4, 627 P.2d at 876-77 (holding that the plaintiff could bring an action for negligent misrepresentation although the plaintiff could not sue on the contract because the contract was void).

<u>**NEW MEXICO LAW REGARDING INSURANCE CONTRACTS**</u>

Under New Mexico law, insurance policies are interpreted like any other contract, except that, "where a policy term is 'reasonably and fairly susceptible of different construction,' it is deemed ambiguous and 'must be construed against the insurance company as the drafter of the policy.'" <u>United Nuclear Corp. v. Allstate Ins. Co.</u>, 2012-NMSC-032, ¶ 10, 285 P.3d 644, 648 (quoting <u>Knowles v. United Serv. Auto. Ass'n</u>, 1992-NMSC-030, ¶ 9, 832 P.2d 394, 396 (citing <u>Battishill v. Farmers Alliance Ins. Co.</u>, 2006-NMSC-004, ¶ 6, 127 P.3d 1111, 1113; <u>City of Santa Rosa v. Twin City Fire Ins. Co.</u>, 2006-NMCA-118, ¶ 7, 143 P.3d 196, 198)). The Supreme Court of New Mexico has stated: "Insurance policies almost always are contracts of adhesion, meaning that 'the insurance company controls the language' and 'the insured has no

---

not, given the chance, recognize a public duty theory of negligent misrepresentation, and predicts that it would.

bargaining power.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 648 (quoting Cal. Cas. Ins. Co. v. Garcia-Price, 2003-NMCA-044, ¶ 20, 63 P.3d 1159, 1163)(citing accord Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14 n.3, 68 P.3d at 907 n.3). The Supreme Court of New Mexico described how insurance contracts are ones of adhesion in Sanchez v. Herrera, 1989-NMSC-073, 783 P.2d 465 (1989):

> The typical insured does not bargain for individual terms within policy clauses; the insured makes only broad choices regarding general concepts of coverage, risk, and cost. Not only does the insurance company draft the documents, but it does so with far more knowledge than the typical insured of the consequences of particular words.

1989-NMSC-073, ¶ 21, 783 P.2d at 469. "Cognizant of this imbalance in power, 'as a matter of public policy' courts 'generally construe[]' ambiguities 'in favor of the insured and against the insurer.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 11, 285 P.3d at 648 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 26, 12 P.3d 960, 967)(citing 2 Steven Plitt et al., Couch on Insurance § 22:14 (3d ed. 2010)). Accordingly, when a court finds that a term in an insurance policy is ambiguous, "[t]he court's construction of [the] policy will be guided by the reasonable expectations of the insured." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977. See Phx. Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶ 23, 9 P.3d 639, 646 ("[T]he test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean."). Additionally, "'[i]t is unnecessary to show that a construction against the insurer is more logical than a construction against the insured,' so long as both constructions are reasonable." United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 11, 285 P.3d at 648 (quoting 2 Plitt, supra § 22:17, at 22:98-22:99).

An insurer's obligation is a question of contract law and will be determined by reference to the insurance policy's terms. See Safeco Ins. Co. of Am., Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037. The clauses must be construed as intended to be a complete and harmonious instrument. See Erwin v. United Benefit Life Ins. Co., 1962-NMSC-067, ¶ 17, 371 P.2d 791, 794 (1962). On the other hand, where a clause "read alone is clear and unambiguous . . . it is not necessary to read the coverages together," because "there is a risk of creating, rather than identifying, ambiguity." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 16, 127 P.3d at 1115. Exclusionary clauses in insurance policies are to be narrowly construed, with the insured's reasonable expectations providing the basis for the analysis. See King v. Travelers Ins. Co., 1973-NMSC-013, ¶ 22, 505 P.2d 1226, 1232 (1973).

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶8, 619 P.2d 1226, 1229. In C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238, 242, the Supreme Court of New Mexico abolished the four-corners standard of contract interpretation, which required a court to determine whether a contract was ambiguous without considering evidence of the circumstances surrounding the contract's negotiation. The Supreme Court of New Mexico held that, "in determining whether a term or expression to which the parties have agreed is unclear, a court

may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." 1991-NMSC-070, ¶ 12, 817 P.2d at 242-43 (footnote omitted). The Supreme Court of New Mexico went on to discuss the parol-evidence rule:

> The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing . . . The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined." [A.] Corbin, The Parol Evidence Rule, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 16, 817 P.2d at 243 (footnote omitted). See Patterson v. Nine Energy Serv., LLC, No. CIV 17-1116 JB/GBW, 2018 WL 6250608, at *19 (D.N.M. Nov. 29, 2018)(Browning, J.). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12, 817 P.2d at 242 (citation omitted). "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12, 817 P.2d at 242 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted). If, however, the "evidence presented is so plain that no

reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606). New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V. Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)). Once the court concludes that an ambiguity exists, the resolution of that ambiguity becomes a question of fact. See Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235. To decide an ambiguous term's meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236. New Mexico contract law "requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract." Schultz & Lindsay Constr. Co., 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614. See Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d at 977 ("An ambiguity in an insurance contract is usually

construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language."). The Supreme Court of New Mexico summarized the law of contract interpretation in New Mexico as follows:

> The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder.

Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." Watson Truck & Supply Co., Inc. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d 639, 642 (citations omitted). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642 (internal quotation marks omitted). New Mexico has recognized that a cause of action for breach of the covenant of good faith and fair dealing sounds in contract. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 16, 872 P.2d 852, 857. The Court has previously held that a "claim for the breach of the covenant of good faith and fair dealing is derivative of the breach-of-contract claim." Back v. ConocoPhillips Co., 2012 WL 6846397, at *22 (D.N.M. Aug. 31, 2012)(Browning, J.)(citing Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *7 (D.N.M.

Apr. 6, 2009)(Browning, J.)). The Supreme Court of New Mexico has also explained that tort recovery for breach of the covenant of good faith and fair dealing is permissible only where a special relationship exists, such as between an insurer and its insured. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 16, 872 P.2d at 857. The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (citations omitted)(internal quotation marks omitted). Similarly, the Court of Appeals of New Mexico, in accord with Bourgeous v. Horizon Healthcare Corp., has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists." Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127, ¶ 18, 144 P.3d 111, 117 (quoting Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 18, 872 P.2d at 857).

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly," which an implied covenant of good faith and fear dealing within a contract imposes, "becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (discussing an Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context). In the insurance context, however, a plaintiff can recover tort damages for breach of this implied covenant. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.

As the Supreme Court of New Mexico explained in Continental Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, 858 P.2d 66:

> Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract. The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party.

1993-NMSC-039, ¶ 64, 858 P.2d at 82 (citing Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 10, 801 P.2d at 642). See Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 188 P.2d 1200, 1203.

> However, the implied covenant of good faith and fair dealing protects only against bad faith -- wrongful and intentional affronts to the other party's rights, or at least affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party. Simply put, in contract there is no implied covenant to exercise "ordinary care," or even "slight care," and the fact that the breaching party may not have acted with ordinary or slight care is immaterial to the questions whether the contract has been breached and if so, what damages should be awarded for the breach.

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d 300, 309-10 (footnote omitted).

The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642.

> Generally, in the absence of an express provision on the subject, a contract contains an implied covenant of good faith and fair dealing between the parties. *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639, 642 (1990); *Spencer v. J.P. White Bldg.,* 92 N.M. 211, 214, 585 P.2d 1092, 1095 (1978). Under the implied covenant of good faith and fair dealing, courts can award damages against a party to a contract whose actions undercut another party's rights or benefits under the contract. *Watson Truck & Supply Co.,* 111 N.M. at 60, 801 P.2d at 642. Our Supreme Court has nevertheless refused to apply this implied covenant to override an express at-will termination provision in an integrated, written contract. *Melnick,* 106 N.M. at 731, 749 P.2d at 1110; *Bourgeous v. Horizon Healthcare Corp.,* . . . 872 P.2d 852, 856 (1994).

Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶ 5, 33 P.3d 679, 681.

## NEW MEXICO LAW REGARDING PUNITIVE DAMAGES

"Punitive damages 'are not compensation for injury.'" Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d 594, 597 (quoting State v. Powell, 1992-NMCA-086, ¶ 13, 839 P.2d 139, 144). "Punitive damages do not measure a loss to the plaintiff, but rather punish the tortfeasor for wrongdoing and serve as a deterrent." Sanchez v. Clayton, 1994-NMSC-064, ¶ 11, 877 P.2d 567, 572. "Punitive damages may not be awarded unless there is an underlying award of compensation for damages." Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d at 597 (citing N.M. Rules Ann. 13-1827). "Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future." Akins v. United Steel Workers of Am., AFL-CIO, CLC, Local 187, 2010-NMSC-031, ¶ 20, 237 P.3d 744, 749 (citing Bogle v. Summit Inv. Co., 2005-NMCA-024, ¶ 34, 107 P.3d 520, 531). "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'" Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d 1136, 1152 (quoting Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 56, 40 P.3d 449, 461). "New Mexico recognizes that, although punitive damages are not normally available for a breach of contract, a plaintiff may recover punitive damages when a defendant's breach was 'malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights.'" Anderson Living Tr. v. ConocoPhillips Co., 952 F. Supp. 2d 979, 1046 (D.N.M. 2013)(Browning, J.)(citing Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d 992, 998).

In determining punitive-damage awards, New Mexico courts apply a preponderance of the evidence standard. See Jessen v. Nat'l Excess Ins., 1989-NMSC-040, ¶ 15, 776 P.2d 1244,

1247-48 (citing United Nuclear Corp. v. Allendale Mut. Ins., 1985-NMSC-090, ¶¶ 14, 89, 709 P.2d 649, 653, 666). "To be liable for punitive damages, a wrongdoer must have some culpable mental state and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14 (citations omitted)(citing McGinnis v. Honeywell, Inc., 1990-NMSC-043, ¶ 31, 791 P.2d 452, 460; Loucks v. Albuquerque Nat'l Bank, 1996-NMSC-176, ¶ 48, 418 P.2d 191, 199). Factors to be weighed in assessing punitive damages are the enormity and nature of the wrong, and any aggravating circumstances. See Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87 (citing Sweitzer v. Sanchez, 1969-NMCA-055, ¶ 26, 456 P.2d 882, 886). Punitive damages may be imposed "when a party intentionally or knowingly commits wrongs," or "when a defendant is utterly indifferent to the plaintiff's rights, even if the defendant lacked actual knowledge that his or her conduct would violate those rights." Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152 (citing N.M. Rules Ann. 13-1827; Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d 115, 125-26). "Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights." Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d at 125 (citing Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d 386, 397). "Recklessness in the context of punitive damages refers to 'the intentional doing of an act with utter indifference to the consequences.'" Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397 (quoting N.M. Rules Ann. 13-1827). "The degree of the risk of danger involved in the activity in question is a relevant factor in determining whether particular conduct rises to the level of recklessness." Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397. "A defendant does not act

with reckless disregard to a plaintiff's rights merely by failing 'to exercise even slight care,' absent the requisite 'culpable or evil state of mind.'" Anderson Living Tr. v. ConocoPhillips Co., 952 F. Supp. 2d at 1031 (quoting Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308). The Court has previously addressed punitive damages under New Mexico law in various situations. See, e.g., Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1242 (D.N.M. 2008)(Browning, J.)(holding a genuine issue of material fact on punitive damages existed where a party had "demonstrated that persons at Eli Lilly may have been aware of a problem, perceived or actual, linking Prozac with increased suicidality and violence"); Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189, 1196 (D.N.M. 2007)(Browning, J.)(granting punitive damages where the defendant "intentionally deceived Applied Capital, misrepresenting Legato Staffing's financial resources and creditworthiness, the existence of the rig, and the bona fides of the transaction generally"); Faniola v. Mazda Motor Corp., No. CIV 02-1011 JB/RLP, 2004 WL 1354469, at *1, *6 (D.N.M. April 30, 2004)(Browning, J.)(noting that "a reasonable factfinder could [not] find that Mazda had a culpable mental state in designing [a] fuel tank" when "Mazda's design was and is accepted in the industry" and the design met "federal safety standards," although the facts showed that "[t]he brake shoe rotated under Faniola's vehicle, striking several places, and punctured her gas tank," causing the car to catch fire).

While the Supreme Court of New Mexico has not addressed punitive damages arising from automobile accidents, the Court of Appeals of New Mexico has upheld punitive damages awards when drivers used alcohol or drugs, drove while intoxicated and suffering from an extreme lack of sleep, and drove erratically or far beyond the speed limit. See DeMatteo v. Simon, 1991-NMCA-027, 812 P.2d 361; Svejcara v. Whitman, 1971-NMCA-093, 487 P.2d 167;

Sanchez v. Wiley, 1997-NMCA-105, 946 P.2d 650.  In Svejcara v. Whitman, the Court of Appeals of New Mexico upheld a jury's punitive damages award where:

> Defendant was driving in a reckless manner while intoxicated.  He turned into slow moving on-coming traffic.  He stated he was traveling three miles per hour and yet the force of his car's impact spun plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender for a total damage exceeding $1,000.00.  The collision caused both plaintiffs to receive personal injuries some of which are permanent and disabling.

1971-NMCA-093, ¶ 21, 487 P.2d at 170.  The Court of Appeals of New Mexico likewise upheld a jury's award in DeMatteo v. Simon, wherein the party "drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident, and then consumed marijuana shortly before the accident allowed the jury to conclude that punitive damages were warranted."  1991-NMCA-027, ¶ 7, 812 P.2d at 364.  In Sanchez v. Wiley, the Court of Appeals of New Mexico reversed a directed verdict for the defendant, because, as the defendant "appeared to be under the influence of alcohol immediately following the accident," a jury could reasonably award punitive damages.  1997-NMCA-105, ¶ 16, 946 P.2d at 655.

The Court predicts that the Supreme Court of New Mexico would agree with these Court of Appeals of New Mexico cases.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25.  The Supreme Court of New Mexico has made clear that utter indifference is sufficient for awarding punitive damages, and the risks, even if not the certainty that a harm will occur, associated with excessive speed, erratic driving, and alcohol and drugs while driving are both known and high.  See, e.g., Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152; Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987

P.2d at 397; <u>Green Tree Acceptance, Inc. v. Layton</u>, 1989-NMSC-006, ¶ 9, 769 P.2d at 87.

Further, the Supreme Court of New Mexico considers a party's knowledge of and failure to

follow state law when upholding punitive damages awards. <u>See</u> <u>Clay v. Ferrellgas, Inc.</u>, 1994-

NMSC-080, ¶ 21, 881 P.2d at 16 ("Ferrellgas employees testified that they knew of the state

laws that required them to install a vapor barrier and to properly vent the trunk of the car when

they installed the tank. . . . There is no question that they did not comply with these

requirements."). In <u>DeMatteo v. Simon</u>, <u>Svejcara v. Whitman</u>, and <u>Sanchez v. Wiley</u>, the drivers

using substances, speeding, and driving erratically egregiously violated well-established and

understood driving rules and norms, which, like failing to follow the regulations for installing

propane tanks, accompany "high risk[s] of harm." <u>Clay v. Ferrellgas, Inc.</u>, 1994-NMSC-080, ¶

24, 881 P.2d at 17.

## LAW REGARDING THE UPA

"The UPA provides individual and class action remedies for unfair, deceptive, or

unconscionable trade practices." <u>Valdez v. Metro. Prop. & Cas. Ins. Co.</u>, at *19 (D.N.M. Mar.

31, 2012)(Browning, J.)(citing <u>Ouynh Truong v. Allstate Ins. Co.</u>, 2010-NMSC-009, ¶ 22, 227

P.3d 73, 80)). "Generally speaking, the UPA is designed to provide a remedy against misleading

identification and false or deceptive advertising." <u>Lohman v. Daimler-Chrysler Corp.</u>, 2007-

NMCA-100, ¶ 22, 166 P.3d 1091, 1096.[34]

---

[34]Here, the Court must look to how the Supreme Court of New Mexico, rather than the
Court of Appeals of New Mexico, would resolve the case. Federal courts sitting in diversity
must apply the substantive law of the state that would otherwise have jurisdiction over the claims
at issue. <u>See</u> <u>Erie</u>, 304 U.S. at 78. In the absence of an authoritative pronouncement from the
highest court, a federal court's task under the <u>Erie</u> doctrine is to predict how the state's highest
court would rule if presented with the same case. <u>See</u> <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d
657, 666 (10th Cir. 2007). When making an <u>Erie</u> guess, a federal court should follow

To state a claim under the UPA for an unfair or deceptive practice, a complaint must allege four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. *Ashlock,* 107 N.M. at 101, 753 P.2d at 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." *Id.* Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. *Id.* Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id.*

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311. "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12. Notably, a plaintiff need not prove detrimental reliance upon the defendant's representations.

---

intermediate state-court decisions "unless other authority convinces us that the state supreme court would decide otherwise." Koch v. Koch Indus., Inc., 203 F.3d 1202, 1230 (10th Cir. 2000)(quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir. 1984)). The Court predicts that the Supreme Court of New Mexico would agree with Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332., that the UPA provides a remedy against misleading, false, or deceptive statements associated with advertising and the sale of goods, based on the Court's read of the Supreme Court of New Mexico's opinion in Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, 811 P.2d 1308, stating that the UPA is modeled after the Uniform Deceptive Trade Practices Act, which "provides a private remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 811 P.2d at 1310-11 (citing N.M. Stat. Ann. § 57-12-1). The Court will, accordingly, apply New Mexico law as articulated in Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332.

See Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 35, 166 P.3d at 1098. The Court

has previously construed the UPA and has noted that, "in the right circumstances, it could grant

judgment as a matter of law on whether a statement is deceptive or misleading" although

"generally the question is a matter of fact." Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,

728 F. Supp. 2d at 1193. The Court has also concluded that a communication can mislead even

if it is not false. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at

1194-95.

> Under the UPA, unconscionable trade practices include:
>
> act[s] or practice[s] in connection with . . . the extension of credit in the collection
> of debts that to a person's detriment:
>
>> (1) take[] advantage of the lack of knowledge, ability, experience
>> or capacity of a person to a grossly unfair degree; or
>>
>> (2) result[] in a gross disparity between the value received by a
>> person and the price paid.

N.M. Stat. Ann. § 57-12-2(E). Accordingly, a trade practice can be procedurally unconscionable

under § 57-12-2(E)(1) or substantively unconscionable under § 57-12-2(E)(2). See Cordova v.

World Fin. Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual

unconscionability can be analyzed from both procedural and substantive perspectives.").

"Procedural unconscionability . . . examines the particular factual circumstances surrounding the

formation of [a] contract, including the relative bargaining strength, sophistication of the parties,

and the extent to which either party felt free to accept or decline terms demanded by the other."

Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08. Substantive

unconscionability, on the other hand, "concerns the legality and fairness of the contract terms

themselves," and "focuses on such issues as whether the contract terms are commercially

reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns." Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907. A contractual term is substantively unconscionable if it is illegal, or if it "is grossly unreasonable and against our public policy under the circumstances," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31, 308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," State ex rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d 658, 670. Moreover, the UPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits." State ex rel. King v. B &B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 671.

Under the UPA, "[a]ny person who suffers any loss of money or property, real or personal, as a result of any . . . method, act or practice declared unlawful by the [UPA] may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater." N.M. Stat. Ann. § 57-12-10(B). UPA plaintiffs do not need to show actual damages, or the actual loss of money or property to recover statutory damages, however. See Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 44, 166 P.3d at 1099-1100 ("[T]he UPA does not require proof of actual monetary or property loss.").[35]

_____

[35]The Court is at a loss to explain this interpretation of the UPA's statutory language, which makes statutory damages available to "[a]ny person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or

- 140 -

practice declared unlawful by the Unfair Practices Act." N.M. Stat. Ann. § 57-12-10(B). The Court agrees with the straightforward reading of the statutory text that the Supreme Court of New Mexico articulated:

> The first remedy under the statute, injunctive relief, expressly is not conditioned upon proof of monetary loss. Any person *likely* to be damaged by an unfair or deceptive trade practice of another may obtain such relief; monetary loss is "not required." Section 57-12-10(A). For example, relief under this provision might be had by one commercial enterprise from the deceptive advertising campaign of another. A competitor might complain that their company could suffer loss of market share and profits because the public might be deceived. . . .
>
> In contrast, recovery of damages under paragraph (B) includes only those persons "who suffer any loss of money or property." The paragraph authorizes recovery of "actual damages" or the sum of one hundred dollars, whichever is greater. Section 57-12-10(B). Such damages might be suffered either by a consumer of goods or services, or the commercial competitor of an enterprise engaged in deceptive trade practices. However, in either case the aggrieved party must produce evidence of "loss of money or property" as a result of the practice.

Page and Wirtz Constr. Co. v. Solomon, 1990-NMSC-063, ¶¶ 21-22, 794 P.2d 349, 354-55 (emphasis in original). In the next paragraph, however, the Supreme Court of New Mexico, without explanation, reached a contrary conclusion: "The record in this case reflects no such [monetary or property] loss. Therefore, recovery is limited to one hundred dollars . . . ." 1990-NMSC-063 ¶ 23, 794 P.2d at 355. Eight years later, the Court of Appeals of New Mexico elaborated on that head-scratching holding:

> The court [below] erred in linking recovery under the UPA to proof of actual damages. Section 57-12-10(B) authorizes the recovery of "actual damages or the sum of one hundred dollars ($100), whichever is greater." In *Page & Wirtz Construction Co. v. Solomon,* 110 N.M. 206, 212, 794 P.2d 349, 355 (1990) (citing § 57-12-10(B)), the Supreme Court held that if a plaintiff produces no evidence showing loss of money or property, "recovery is limited to one hundred dollars, which may be trebled by the court when the party willfully has engaged in the unfair or deceptive practice." Thus, Plaintiff was only required to put on evidence of his actual losses as it pertained to recovery of actual damages. In the absence of actual losses, Plaintiff is still entitled under UPA to recover the statutory damages of one hundred dollars.

Jones v. General Motors Corp., 1998-NMCA-020, ¶ 23, 953 P.2d 1104, 1109. The Court cannot, however, take its own, independent view of state law and must, instead, defer to New Mexico courts on questions of New Mexico law. See Erie, 304 U.S. at 78 ("[W]hether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a

In a class action under the UPA, statutory damages are available only to the named plaintiff whereas class members can recover only their actual damages. <u>See</u> N.M. Stat. Ann. § 57-12-10(B). Injunctive relief under the UPA is available to people "likely to be damaged by an unfair or deceptive trade practice . . . under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive or take unfair advantage of any person is not required." N.M. Stat. Ann. § 57-12-10(A). Moreover, the court "shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails." N.M. Stat. Ann. § 57-12-10(C).

## LAW REGARDING THE UIPA

The New Mexico Legislature passed the UIPA "to regulate trade practices in the insurance business and related businesses," including "practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices." N.M. Stat. Ann. § 59A-16-2. Section 59A-16-4 proscribes certain misrepresentations that relate to insurance transactions, including "misrepresent[ing] the benefits, advantages, conditions or terms of any policy." N.M. Stat. Ann. § 59A-16-4. Section 59A-16-5 forbids "untrue, deceptive or misleading" advertisements that relate to insurance. N.M. Stat. Ann. § 59A-16-5. Section 59A-16-8 makes actionable certain falsifications of insurance records and the circulation of "any false statement of the financial condition of an insurer." Various provisions in the UIPA proscribe discrimination in relation to insurance transactions. <u>See</u>, <u>e.g.</u>, N.M. Stat. Ann. §§ 59A-16-11 to -

matter of federal concern."). Consequently, the Court will apply the UPA as the Supreme Court of New Mexico and the Court of Appeals of New Mexico applied the statute in <u>Page and Wirtz Construction Co. v. Solomon</u> and <u>Jones v. General Motors Corp.</u>, respectively.

13.2. Section 59A-16-19 prohibits anti-competitive insurance practices "resulting or tending to result in unreasonable restraint of, or monopoly in, the business of insurance." N.M. Stat. Ann. § 59A-16-19.

The UIPA imposes liability for a laundry list of unfair insurance claims practices, including the following:

A.  misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

B.  failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

C.  failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

D.  failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

E.  not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;

F.  failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

G.  compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered;

H.  attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

I.  attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

J.    failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made;

K.    making known to insureds or claimants a practice of insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

L.    delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

M.    failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage;

N.    failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

O.    violating a provision of the Domestic Abuse Insurance Protection Act.

N.M. Stat. Ann. § 59A-16-20. Section 59A-16-30 provides a cause of action for UIPA violations and allows attorney's fees for prevailing parties. See N.M. Stat. Ann. § 59A-16-30. The Honorable Bruce D. Black, then-United States District Judge for the District of New Mexico, concluded that a plaintiff failed to plausibly plead a UIPA claim:

> Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act that prohibits unfair claims practices. Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged. At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, it is not clear either what Dr. Yumukoglu is claiming or to what relief he is entitled under § 56A-16-20. Dr. Yumukoglu's

claim appears, like his claim for breach of the duty of good faith and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits. As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's benefits did not amount to bad faith. Provident's motion for summary judgment on Plaintiff's claim for statutory violation is granted.

Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d 1215, 1227 (D.N.M. 2001)(Black, J.)(footnote and citations omitted). The Court has previously found that a plaintiff failed to state a claim under rule 12(b)(6) when the complaint did not contain even "a formulaic recitation of the elements of a cause of action" under the UIPA. Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11-0486, 2012 WL 1132332, at *7 (D.N.M. March 28, 2012)(Browning, J.)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

## ANALYSIS

The Court concludes that Financial Indemnity is not entitled to judgment as a matter of law as to all claims for insureds who have non-minimum limits UIM coverage, because Bhasker has alleged that Financial Indemnity's business practices misled and deceived not only herself but also proposed class members who purchased greater-than-minimum-limits UIM coverage. The Court also concludes that, at this stage in the proceedings, Financial Indemnity can be liable to Bhasker for extracontractual and punitive damages, because Bhasker has alleged that Financial Indemnity's decision to sell illusory UIM coverage was willful or reckless. Accordingly, the Court denies the MJP.

**I.     FINANCIAL INDEMNITY IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO ALL CLAIMS FOR INSUREDS WHO HAVE NON-MINIMUM LIMITS UIM COVERAGE, BECAUSE BHASKER HAS ALLEGED THAT FINANCIAL INDEMNITY'S BUSINESS PRACTICES MISLED AND DECEIVED PROPOSED CLASS MEMBERS WHO PURCHASED SUCH <u>COVERAGE</u>.**

The Court will deny the MSJ's request to grant Financial Indemnity partial judgment on the pleadings as to Bhasker's claims for insureds who have non-minimum limits UIM coverage, because Bhasker's Complaint alleges that Financial Indemnity acted in bad faith when it sold and solicited UIM coverage to the proposed class members. The Court concludes that Bhasker uses the word "illusory" to signify both Financial Indemnity's valueless, minimum limits UIM policies and the alleged deceptive and misleading business practices that compelled insureds to purchase UIM policies above minimum limits. Accordingly, Bhasker's theory is that Financial Indemnity misled her and a class of insureds who, like Bhasker, purchased UIM coverage believing that they would receive the full UIM coverage reflected on their declarations pages, whether minimum limits or some greater figure.

## A. BHASKER'S USE OF THE WORD "ILLUSORY" ENCOMPASSES DECEPTIVE AND MISLEADING BUSINESS PRACTICES.

In the MJP, Financial Indemnity asserts that "[t]his Court's Order indicates clearly that the illusory coverage claim raised by this case applies to minimum limits UIM coverage, not where any level of UIM limits above the minimum is at issue." MJP at 4. Financial Indemnity cites language from the Court's MOO which emphasizes, for example, that Bhasker's UIM insurance is illusory and that, because of New Mexico's offset law, "there is virtually *no possible underinsured minimum limits claim* available" to Bhasker and "other similarly situated members of the class." MJP at 4 (quoting MOO at 3; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1194)(emphasis in MJP). Financial Indemnity argues that Bhasker's illusory coverage theory does not apply outside the minimum limits UIM context, because, for example, "if the insured has UIM limits of $50,000, $100,000 or any amount greater than $25,000, and the tortfeasor has

$25,000 in bodily injury liability limits and that amount is offset, the injured insured *will* recover UIM benefits where the damages exceed the tortfeasor's limits." MJP at 5 (emphasis in MJP).

Although the Court agrees with Financial Indemnity that coverage at higher-than-minimum limits is not illusory in the sense that such policies never confer a financial benefit to insureds, the Court maintains its position that Bhasker uses the word "illusory"[36] not only to refer to valueless, minimum limits UIM coverage but also as a synonym for the word "deceptive," i.e., not in reference to any particular legal doctrine, such as, for example, the doctrine of illusory coverage.[37] The Court noted in its MOO:

> Bhasker's references to "illusory" coverage indicates that she uses the term loosely. In her Complaint, she alleges that Financial Indemnity sold her "illusory" UIM coverage. Complaint ¶¶ 1, 46, 66, 68, at 1, 7, 13-14. She also alleges that the UIM coverage is illusory "in part," Complaint ¶ 67, at 14, and "illusory in the event of a covered occurrence, as in this case, involving a minimally insured driver," Complaint ¶ 32, at 5. Her inconsistent use of "illusory" is a good clue that her claims are not based on legal theories in which the coverage's "illusory" nature is an element necessary to prove. Rather, Bhasker seems to be arguing, generally, that her UM/UIM policy did not cover what she thought it would, in which case the UIM coverage was illusory in the sense that it appeared to be something it was not. According to her Complaint, she believes her policy's UIM component is worth nothing or close to nothing. Consequently, even if the Court agreed with Financial Indemnity that the policy's UIM coverage has some value, that designation would not foreclose Bhasker's claims that Financial Indemnity misled her about what the UM/UIM policy covered.

MOO at 76-77; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1238 (footnote omitted).

---

[36]Black's Law Dictionary defines "illusory" as: "Deceptive; based on a false impression." Illusory, Black's Law Dictionary 865 (10th ed. 2014).

[37]Black's Law Dictionary defines the doctrine of illusory coverage as: "A rule requiring an insurance policy to be interpreted so that it is not merely a delusion to the insured; specif., a rule of contract interpretation or reformation that avoids an interpretation that would result in never triggering an insured's coverage or having the insurer incur no risk." Doctrine of Illusory Coverage, Black's Law Dictionary 586 (10th ed. 2014).

Bhasker validated the above analysis during the August 10, 2018, hearing when she stated that "this case is about defendant's misleading and deceptive business practices. Whether the coverage is illusory is a subissue to the overarching theme." Aug. 10 Tr. at 16:12-15 (Bhasker). The Court thus concludes that Financial Indemnity's characterization of Bhasker's illusory coverage theory as limited to minimum limits UIM coverage is unavailing.

**B.  THE SUPREME COURT OF NEW MEXICO WOULD CONCLUDE THAT HIGHER-THAN-MINIMUM-LIMITS UIM COVERAGE HAS VALUE, BECAUSE <u>SCHMICK</u> OFFSETS ARE IN ACCORD WITH NEW MEXICO PUBLIC POLICY.**

As stated above, the Court agrees with Financial Indemnity that higher-than-minimum limits UIM coverage is not illusory in the sense that such coverage never confers a financial benefit to insureds. Although several state supreme courts have held such coverage illusory, the Court predicts that the Supreme Court of New Mexico would not join them based on the Supreme Court of New Mexico's prior analysis of the legislative intent behind § 66-5-301 in <u>Schmick</u>. Although <u>Schmick</u> does not discuss the illusory coverage question, the Supreme Court of New Mexico in <u>Schmick</u> concludes that "[o]ur statute limits the insured's recovery to the amount of underinsured motorist coverage purchased for the insured's benefit; that amount will be paid in part by the tortfeasor's liability carrier and the remainder by the insured's uninsured motorist insurance carrier." <u>Schmick</u>, 1985-NMSC-073, ¶ 28, 704 P.2d 1092 at 1099. This position represents one of two competing statutory approaches to insurance liability offsets in the UIM context. The Supreme Court of West Virginia, to which Bhasker repeatedly directs the Court's attention, notes that its state's UIM legislation,

> sometimes called reduction-type or decreasing-layer underinsured motorist coverage, is premised upon the idea that the purpose of underinsured motorist coverage is to put the insured in the same position he or she would have occupied

had the tortfeasor's liability insurance limits been the same as the underinsured motorist coverage limits purchased by the insured.

State Auto. Mut. Ins. Co. v. Youler, 396 S.E.2d 737, 747 (W. Va. 1990). See Russ & Segalla, Supra § 122:36 (referring to this concept as the "gap theory"). New Mexico follows this approach. See Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 13, 780 P.2d at 637 ("The purpose of our statute is to assure that, in the event of an accident with an underinsured vehicle, an insured motorist entitled to compensation will receive at least the sum certain in underinsurance coverage purchased for his or her benefit"). The second approach offsets the tortfeasor's liability coverage against the amount of damages that an insured sustains and makes the insurer liable to its insured for any excess up to the limits of the insured's UIM coverage. See State Auto. Mut. Ins. Co. v. Youler, 396 S.E.2d at 748. The Supreme Court of West Virginia notes that this approach to UIM legislation,

> sometimes called excess-type or floating-layer underinsured motorist coverage, is premised upon the idea that the injured person is entitled to recover under his or her own underinsured motorist coverage to the extent that the tortfeasor's liability insurance coverage is insufficient to compensate the injured person fully for his or her loss, subject only to the limits of the underinsured motorist coverage,

State Auto. Mut. Ins. Co. v. Youler, 396 S.E.2d at 748, and this approach represents the so-called "windfall" that Financial Indemnity references, MJP at 8. See Russ & Segalla, Supra § 122:36 ("Some courts . . . validate offsets in order to prevent the insured from receiving double recovery or coverage for which the insured did not pay."). Such double recovery concerns are likely why New Mexico does not follow the excess theory. See Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 13, 780 P.2d at 636-37 ("Schmick distinguishes statutes under which 'the insured's total damages, and not the amount of uninsured motorist coverage purchased for his benefit, provide the ceiling on recovery.'" (quoting Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d

1092 at 1099)).  West Virginia, however, follows in full the second approach.  See State Auto. Mut. Ins. Co. v. Youler, 396 S.E.2d at 748 ("[W]e conclude, that the tortfeasor's liability insurance coverage is to be set off against the amount of *damages* sustained by the injured person, not against the underinsured motorist coverage limits."  (emphasis in original)).

Whether a state follows the first approach or the second approach is significant for Bhasker's illusory coverage theory, because the two approaches represent differing policy considerations.  To begin, the gap theory, which New Mexico follows, is more favorable to insurers than the excess theory, because it caps the amount that insureds can recover and permits insurers to subtract the tortfeasors' liability limits from what insurers would otherwise owe to insureds.  The Supreme Court of New Mexico acknowledged as much when it said: "[W]e observe that the result reached by [jurisdictions that follow the excess theory] is more equitable in that the injured insured collects all proceeds for which, ostensibly, a premium has been paid and has his or her damages compensated more fully."  Schmick, 1985-NMSC-073, ¶ 31, 704 P.2d at 1100.  Nevertheless, the Supreme Court of New Mexico continued: "New Mexico's uninsured/underinsured motorist statute, as presently enacted by our Legislature does not allow for such recovery."  Schmick, 1985-NMSC-073, ¶ 31, 704 P.2d at 1100.  Hence, the Supreme Court of New Mexico has indicated that, in this state, the goal behind UIM legislation is not to see insureds fully compensated for their damages but rather to see insureds compensated up to the amount equal to the UM/UIM protection purchased for their benefit.  See Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 13, 780 P.2d at 636-37.  In contrast, the Supreme Court of West Virginia, in Pristavec v. Westfield Insurance Co., expressly considered the equitable concerns that the Supreme Court of New Mexico discounted when, after concluding

that it would not compare the amount of the tortfeasor's liability limits with the insured's UIM

coverage limits, the Supreme Court of West Virginia stated:

> To hold otherwise would create the untenable distinction between those persons
> who can afford to purchase underinsured motorist coverage with relatively high
> coverage limits and who ordinarily would be entitled to the full compensation
> benefits of the underinsured motorist statute, and those persons who can afford to
> purchase underinsured motorist coverage with only the minimum or relatively low
> coverage limits and who ordinarily would not be entitled to underinsured motorist
> coverage. We do not believe the legislature intended such an unjust result.

Pristavec v. Westfield Ins. Co., 400 S.E.2d at 582.  Compare Pristavec v. Westfield Ins. Co., 400

S.E.2d at 582 ("[T]he preeminent public policy in this state under the underinsured motorist

statute is the full compensation of the injured party for his or her damages not compensated by a

negligent tortfeasor, up to the limits of the underinsured motorist coverage.") with State Farm

Mut. Auto. Ins. Co. v. Safeco Ins. Co., 2013-NMSC-006, ¶ 7, 298 P.3d at 454 ("The policy

reason for enacting UIM legislation is 'to put an injured insured in the same position he would

have been in had the tortfeasor had liability coverage in an amount equal to the

uninsured/underinsured motorist protection purchased for the insured's benefit.'" (quoting

Schmick, 704 P.2d at 1095)).  Bhasker's citation to Pristavec v. Westfield Insurance Co. to

support her illusory-coverage-at-all-limits theory thus does not persuade the Court.  See MJP

Response at 5-6.  The public policy behind New Mexico's approach to offsets does not take

account of an insured's total damages but instead the amount of UIM coverage purchased for the

insured's benefit, which, in contrast to West Virginia, provides a ceiling and not a floor.

Bhasker's reliance on Hardy v. Progressive Specialty Insurance Co. is similarly

unavailing.  To begin, the first question certified to the Supreme Court of Montana in Hardy v.

Progressive Specialty Insurance Co. is whether Montana is a gap theory or an excess theory

state.  See Hardy v. Progressive Specialty Ins. Co., 2003 MT 85, ¶ 3, 67 P.3d at 894 ("1. Is the

offset provision in the Progressive policy void in Montana because it violates the public policy of

this state?"); Greg Munro, Exposing "Illusory" Underinsured Motorist Coverage Trial Trends 28

(2003)("In the case of Hardy v. Progressive Specialty Ins. Co. pending at the Montana Supreme

Court, the insured Hardy seeks to have the offending illusory 'narrow' UIM definition declared

invalid."  (footnote omitted)).    In response, the Supreme Court of Montana proclaimed that

Montana is an excess theory state: "Public policy considerations that favor adequate

compensation for accident victims apply to UIM coverage . . . .  The purpose of underinsured

motorist coverage is to provide a source of indemnification when the tortfeasor does not provide

adequate indemnification."  Hardy v. Progressive Specialty Ins. Co., 2003 MT 85, ¶ 21, 67 P.3d

at 896 (internal citations omitted).    Contra State Farm Mut. Auto. Ins. Co. v. Marquez, 2001-

NMCA-053, ¶ 6, 28 P.3d at 1133-34 ("The purpose of the statute is to place an injured

policyholder in the same position as the policyholder would have been in if the uninsured

motorist had possessed liability insurance."  (citing Chavez v. State Farm Mut. Ins. Co.,

1975-NMSC-011, ¶ 7, 533 P.2d 100, 102)).    This conclusion -- that Montana is an excess

state -- enabled the Supreme Court of Montana to further conclude that the offset provision

within Montana's UIM statute is void for public policy, as the offset prevented Hardy from

recovering from his UIM policy in addition to the tortfeasor's liability policy.  See Hardy v.

Progressive Specialty Ins. Co., 2003 MT 85, ¶ 21, 67 P.3d at 896-97.  In other words, Hardy v.

Progressive Specialty Insurance Co. answered for Montana in 2003 what Schmick answered for

New Mexico in 1985:

> On appeal we address two issues.  . . .  The second issue is whether underinsured
> motorist benefits are calculated by subtracting the amount of the tortfeasor's

> liability coverage from the amount of the insured's uninsured motorist coverage
> or whether the underinsurance benefits due equal the amount of uninsured
> motorist coverage purchased for the insured's benefit in addition to the amount of
> liability insurance proceeds available from the tortfeasor.

Schmick, 1985-NMSC-073, ¶ 6, 704 P.2d at 1094. With some reluctance and cognizant of the

perceived inequity to injured insureds, see Schmick, 1985-NMSC-073, ¶ 31, 704 P.2d at 1100,

the Supreme Court of New Mexico confirmed that the Legislature, in enacting § 66-5-301,

intended the first definition, that UIM benefits "are calculated by subtracting the amount of the

tortfeasor's liability coverage from the amount of the insured's uninsured motorist coverage,"

i.e., the gap theory, Schmick, 1985-NMSC-073, ¶ 6, 704 P.2d at 1094. This conclusion -- that

New Mexico is a gap theory state -- enabled the Supreme Court of New Mexico to further

conclude, "under a statute like ours, where the most an insured can receive is the amount of

underinsurance purchased for his benefit, that amount must be offset by available liability

proceeds." Schmick, 1985-NMSC-073, ¶ 30, 704 P.2d at 1100. The Court, therefore, predicts

that the Supreme Court of New Mexico would not follow the Supreme Court of Montana in

concluding that higher than minimum limits UIM coverage is illusory.

Bhasker's assertion that Financial Indemnity benefits at insureds' expense each time

Financial Indemnity applies a Schmick offset to prevent insureds from receiving their purchased

UIM coverage's "full dollar value," MJP Response at 7, is true; however, Financial Indemnity

does so in accordance with the law, see Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-

060, ¶ 15, 780 P.2d at 637. Section 66-5-301 entitles insurers, in the UIM context, to offset the

tortfeasor's liability limits payments. See Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099.

Although this result means that an insurer may offset an insured's entire UIM coverage when the

tortfeasor and the insured have equal liability and UIM limits, respectively, Schmick and its

progeny indicate that this effect is by Legislative design.  See State Farm Mut. Auto. Ins. Co. v. Safeco Ins. Co., 2013-NMSC-006, ¶ 7, 298 P.3d at 454; Samora v. State Farm Mut. Auto. Ins. Co., 1995-NMSC-022, ¶ 10, 892 P.2d at 603; Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 15, 780 P.2d at 637; Schmick, 1985-NMSC-073, ¶ 28, 704 P.2d at 1099.  Unlike minimum limits UIM coverage, which the Court in its MOO predicts that the Supreme Court of New Mexico would conclude is illusory because it rarely, if ever, compels insurers to pay out benefits,[38] insurers avoid paying on non-minimum limits UIM policies only when insureds and tortfeasors by happenstance have equal UIM and liability limits.  Hence, non-minimum limits UIM policies have value.  The Court recognizes that UIM statutes from other jurisdictions are more favorable to insureds than § 66-5-301 is to New Mexico policyholders when such statutes permit insureds to recover fully for their loss.  Nonetheless, the Supreme Court of New Mexico's

---

[38]In all cases where the tortfeasor's liability coverage is equal to or more than Bhasker's minimum limits UIM coverage, Bhasker can recover nothing from the UIM coverage.  In any case where the tortfeasor's coverage is less than $25,000.00, the tortfeasor is uninsured, see Weed Warrior, 2010-NMSC-050, ¶ 10, 245 P.3d at 1212 ("[A]n uninsured motorist is one who does not carry the statutory minimum for liability coverage, or $25,000, and injury caused by such a driver would be covered by the injured individual's UM coverage." (emphasis added)), and UIM coverage is unavailable pursuant to the terms of the policy.  In other words, Weed Warrior determined that: (i) an uninsured motorist is any driver carrying less than the minimum $25,000.00 liability coverage, and (ii) an injured driver with UM/UIM coverage will collect only UIM benefits if both the UM/UIM coverage and the damages exceed $25,000.00.  According to the Supreme Court of New Mexico, it is the UM, not the UIM, that compensates the injured driver for all damages up to $25,000.00.  Hence, the Court in its MOO predicted that "the Supreme Court of New Mexico would deem Financial Indemnity's UIM coverage illusory when its UM/UIM coverage is not greater than $25,000.00."  MOO at 75; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1237.

interpretation of the Legislative intent behind § 66-5-301 remains settled law.  The Court lacks

both authority and inclination to disturb it.[39]

[39]The Court pauses long before predicting that the Supreme Court of New Mexico would reject the minority and go with the majority position, given that the majority position is less generous to insureds.  The Court is partially concerned with the age of Schmick and the trend of New Mexico insurance law over the years since 1985.  The Court has thought long and hard whether the current Supreme Court of New Mexico would do the same as it did thirty-four years ago.  The Court is not sure that the current Supreme Court of New Mexico would do the same, but as a federal district court, there are rules that restrict its predictions.  First, although the Supreme Court of New Mexico decided Schmick in 1985, it has cited Schmick twenty-seven times since then.  There is nothing to indicate that the Supreme Court of New Mexico is looking for an occasion or an excuse to reconsider Schmick.  Indeed, it has reaffirmed its central message as recently as 2013: "The statutory offset for a tortfeasor's liability coverage is contained within the formula we announced in Schmick for computing the underinsurance benefits due an insured."  State Farm Mut. Auto. Ins. Co. v. Safeco Ins. Co., 2013-NMSC-006, ¶ 20, 298 P.3d at 458.  Furthermore, it is the majority rule and the better rule, because it provides clarity to insurers and prevents insureds from receiving recovery greater than that for which they paid.  As the Supreme Court of New Mexico stated in State Farm Mutual Automobile Insurance Co. v. Safeco Insurance Co:

> Because the tortfeasor's liability limits are taken into consideration, any UIM insurer . . . should not be concerned that the insured will receive more compensation than what is permitted by the UIM statute as interpreted by case law.  We see no reason to depart from an analysis that has survived a quarter of a century.

State Farm Mut. Auto. Ins. Co. v. Safeco Ins. Co., 2013-NMSC-006, ¶ 15, 298 P.3d at 456 (citing Schmick, 1985-NMSC-073, ¶ 24, 704 P.2d at 1098).  In sum, the Court would have to disregard a lot of Supreme Court of New Mexico statements in twenty-seven cases on just a hunch or a suspicion, and it is unwilling to do that.  The Supreme Court of New Mexico has spoken; the Court will not disregard that language:

> The formula is the criterion to be used in determining underinsurance benefits due and it defines the parameters within which recoveries must stay.  Therefore, an insured collects from his underinsured motorist carrier the difference between his uninsured motorist coverage and the tortfeasor's liability coverage or the difference between his damages and the tortfeasor's liability coverage, whichever is less.

Schmick, 1985-NMSC-073, ¶ 24, 704 P.2d at 1098.

**C. BHASKER'S WELL-PLED COMPLAINT ALLEGES THAT FINANCIAL INDEMNITY'S BUSINESS PRACTICES DECEIVED AND MISLED THE PROPOSED CLASS, TO INCLUDE UIM POLICYHOLDERS WITH GREATER-THAN-MINIMUM LIMTS COVERAGE.**

The question whether the Supreme Court of New Mexico would conclude that higher limits UIM coverage is illusory has no bearing on Bhasker's claim that Financial Indemnity's policy application violated her and the proposed class members' reasonable expectations. Despite the Court's prediction that the Supreme Court of New Mexico would not conclude that the <u>Schmick</u> offset renders higher-than-minimum-limits UIM coverage illusory, Bhasker may proceed on her theory that Financial Indemnity's misleading and deceptive business practices engendered for the proposed class -- to include insureds who purchased non-minimum limits coverage -- a reasonable expectation that UIM insurance provides additional coverage when the insured's damages exceed what is available from the tortfeasor.

Bhasker's well-pled Complaint effectively extends her deceptive-and-misleading-business-practices theory to the proposed class. According to the Complaint, Bhasker asserts that she "brings this action on her own behalf, and on behalf of the many insured around the state who have been deceived by Defendant's practices." Complaint ¶ 4, at 2. The alleged deception includes Financial Indemnity's use of, according to Bhasker, an "incorrect and inappropriate form from another state," which "included ambiguous language that Plaintiff could purchase underinsured coverage in excess of her selected liability coverage limits." Complaint ¶ 27, at 4 (citing Policy Application at 1-4). Bhasker submits several documents in support: (i) Bhasker's insurance application summarizing her policy, <u>see</u> Policy Application at 1-2; and (ii) a form that Bhasker signed that features a one-paragraph description of UM/UIM coverage, <u>see</u> New Mexico Auto Supplement at 1 (Doc. 12-1)("Policy Form"). That UM/UIM description reads:

Under New Mexico Insurance Law (NMSA 1978 sec. 66-5[-]301), we are required to provide Uninsured and Underinsured Motorist coverage up to the Bodily Injury and Property Damage liability limits provided in this policy. Uninsured/Underinsured Motorist bodily injury protects the name insured, resident relatives and occupants of uninsured vehicle if any of those persons sustain bodily injury in an accident for which the owner or operator of the motor vehicle that is legally liable, either does not have insurance, is a hit and run vehicle, or has insurance in an amount less than the limit of your Uninsured Motorist Coverage. If selected, Uninsured/Underinsured Motorist limits must be the same for all the vehicles on the policy, and no less than the limits of your bodily injury liability limits. You have the right to reject such coverage, stack the coverage for bodily injury, or select higher limits of your bodily injury and property damage limits. If you choose to add together the limits of your coverage (stack) for each vehicle listed on the policy, your premium will be higher.

Policy Form at 1 (emphasis added). Bhasker alleges that Financial Indemnity "failed to state that the underinsured coverage is illusory in the event of a covered occurrence, as in this case, involving a minimally insured driver." Complaint ¶ 33, at 5. Bhasker asserts that "[a] purchase of higher limits, for example, at a premium of $201 would yield a[n] . . . underinsured indemnification to premium ration of 308/1, which compared to the purchase of minimal combined coverage for virtually no underinsured indemnification." Complaint ¶ 34, at 6. Bhasker alleges that Financial Indemnity "failed to act fairly, honestly, and in good faith when dealing with the Plaintiff [by] fail[ing] to fully inform Plaintiff of illusory underinsured coverage with a disproportionate premium/indemnification ratio when compared to the next tier of available coverage and to not materially misrepresent the terms of underinsured coverage." Complaint ¶ 35, at 6. Bhasker also avers that Financial Indemnity "misrepresented to [her] that she would benefit from underinsured coverage when they knew, or should have known, that the coverage was meaningless," and that Financial Indemnity made these misrepresentations "knowingly and willfully, with the intent to deceive and induce the Plaintiff in purchasing underinsured coverage." Complaint ¶ 29, at 5.

Bhasker asserts that Financial Indemnity misled the proposed class in the same way. See

Complaint ¶ 52, at 9 ("Upon information and belief, all underinsured applications and insurance

policies issued by the Defendant to New Mexico policyholders are uniform in all respects

material to the claims brought herein."); Complaint ¶ 73, at 15 (alleging that Financial Indemnity

"failed to deliver the quality or quantity of services applied for and purchased by Plaintiff and

other insured" by not providing sufficiently clear "applications and policies"); Complaint ¶ 83, at

17 (alleging that Financial Indemnity "misrepresented the terms of the policy sold and provided

to Plaintiff and other insureds"); Complaint ¶ 93, at 19 (stating that Financial Indemnity "failed

to provide underinsured coverage and/or denied underinsured claims for benefits to Plaintiff and

other members of the Class"). Bhasker then asserts that, because Financial Indemnity has

deceived many other New Mexicans in the same way as it deceived her, the action is "properly

maintainable as a class action pursuant to Rule 1-023 NMRA."[40] Complaint ¶¶ 53-54, at 9.

Financial Indemnity asserts that it "has clearly established that no material issue of fact

remains to be resolved" and is therefore entitled to judgment as a matter of law. MJP Reply at 2

(quoting Newsome v. The GEO Grp., Inc., No. CIV 12-0733, 2014 WL 12796733, at *1).

Bhasker, however, articulates a number of material facts in dispute. One such disputed issue is

---

[40]Bhasker proffers a class definition:

All persons (and their heirs, executors, administrators, successors, and assigns)
who, in the prior six years from the date of filing of this complaint, were a
policyholder and/or insured, of a Motor Vehicle Policy issued by defendant where
that policy did not and does not provide underinsured coverage paid for by the
policyholder, and sold and solicited by the defendant, due to the application of an
offset as set forth in NMSA 66-5-301, otherwise known as the New Mexico offset
law or being a "difference state."

Complaint ¶¶ 54-55, at 9.

that insureds with non-minimum limits UIM coverage did not receive benefits for which they paid and, thus, reasonably expected.  See MJP Response at 8.  According to Bhasker, because her policy application evidences that she reasonably expected UIM benefits, contains inaccurate statements of New Mexico insurance law, and fails to inform her about the Schmick offset, she is entitled, through discovery, to obtain similar documents, testimony, and admissions from Financial Indemnity, so that a jury may decide if Financial Indemnity's business practices misled and deceived the proposed class in the same manner.  See MJP Response at 8.  Moreover, Bhasker asserts that an additional disputed issue of material fact is whether Financial Indemnity "knew or should have known that the sale of illusory UIM coverage at higher limits would harm putative class members."  MJP Response at 8.  Financial Indemnity concedes none of Bhasker's arguments regarding what it knew or should have known.  Rather, Financial Indemnity maintains that it merely sold UIM policies in accordance with New Mexico law, which permits offsets, and thus is not liable to insureds for any resulting disappointment.  See MJP at 9; Aug. 10 Tr. at 9:17-10:6 (Hanover)(quoting from Schmick to describe how New Mexico's offset provision permits insurers to offset the UIM coverage purchased for the insured's benefit by any available liability proceeds).   Hence, the Court concludes that Bhasker asserts material facts that Financial Indemnity disputes.

In its motion to dismiss analysis, the Court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same."  Park Univ. Enters. Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244.  Bhasker has asserted facts supporting her allegations that Financial Indemnity misled her and the proposed class when selling them UM/UIM coverage, for example, that Financial Indemnity intentionally

or negligently drafted ambiguous UIM policy applications that led its insureds to believe that New Mexico is not an offset state. See Complaint ¶ 73, at 15 (alleging that Financial Indemnity "failed to deliver the quality or quantity of services applied for and purchased by Plaintiff and other insured" by not providing sufficiently clear "applications and policies"); Complaint ¶ 83, at 17 (alleging that Financial Indemnity "misrepresented the terms of the policy sold and provided to Plaintiff and other insureds"). Assuming that such factual allegations are true -- as the Court must at this stage -- Bhasker is entitled to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Because Financial Indemnity denies Bhasker's factual allegations, Financial Indemnity's request for judgement on the pleadings is inappropriate. See Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244 ("Judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."). Consequently, the Court will not as a matter of law block Bhasker's claims as to insureds who have non-minimum limits UIM coverage.

## II. FINANCIAL INDEMNITY CAN BE LIABLE TO BHASKER FOR EXTRACONTRACTUAL AND PUNITIVE DAMAGES, BECAUSE BHASKER HAS ALLEGED THAT FINANCIAL INDEMNITY'S DECISION TO SELL ILLUSORY UIM COVERAGE WAS WILLFUL OR RECKLESS.

The Court will deny the MSJ's request to grant Financial Indemnity partial judgment on the pleadings as to Bhasker's claims for extracontractual and punitive damages, because Bhasker's Complaint alleges that Financial Indemnity knew of and failed to avoid the harm to insureds that results from selling illusory UIM coverage. In the MJP, Financial Indemnity asserts that the Court may not award punitive damages "where, as here, a defendant has a

justifiable basis for its conduct," MJP at 11 (citing <u>Lite Cookies Ltd. v. Tassy & Assocs., Inc.</u>, No. CIV 08-1172 BB/WDS, 2011 WL 13162088, at *3 (D.N.M. Sept. 1, 2011)(Black, J.)("[I]ntentional breach of contract by itself is not enough to support an award of punitive damages. . . . Plaintiff must show that Defendant's acts were without justification.")), and "where, as here, the applicable area of law is unsettled," MJP at 12 (citing <u>McCann v. Coughlin</u>, 698 F.2d 112, 127 (2d Cir. 1983)("Given the unsettled state of the law on this issue . . . we decline to find that the district court's decision not to award McCann punitive damages was an abuse of discretion.").

Financial Indemnity further asserts that, "where, as here, the insurer had a legitimate basis for disputing the claim," courts have refused to award punitive damages, even for erroneous coverage determinations. MJP at 12-13 (citing <u>United Nuclear Corp. v. Allendale Mut. Ins. Co.</u>, 1985-NMSC-090, ¶ 17, 709 P.2d 649, 654 ("[S]ince there were legitimate questions regarding the amount of [the insureds] claimed damages . . . we cannot say that [the insurer's] failure to pay [the insured's] claim was malicious or in bad faith . . . . Thus, we determine that the trial court's award of $25 million in punitive damages was erroneous."); <u>T.G.S. Transp., Inc. v. Canal Ins. Co.</u>, 216 F. App'x 708, 708 (9th Cir. 2007); <u>Crenshaw v. MONY Life Ins. Co.</u>, No. 02CV2108-LAB RBB, 2004 WL 7094011, at *8 (S.D. Cal. May 3, 2004)(Bruns, J.)("[I]f there is a proper basis to dispute coverage, even an erroneous denial of a claim in breach of the insurer's contract will not by itself support tort liability . . . . Only the damages flowing from the breach of contract . . . are at issue."). The MJP discusses several cases where courts have concluded that minimum limits UIM coverage is not illusory, thereby suggesting, according to Financial Indemnity, that Financial Indemnity has a reasonable basis for

its position that minimum limits UIM coverage provides value, "and therefore did not act with the requisite animus to allow for a valid extra-contractual or punitive damages claim." MJP at 14.

The Court does not dispute that Financial Indemnity had a reasonable basis for its position that minimum limits UIM coverage provides value;[41] however, regardless whether minimum limits UIM coverage provides value, Financial Indemnity remains liable for material misrepresentations that compelled insureds to purchase its UIM coverage under the mistaken belief that such coverage entitles insureds to not only tortfeasors' liability limits but also to the full amount of UIM coverage reflected on insureds' declarations pages. If such

---

[41]Financial Indemnity is correct when it characterizes the Court as "receptive to the argument that the rare scenarios where a policyholder would benefit from a policy suggests that the policy has at least some value." MJP at 13-14 (quoting MOO at 74; Bhasker v. Kemper Cas. Ins. Co., 284 F. Supp. 3d at 1237). Had the Supreme Court of New Mexico not stated, for example, that "[a]n insured carries UIM coverage only if the UM/UIM limits on her or his policy are greater than the statutory minimum of $25,000," Weed Warrior, 2010-NMSC-050, ¶ 10, 245 P.3d at 1212, the Court would have agreed with Financial Indemnity and ruled that minimum limits UIM policies are not illusory. It is not clear, from its opinion, that the Supreme Court of New Mexico imagined all the scenarios in which UIM coverage may pay, and the Court agrees with Financial Indemnity that such scenarios -- for example, where the tortfeasor has an out-of-state policy with lower bodily injury liability minimum limits than in the state policy, or where there are multiple injured parties in an accident, such that no single policy holder will recover the entirety of the tortfeasor's liability limits, or where the insured receives less than the tortfeasor's policy limits because of a contractual exclusion for punitive damages, in which case, under New Mexico law, the insurer may not offset the full amount of the tortfeasor's liability limits -- are persuasive. The Court, however, does not write on a clean slate and must therefore conclude that Weed Warrior forecloses Financial Indemnity's claims on the illusory coverage issue.

The Court is cognizant that its conclusions may affect how litigation unfolds. Bhasker may later argue that the Court has already determined that the UIM portion of the UM/UIM coverage is worth zero dollars; that the Court has already determined that the UIM portion is illusory; and that, therefore -- for example -- the policy is void and should be rescinded. The Court, however, is not making any decisions about damages or remedies, but is trying to give Bhasker and Financial Indemnity information as much as possible to help them shape how to proceed. The Court does not necessarily foreclose any of Financial Indemnity's arguments on damages or remedies.

misrepresentations were willful or reckless, as Bhasker's Complaint alleges, then a jury may properly consider whether punitive damages are appropriate. Hence, Financial Indemnity asserts in error that only damages for breach of contract are at issue. <u>See</u> MJP at 12-13.

Bhasker's Complaint includes facts sufficient to support a plausible claim for punitive damages, and, because the Court must consider her allegations as true, "including factual allegations that the defendant was willful or reckless in its decision to continue to sell illusory coverage to consumers in this state," MJP Response at 11-12, the Court will not dismiss her punitive damage claims at this stage of the proceedings. The Court agrees with Bhasker that Financial Indemnity may possess information regarding whether it knew that it was violating New Mexico consumer protections laws, and the Court will therefore permit discovery on this issue. Discovery may produce evidence that Financial Indemnity knowingly misrepresented that it would pay out full UIM benefits in the majority of UIM claims situations, for example, by intentionally not disclosing New Mexico's status as an offset state. The Court agrees with Bhasker that such conduct "is precisely the sort of information, which, if presented to a jury, could lead to an award of punitive damages." MJP Response at 14. If discovery proves out by a preponderance of the evidence that Bhasker's assertion that Financial Indemnity engaged in misleading and deceptive business practices, punitive damages are appropriate pursuant to New Mexico law. <u>See</u> <u>Anderson Living Tr. v. ConocoPhillips Co.</u>, 952 F. Supp. 2d at 1046 ("New Mexico recognizes that, although punitive damages are not normally available for a breach of contract, a plaintiff may recover punitive damages when a defendant's breach was 'malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights.'" (quoting <u>Romero v. Mervyn's</u>, 1989-NMSC-081, ¶ 23, 784 P.2d at 998)).

The Court is not permitting Bhasker's punitive damages claim to proceed based on her theory that UIM coverage is without value, or that Financial Indemnity should have known that the mere sale of UIM coverage was harmful per se to its insureds. As stated above, the Court concludes that Financial Indemnity had a reasonable basis for enforcing the statutory offset as it did, and for asserting its position that minimum limits UIM coverage is neither illusory nor otherwise unlawful. The Court so concludes for three reasons: (i) because the illusory-coverage-at-minimum-limits question is one of first impression in New Mexico; (ii) because applying the statutory offset is a long-standing practice among New Mexico insurers; and (iii) because numerous out-of-state courts have held that a limits offset in circumstances similar to Bhasker's is not unlawful. To permit punitive damages when a defendant had a reasonable basis for its belief would disregard New Mexico's policy objectives underlying such an award. See Akins v. United Steel Workers of Am., AFL-CIO, CLC, Local 187, 2010-NMSC-031, ¶ 20, 237 P.3d at 749 ("Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future." (internal citation and quotations marks omitted)). "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'" Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152 (quoting Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 56, 40 P.3d at 461). Accordingly, absent evidence of bad faith or reckless disregard related to the solicitation and sale of Financial Indemnity's UIM policies, the Court will foreclose Bhasker's punitive damages claims. See Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14 ("To be liable for punitive damages, a wrongdoer must have some culpable mental state and the

wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." (citations omitted)). At this stage in the proceedings, however, the Court will permit further discovery requests that seek evidence relevant to Financial Indemnity's knowledge of wrongdoing. See Sanchez v. Matta, 229 F.R.D. at 654 ("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").

**IT IS ORDERED** that the requests in the Defendant's Motion for Judgment on the Pleadings and Memorandum of Law in Support, filed April 4, 2018 (Doc. 58), are denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

William Ferguson
Adrian O. Vega
Kedar Bhasker
Will Ferguson & Associates
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Kerri Lee Allensworth
Alicia M. Santos
O'Brien & Padilla, PC
Albuquerque New Mexico

--and--

Mark L. Hanover
Dentons
Chicago, Illinois

*Attorneys for the Defendant*